

**FILED**
MAR 2 3 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**ORIGINAL**

07- 79 (ESH)

## ATTACHMENT A

## FACTUAL BASIS FOR THE PLEA
## OF JAMES STEVEN GRILES

This statement is submitted to provide the Court with a factual basis for my plea of guilty to the charge of Obstruction of Proceedings Before the United States Senate in violation of Title 18, United States Code, Section 1505, filed against me in this matter.

1. On March 8, 2001, the defendant, JAMES STEVEN GRILES, was nominated to serve as the Deputy Secretary of the United States Department of the Interior ("DOI"), the Federal agency responsible for, among other things, such Native American matters as tribal recognition, gaming compacts and applications to place land into trust for gaming purposes, and distributing Federal program funds. GRILES was confirmed by the United States Senate on July 12, 2001, and upon being sworn in on July 17, 2001, served as the second-highest ranking official within DOI until he resigned effective January 31, 2005.

2. From January 2001, to March 2004, Jack A. Abramoff was a Washington, D.C. lobbyist with a law and lobbying firm identified herein as "Firm A." Abramoff's client list included Native American tribal governments operating, or interested in operating, gaming operations on designated Federal land, and others seeking Federal recognition and program funds. Abramoff also represented other entities subject to DOI oversight. Consequently, Abramoff and his clients had a substantial and recurring interest in decisions made by DOI and its officials.

3. "Organization A," which purports to be a tax-exempt organization under Internal Revenue Code Section 501(c)(4), was founded in 1997 and run by "Person A." Since its inception, Organization A operated through contributions from donors. In or about June 1998, Person A set up Organization A in Washington, D.C. Thereafter, GRILES took an active interest

in Organization A and began assisting Person A in raising funds to support Organization A until GRILES was confirmed as DOI Deputy Secretary. From sometime in 1998, and continuing through early or mid 2003, GRILES had a personal and, at times, romantic relationship with Person A. GRILES and Person A remained close friends for some time after their romantic relationship ended.

4. GRILES was introduced to Abramoff by Person A on or about March 1, 2001, a week prior to GRILES' nomination to serve as DOI Deputy Secretary. During this meeting, the three discussed GRILES' impending nomination, Abramoff's interests in DOI issues and recommending colleagues for DOI positions, and Organization A. Thereafter, at some point during his tenure as DOI Deputy Secretary, GRILES became aware of the fact that Abramoff was a substantial contributor to Organization A. GRILES has since learned that between March 2001 and May 2003, Abramoff personally and through his clients donated a total of $500,000 to Organization A.

5. As a result of GRILES' personal and romantic relationship with Person A, Person A's introduction of Abramoff to GRILES gave Abramoff more credibility as a lobbyist than Abramoff ordinarily would have had with GRILES and facilitated the building of a professional relationship between Abramoff and GRILES that ordinarily would have taken years to develop. Consequently, during GRILES' tenure as DOI Deputy Secretary, Abramoff had a unique relationship with GRILES that distinguished him from other lobbyists and allowed him access to GRILES directly and through Person A indirectly.

6. Both before GRILES' confirmation and during GRILES' tenure as DOI Deputy Secretary, Abramoff occasionally sought and received – both directly and through Person A –

GRILES' advice and intervention on various matters within the jurisdiction of DOI that directly affected Abramoff and his clients.

7. On October 20, 2005, GRILES submitted to a voluntary interview conducted by investigators for the United States Senate Committee on Indian Affairs ("Senate Committee"), which was investigating allegations of misconduct by Abramoff and others made by several Native American tribes. In the October 20, 2005 interview, the Senate investigators focused on, among other things: the level of access Abramoff had to certain officials within DOI, including Deputy Secretary GRILES; the nature and extent of GRILES' relationship and dealings with Abramoff and Person A while serving as DOI Deputy Secretary; whether GRILES, Abramoff, and Person A communicated about issues pending before DOI that directly affected Abramoff's clients; and whether GRILES, in fact, had advised Abramoff and intervened on issues pending before DOI that directly affected Abramoff's clients. GRILES was aware of the scope of the Senate Committee's inquiry prior to the commencement of his interview.

8. During his October 20, 2005 Senate interview, in an effort to conceal the true nature of the circumstances under which he met Abramoff through Person A and how and why GRILES' relationship with Abramoff developed, GRILES did not testify fully and truthfully when questioned by Senate investigators about the true nature and extent of GRILES' relationship with Person A, the person who introduced Abramoff to GRILES; how and why GRILES' relationship with Abramoff thereafter developed; and the nature of Abramoff's access to GRILES. Instead, by way of example, when asked the following questions, GRILES gave the following answers, knowing the underscored declarations to be materially false statements about his relationship with Abramoff:

Q:   How would you describe your relationship [with] Mr. Abram[of]f over time?

A:   He was a lobbyist in town, who occasionally I would see or have a discussion with. As I did with numerous, numerous other lobbyists around town. <u>No different than others</u>.

Q:   Would you describe hi[m] as a friend?

A:   No. I was friendly toward him. But I – he was not a friend of mine.

Q:   If – and what you just described represents the extent of your relationship with Mr. Abramoff? It never exceeded that?

A:   <u>No</u>.

Q:   That's as good as it got? He was another lobbyist with whom I did business. Just as I did business with many others in town?

A:   <u>That is my vision, and there was nothing unique about it</u>. Then there are lots of those people in this town, who are lobbyists, who are very personal friends of mine, but he was not one.

***

Q:   So, those communications [with Mr. Abramoff], as you s[aid] before would have been no more distinguishable from the many communications you had with the myriad of other lobbyists that come to you on a daily basis, about matters affecting their clients?

A:   <u>Yeah</u>.

Q:   Is that a fair statement?

A    <u>That is a fair statement</u>. <u>That I didn't distinguish him from anybody else</u>.

9.   On November 2, 2005, GRILES testified in public hearings held before the Senate Committee in furtherance of the Senate Investigation. Senators John McCain (R.-AZ) and Byron L. Dorgan (D.-ND), then-Chairman and Vice Chairman of the Committee, respectively, presided. Among other things, the Senators questioned GRILES about the true nature of his

relationship and dealings with Abramoff and Person A while GRILES served as DOI Deputy Secretary.

10. During his November 2, 2005 Senate testimony, in an effort to conceal the true nature of the circumstances under which he met Abramoff though Person A, and how and why GRILES' relationship with Abramoff developed, GRILES did not testify fully and truthfully when questioned by Senate investigators about the true nature and extent of GRILES' relationship with Person A, the person who introduced Abramoff to GRILES; how and why GRILES' relationship with Abramoff thereafter developed; and the nature of Abramoff's access to GRILES. Instead, by way of example, GRILES gave the following testimony, knowing the underscored declarations to be materially false statements about his relationship with Abramoff:

Griles: . . . [Abramoff] also apparently has claimed to have special access to my office on behalf of his Indian gaming clients. That is outrageous, and it is not true.

***

Griles: My relationship with Mr. Abramoff was, as with other lobbyists, nothing more, nothing less, just as it would be with Senators and other interest groups. I returned calls directly. If people called, I had those calls returned by others who had direct responsibilities.

***

Griles: . . . As I said, my relationship with Mr. Abramoff is no different than any other lobbyist.

***

Griles: . . . There was no special relationship for Mr. Abramoff in my office. It never did exist.

11. The underscored declarations identified above in Paragraphs 8 and 10 were not true, as GRILES then and there well knew for the reasons stated in Paragraphs 5 and 6.

The underscored declarations were material to the October 20, 2005 Senate interview, the November 2, 2005 Senate Hearing, and the ongoing Senate Investigation into Abramoff and others in that it was material that the Senators and Senate investigators who questioned GRILES learned the truth about the nature of GRILES' relationship with Abramoff and Person A.

12.     GRILES admits that the materially false and misleading statements and testimony described herein may have or had the effect of, or were capable of, influencing the Senate Committee's assessment of GRILES' credibility overall and the following conclusions drawn by the Senate Committee in its September 5, 2006 Final Report:

> Based on the information in its possession, the Committee cannot definitively conclude what, if anything, Griles did to assist Abramoff's clients on matters then pending at Interior. In its totality, the information described above supports relatively modest propositions, namely, that Abramoff <u>believed</u> that he had influence over Griles, either directly or through [Person A]; that Abramoff told others that he had a robust relationship with Griles or had some influence over decision-making at Interior; and that it was likely on that basis that he may have directed his Tribal clients to "contribute" to [Organization A]. However, it must be carefully said that, without more evidence, it is plausible that, in fact relying on his relationship with [Person A], Abramoff may have simply exaggerated his access to Griles to his clients.
>
> In any event, given the paucity of evidence in the Committee's possession, the Committee is unable to arrive at any definitive conclusions as to the veracity of Griles' testimony on his relationship, and interaction, with Abramoff during all times relevant. And, without a good faith basis for concern that Griles may have been untruthful with the Committee, further exploration is beyond the scope of the investigation. . . .
>
> ***
>
> . . . Unfortunately, the extent to which [Person A] actually sought to influence Interior on pending matters affecting Abramoff's clients remains unclear. Also unclear is what, if anything, Griles (who Abramoff believed was [Person A]'s contact at Interior) might have done on behalf of Abramoff's clients at Interior and (if Griles did anything) what his motives for doing so might have been.

"Gimme Five" – Investigation of Tribal Lobbying Matters, S. Rep. No. 109-325, at 244-45 (2006) (Final Report before the United States Senate on Indian Affairs) (emphasis in original).

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge filed in the criminal Information against me. I am competent to make this statement and I do so knowingly and voluntarily and because I am in fact guilty of the crime charged. I have discussed this factual basis with my attorneys, and I understand that this statement is admissible as evidence against me if I fail to comply with the plea agreement.

DATE: March 20, 2007

_____
JAMES STEVEN GRILES
Defendant

Counsel for James Steven Griles:

_____
BARRY M. HARTMAN, ESQ.
BRIAN W. STOLARZ, ESQ.
Kirkpatrick & Lockhart Preston
    Gates Ellis LLP
1601 K Street, N.W.
Washington, DC 20006
T: 202-778-9000
F: 202-778-9100

_____
STANLEY M. BRAND, ESQ.
Brand Law Group, P.C.
923 Fifteenth Street, N.W.
Washington, DC 20005
T: 202-662-9700
F: 202-737-7565