## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal No. 07-CR-079 (ESH) |
| | : | |
| | : | |
| JAMES STEVEN GRILES, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT JAMES STEVEN GRILES' MEMORANDUM
## IN AID OF SENTENCING

June 8, 2006

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
Barry M. Hartman, Esq.
Brian W. Stolarz, Esq.

Counsel for James Steven Griles
1601 K Street, NW
Washington, DC 20006

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................. 4

III. SENTENCING STANDARDS PURSUANT TO 18 U.S.C. §3553 …....……5

    A. Legal Standard for Sentencing ................................................................. 5

    B. Sentencing Factors Under 18 U.S.C. §3553(a) ...................................... 6

        1. Nature and Circumstances of the Case ........................................... 6

            a. Mr. Griles' Voluntary Decision to Testify before the Senate
               Indian Affairs Commitee ............................................................ 7

            b. Mr. Griles' Preparation for his Interview with the Senate
               Committee Staff and Testimony before the Senate Committee . 9

            c. Mr. Griles' Interview by the Senate Committee Staff .............. 11

            d. Mr. Griles' Testimony before the Senate Commitee ................ 14

            e. Post-Hearing Investigation into Mr. Griles' Testimony and
               Contacts with Mr. Abramoff .................................................... 17

        2. History and Character of the Defendant ........................................... 19

            a. Childhood and Upbringing in Rural Virginia ........................... 20

            b. Education and Beginning of Public Service ............................. 20

            c. Initial Federal Service ............................................................... 23

            d. Private Industry Work After His Initial Federal
               Service .................................................................................... 26

            e. Service as Deputy Secretary of the Interior .............................. 28

  f. Commitment to Volunteerism ..................................................... 34

  g. Return to Private Sector after Federal Service ......................... 37

  h. Overall characteristics of Honesty and Integrity ..................... 39

  i. Support of a Loving Family ........................................................ 42

 3. The Need for the Sentence Imposed .................................................. 45

 4. The Kinds of Sentences Available ...................................................... 47

 5. Applicable Advisory Guideline Range ............................................... 53

 6. Need to Avoid Unwarranted Sentence Disparities ............................ 54

  a. Home Confinement, Community Service, Probation and a Fine are Appropriate when Mr. Griles' Conduct is Compared to Others Convicted in the "Abramoff Scandal" ...................... 54

  b. Home Confinement, Community Service, Probation and a Fine are Appropriate When Mr. Griles' Conduct is Compared with Other §1505 Cases ................................................. 55

 7. The Need to Provide Restitution to any Victims of the Offense ........ 57

IV. CONCLUSION ................................................................. 57

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Criminal No. 07-CR-079 (ESH) |
| | : | |
| | : | |
| JAMES STEVEN GRILES, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

James Steven Griles, through undersigned counsel, respectfully submits the following

memorandum in aid of sentencing.  Mr. Griles respectfully requests that this Honorable Court

impose a period of probation with appropriate terms and conditions, including three months

home confinement, 500 hours of community service, and a reasonable fine.  Mr. Griles submits

that this sentence properly balances the seven sentencing factors required to be considered under

18 U.S.C. §3553, including the nature of the offense and Mr. Griles' history and character.

**I.    Introduction**

Mr. Griles comes before this Honorable Court for sentencing having pled guilty to

obstruction of the Senate Indian Affairs Committee ("Senate Committee") investigation into

"allegations of misconduct made by several tribes against their lobbyists and other

representatives."  *See* October 12, 2005 letter from Senator John McCain to Steven Griles,

Exhibit Volume II in Support of Mr. Griles' Sentencing Memorandum ("Exhibit Vol. II") at

Exhibit C-1.[1]

Mr. Griles' conduct giving rise to the offense took place on October 20, 2005 and

November 2, 2005 when he testified before the Senate Committee. Mr. Griles admitted

concealing the true nature and extent of his relationship with Ms. Federici, who introduced Mr.

Griles to Mr. Abramoff, how and why his relationship with Mr. Abramoff thereafter developed,

and the nature of Mr. Abramoff's access to Mr. Griles. *See* March 20, 2007 Factual Basis for Plea

("FBP") at ¶¶ 8, 10. During his testimony Mr. Griles acknowledged that he met Mr. Abramoff

through Ms. Federici, but he did not inform the Senate Committee that Mr. Abramoff was the

only lobbyist that he met through Ms. Federici, a person with whom he had a personal and at

times romantic relationship. Despite this fact, Mr. Griles testified that his relationship with Mr.

Abramoff was not "unique." Mr. Griles acknowledges that this information was material to the

Senate Committee investigation, and had the Senate Committee known this fact, it may have had

an effect on the Senate Committee and its investigation. FBP at ¶¶ 11, 12.

Mr. Griles' failure to inform the Senate Committee of the above described facts was

wrong and he should have been more forthcoming on this subject. Mr. Griles also acknowledges

that as a result of his personal and at times romantic relationship with Ms. Federici, Ms.

Federici's introduction of Mr. Abramoff to Mr. Griles gave Mr. Abramoff more credibility as a

lobbyist than he ordinarily would have had, and facilitated the building of a professional

relationship between Mr. Abramoff and Mr. Griles that ordinarily would have taken years to

develop.

---

[1] Two Exhibit Volumes will be filed with this Memorandum. Exhibit Volume I ("Exhibit Vol. I") contains
sentencing support letters (A-1 through A-91). Exhibit Volume II ("Exhibit Vol. II") contains Mr. Griles'
community service proposal (B-1 through B-8) and other documents referenced in this Memorandum (C-1 through
C-16).

In considering the proper sentence, Mr. Griles asks that the Court consider his 24 years of public service, his longstanding and demonstrated commitment to volunteerism and the community, and his reputation for integrity and honesty as described by the ninety-one individuals who wrote on his behalf, including a sitting Governor, a Member of Congress, three former Interior Secretaries, Democratic and Republican political activists, Chief Executive Officers of major corporations, career civil servants, teachers, and above all, his family.[2]

Mr. Griles respectfully requests that the Court also consider the context in which his misconduct occurred. First, Mr. Griles was the Deputy Secretary of a 70,000-person federal agency, and there were many days when he walked into his office and saw up to three feet of paperwork on his desk, not to mention back-to-back meetings and dozens of phone calls.[3] The vast majority of the Senate Committee's inquiry focused on contacts Mr. Griles had with Mr. Abramoff, one lobbyist, about a variety of issues that occurred three to five years before he was asked to testify. These contacts were interspersed among hundreds if not thousands of other contacts with many lobbyists, citizens and others involving countless issues.

Although Mr. Griles was not forthcoming about the circumstances under which he met Mr. Abramoff, he did his best to recall the few substantive contacts he had with Mr. Abramoff and the occasions when he talked about issues of interest to Mr. Abramoff with Ms. Federici. The plea agreement does not state that Mr. Griles lied about those specific contacts. In fact, the record shows that Mr. Griles struggled to remember the details of some of these contacts, but was unable to do so. At great personal cost, he repeatedly tried to provide more information, but

---

[2] It is worth noting that in a city where supporters of persons touched by political scandal scurry away, dozens and dozens of Mr. Griles supporters from throughout his life have come forward to ensure that the Court has an accurate and full view of who Mr. Griles really is.

[3] *See* Exhibit Vol. II, Exhibit C-10 (Mr. Griles' calendar).

was hamstrung because he could not get access to documents and records that would have helped him remember these events in more detail.

Second, Mr. Griles did not take anything of value from Mr. Abramoff or act improperly with respect to him. In fact, as Mr. Griles told the Senate Committee, he refused overtures from Mr. Abramoff for items of value, including sports tickets, the use of Mr. Abramoff's arena box at sporting and entertainment events, and the now infamous all-expenses paid golfing trip to Scotland that included a Member of Congress and others. There have been both Congressional and DOJ investigations into whether Mr. Griles took anything of value from Mr. Abramoff, or acted improperly with respect to him. Neither occurred and nothing in Mr. Griles' plea suggests otherwise.

Finally, as set forth in detail below, when seen in the context of other Abramoff-related cases and other §1505 cases from this District, Mr. Griles' conduct compels the conclusion that three months home confinement, 500 hours of community service, probation and a reasonable fine is a sufficient and proper sentence.

## II.    **Factual Background and Procedural History**

On March 23, 2007, Mr. Griles pled guilty to one count of obstruction of a Congressional proceeding pursuant to 18 U.S.C. §1505. Mr. Griles entered into a written plea agreement which set forth the relevant facts. The agreement also included the applicable advisory United States Sentencing Guidelines ("Guidelines") range. Under this criterion the offense level is 12, and the corresponding sentence range is 10-16 months. Based on this criterion, the DOJ is recommending a sentence at the lowest-end of the advisory Guidelines range (10 months) and is further recommending that this low-end sentence be split between incarceration and an alternative to incarceration such as home confinement. The DOJ has agreed that Mr. Griles may

seek a different sentence under the plea agreement, and is aware that Mr. Griles is seeking an alternative to incarceration. Although the DOJ reserved the right to object to the sentence sought by Mr. Griles, it agreed not to seek a sentence greater than the recommended 10-month split sentence.

### III.  Sentencing Standards Pursuant to 18 U.S.C. §3553

#### A.  Legal Standard for Sentencing

18 U.S.C. §3553(a) requires that the Court consider the following factors in determining a sentence: (1) the nature and circumstances of the offense; (2) the history and character of the defendant; (3) the need for the sentence imposed; (4) the kinds of sentences available; (5) the applicable advisory guideline range and any policy statements therein; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. §3553 (2007). The Court is required to consider these factors and fashion a sentence "*sufficient, but not greater than necessary*" to comply with traditional sentencing purposes. *Id.* (emphasis added).

In considering these factors, 18 U.S.C. §3661 states that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661 (2007).

Since *United States v. Booker*, 543 U.S. 220 (2005), it is clear that the sentencing Guidelines are merely advisory and in no respect binding on the Court. *Booker* requires that the Court must consider all seven factors set forth in 18 U.S.C. §3553(a), only one of which is the advisory Guidelines range. 18 U.S.C. §3553(a) (2007); *United States v. Simpson*, 430 F.3d 1177,

1186 (D.C. Cir. 2005) ("*Booker* require[s] sentencing courts to consider the §3553 factors").[4] The sentencing factors of 18 U.S.C. §3553 are discussed in detail below, and show that a sufficient and appropriate sentence in this matter should include an alternative to incarceration in the form of probation with three months home confinement and 500 hours of community service, and a reasonable fine.

B.     **Sentencing Factors Under 18 U.S.C. §3553(a)**

1.     **Nature and Circumstances of the Case**

Mr. Griles admitted concealing the true nature and extent of his relationship with Ms. Federici, who introduced Mr. Griles to Mr. Abramoff, how and why his relationship with Mr. Abramoff thereafter developed, and the nature of Mr. Abramoff's access to Mr. Griles. *See* March 20, 2007 FBP at ¶¶ 8, 10. Mr. Griles' plea agreement did not include any admissions regarding any impropriety in his contacts with Mr. Abramoff, nor did it include any suggestion that Mr. Griles accepted anything of value from Mr. Abramoff. *Id.* Indeed, the DOJ affirmed that *none* of the specific contacts between Mr. Griles and Mr. Abramoff were unlawful or

---

[4] Until recently there were two cases pending before the United States Supreme Court, one raising the issue of whether a Guidelines sentence is "presumptively reasonable," *Rita v. United States*, 177 Fed. Appx. 357 (4th Cir. 2006), *cert. granted* 127 S.Ct. 551 (2006), and one raising the issue of whether a substantial variance requires extraordinary circumstances, *Claiborne v. United States*, 439 F.3d 479 (8th Cir. 2006), *cert. granted* 127 S.Ct. 551 (2006), *dismissed as moot* 551 U.S. _____ (2007) (per curiam). Because *Claiborne* has been dismissed as moot, only the "presumptively reasonable" issue raised in *Rita* remains before the Court. The resolution of *Rita* could impact precedent in this Circuit. *See United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006) (affording a "rebuttable presumption of reasonableness" to a properly calculated Guidelines range). We respectfully submit that the presumption of reasonableness for a Guidelines sentence is not consistent with *Booker*'s requirement to consider all factors of 18 U.S.C. §3553. *See e.g. United States v. Biheiri*, 356 F. Supp. 2d 589, 594 n.6 (E.D. Va. 2005) (stating that "[n]o individual [sentencing] factor is singled out as having greater weight; instead, the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances"). Moreover, even though the exceptional variance issue is no longer before the Supreme Court, Mr. Griles' request for three months home confinement and 500 hours of community service in lieu of incarceration is not an exceptional variance, and even if it were, the facts and circumstances justify such a result. Additionally, Mr. Griles submits that recent precedent from a sister Circuit that upheld a sentence more than two-thirds from the bottom of the advisory guideline is consistent with *Booker* in analyzing the circumstances justifying a variance. *See United States v. Pasquantino*, 2007 WL 1149917 (4th Cir. Md. April 18, 2007) (unpublished) (citing precedent and holding that "[g]enerally, if the reasons justifying the variance are tied to §3553(a) and are plausible, the sentence will be deemed reasonable") *citing United States v. Moreland*, 437 F.3d 424, 433-34 (4th Cir. 2006).

improper and that Mr. Griles did not take anything of value. Moreover, the plea agreement does not suggest that Mr. Griles lied to or obstructed the Senate Committee about specific contacts with Mr. Abramoff on particular substantive issues. *Id.* In fact, when he testified Mr. Griles acknowledged that he knew Mr. Abramoff and had dealings with him, acknowledged that he met Mr. Abramoff through Ms. Federici and also acknowledged that he talked to her a few times about issues of interest to Mr. Abramoff.[5] Despite his best efforts and attempts, Mr. Griles did not recall the details of some of these events, and there is no allegation in the plea agreement that his statements in this regard were false, misleading or concealing in any way. Consequently, the details of those contacts have no place in the instant proceeding and we do not address them.[6]

### a.   Mr. Griles' Voluntary Decision to Testify before the Senate Indian Affairs Committee

On October 12, 2005, Mr. Griles received a letter from the Senate Committee requesting that he testify in connection with its investigation of "allegations of misconduct by several Indian tribes against their lobbyists and other representatives." October 12, 2005 letter from Senator John McCain to Steven Griles at Exhibit Vol. II, Exhibit C-1.

---

[5] *See* Executive Session Tr. at Exhibit Vol. II, Exhibit C-7, at p. 50.

[6] As explained *infra* at Section III(B)(1), Mr. Griles told the Senate Committee and Staff that he could not remember details of contacts he had with Mr. Abramoff and was not given access to documents that would have helped him remember. When given the chance to remember these events, he has acknowledged those that he did remember, and also acknowledged events that appear to be documented but that he did not recall. The plea agreement does not state that Mr. Griles concealed any of these details or that he misled the Senate Committee when he indicated what he could not recall certain events or details of events. Nonetheless, it is our understanding that the DOJ may file a sentencing memorandum that focuses on the very details that Mr. Griles legitimately could not recall, or was not asked about. We also understand that the DOJ will submit hundreds of the same documents that Mr. Griles was not permitted to review before he testified that relate to these events and/or the conduct of third parties. Evidence of events or facts that Mr. Griles *did not* conceal has no bearing on the sentence that should be imposed for that which he did conceal, and we respectfully urge the Court to refrain from considering it. Moreover, to the extent the DOJ seeks to present evidence of conduct of third parties wholly unrelated to Mr. Griles, such evidence is not within the scope of 18 U.S.C. §3661 which precludes the Court from limiting information in a sentencing concerning "conduct *of a person* convicted of an offense…" (emphasis added). It should, therefore, not be considered.

Mr. Griles voluntarily decided to testify before the Senate Indian Affairs Committee for several reasons. First, Mr. Griles believed that as a citizen it was his duty to provide information to Congress when requested. Second, because he had been Deputy Secretary at the Department of the Interior, he thought he could be helpful in the investigation that related to activities in his Department.[7] Third, the Senate Committee's investigation was concerned with potential mistreatment of Indian Tribes. As Deputy Secretary, Mr. Griles was substantially responsible for and familiar with the Department's trust relationship with Indian tribes. That trust relationship has a tortured history dating back many decades before Mr. Griles joined the Department and he took it upon himself to improve it.[8] Fourth, as a lobbyist who interacted with Congress and previously with this Senate Committee, Mr. Griles also believed it was incumbent on him to appear before the body in which he previously worked and provide any requested information.

Finally, the "Abramoff scandal" was the subject of massive press interest and coverage. There were numerous reports making false and outrageous allegations suggesting that Mr. Griles improperly did "favors" for Mr. Abramoff. These reports were borne of leaks of investigatory information that were incomplete, inaccurate and unfair, and impugned Mr. Griles' integrity. Thus, Mr. Griles wanted to clear his name.

---

[7] Mr. Griles' opening statement to the Senate Committee reflected his respect for the work of the Committee and his willingness to provide information: "I am appearing today voluntarily. I believe the Committee's work is very, very important. What I have heard today [regarding lobbying issues involving Indian tribes] is extremely disheartening." *See* Excerpt from November 2, 2005 Public Hearing Transcript ("Public Tr.") before the Senate Committee on Indian Affairs at Exhibit Vol. II, Exhibit C-2.

[8] Former Secretary of the Interior Gale Norton stated that: "He [Mr. Griles] took on some of the toughest and least rewarding projects. In particular, we faced the daunting challenge of reforming over a century of bureaucratic management of lands and funds held in trust for tribes and individual Indians. He put together a diverse group of tribal leaders to explore and negotiate agency reorganizations and operational improvements. *There is little way to really express the magnitude of the challenge. . .*" Former Secretary of the Interior Gale Norton letter at Exhibit Vol. I, Exhibit A-58. (emphasis added).

**b.**  **Mr. Griles' Preparation for his Interview with the
Senate Committee Staff and Testimony before the
Senate Committee**

From information provided by the Committee Staff to Mr. Griles' counsel, and from prior

hearings about which he read, Mr. Griles immediately recognized that the subject of the inquiry

– allegations of misconduct by several Indian tribes against their lobbyists and other

representatives – related to events that occurred between three and five years before his

scheduled testimony. Moreover, whatever contacts he had with Mr. Abramoff occurred in the

context of his having to deal with thousands of issues as Deputy Secretary, ranging from the

September 11 attacks, to historic litigation challenging the Department's fulfillment of its trust

obligations to American Indians, to snowmobiling in Yellowstone National Park. *See* Exhibit

Vol. II, Exhibit C-10 (Mr. Griles' calendars).

He knew that to be fully prepared and remember the details of his dealings with one

lobbyist, he needed to review relevant documents including his cell phone records, email records,

calendars, and other materials. Therefore, to prepare for his testimony and provide full and

complete information about the relevant issues, Mr. Griles immediately requested documents and

information from the Senate Committee and from the Department of the Interior through

Freedom of Information Act ("FOIA") requests. Despite repeated requests before meeting with

the Committee Staff and before testifying, he was not provided with documents that reflected his

contacts with Mr. Abramoff. *See* October 17, 2005 letter from Barry M. Hartman to Pablo

Carillo, Esq. at Exhibit Vol. II, Exhibit C-3.[9]  In fact, Mr. Griles had second thoughts about

_____

[9] This letter states that "Mr. Griles would like to appear for that [October 20, 2005] deposition, and currently intends
to, but is concerned that he will not be adequately prepared because he lacks access to documents and other
information that might assist him in providing informed and complete responses. In that regard, he has sought

appearing without being adequately prepared. *See* October 18, 2005 letter from Barry M. Hartman to Pablo Carillo, Esq. at Exhibit Vol. II, Exhibit C-4. ("As we understand it, you have had at least several weeks to carefully consider the information and documents to prepare your questions, but are declining to afford Mr. Griles the same opportunity in connection with his answers."). The Senate Committee Staff denied his document requests, and indicated an intent to subpoena him if he did not appear voluntarily. *See* October 18, 2005 e-mail from Pablo Carillo, Esq. to Barry M. Hartman at Exhibit Vol. II, Exhibit C-5. His FOIA request was largely denied also. He was not given access to emails sent by him or on his behalf. He was not given his cell phone records. He was given some of his calendars. He was not given his Ethics file.[10]

While preparing for the interview and testimony, Mr. Griles also knew that the subject of Ms. Federici might come up because that his how he met Mr. Abramoff. Mr. Griles also knew that he had a personal and at times romantic relationship with Ms. Federici when he was introduced to Mr. Abramoff. They were two single, consenting adults, and Mr. Griles believed that this relationship was private and none of the Senate Committee's business and he preliminarily decided not to reveal it.

---

records from the Department of Interior that might help him cooperate, but has not received them." *See* Exhibit Vol. II, Exhibit C-3.

[10] *See* Selected FOIA correspondence at Exhibit Vol. II, Exhibit C-6, particularly the October 19, 2005 letter denying all emails, phone logs, and Abramoff-related communications. We understand that Mr. Griles' name was on as many as 60,000 emails. Mr. Griles was given information on some proceedings within the Department relating to some of the issues that were being investigated, but he had not participated in those proceedings so they were not useful in helping him remember about his contacts with Mr. Abramoff.

c.    **Mr. Griles' Interview by the Senate Committee Staff**

The initial interview with Senate Committee Staff members, held on October 20, 2005, lasted about four hours.[11]  Mr. Griles was asked about the following issues relating to Mr. Abramoff and responded as noted:[12]

| Subject | Response at Interview |
|---------|----------------------|
| A dinner sponsored by The Council of Republicans for Environmental Advocacy ("CREA") at a private home in Washington, D.C.[13] | Remembered and acknowledged event and general circumstances at interview but did not remember details; not shown documents. |
| A photo opportunity for one of Mr. Abramoff's tribal clients with the Secretary of the Interior.[14] | Remembered event and general circumstances at interview. When Mr. Griles was finally shown documents previously denied him, it helped him remember some additional details. |
| Efforts by the Jena Band of Choctaw Indians to acquire land for gaming purposes.[15] | Remembered portions of event and circumstances at interview. |
| The Saginaw Chippewa Indian Tribe school construction demonstration program.[16] | Remembered portions of event and circumstances at interview. |
| The Coushatta Tribe of Louisiana leadership dispute.[17] | Remembered portions of event and circumstances at interview. |

---

[11] Prior to providing testimony, Mr. Griles, through counsel, contacted the DOJ to ensure that appearing before the Senate Committee would not interfere with the ongoing DOJ investigation and was told he was free to do so.

[12] All referenced excerpts from the Executive Session of the Senate Indian Affairs Committee ("Executive Session Tr."), October 20, 2005 are attached to Exhibit Vol. II, Exhibit C-7

[13] Executive Session Tr. at Exhibit Vol. II, Exhibit C-7 p. 27.

[14] *Id.* at p. 28.

[15] *Id.* at p. 40, 71-74.

[16] *Id.* at p. 41-42, 82-83.

[17] *Id.* at p. 40, 71-74.

11

| Discussions with Mr. Abramoff about his law firm, Greenberg Traurig.[18] | Recalled a meeting and conversation but was confused at interview. When Mr. Griles was finally shown documents previously denied him, it helped him remember some additional details. |
|---|---|
| Efforts to have Mark Zachares hired at the Department in the Office of Insular Affairs at the Department of the Interior.[19] | During the interview, Mr. Griles stated that "they [conversations with Mr. Abramoff about people being placed in the Department of the Interior] may not have occurred, and they may have occurred. I just – today I have not – until, if you have something that may refresh my memory, I will be more than willing to spend the time to try to review it and try to help you." Executive Session Tr. at Exhibit Vol. II, Exhibit C-7 at p. 36. |
| A letter regarding an election in the Commonwealth of the Northern Mariana Islands.[20] | Did not recall at the time. When Mr. Griles was finally shown documents previously denied him, it helped him remember some additional details. |
| A tribal insurance issue.[21] | Did not recall at the time. When Mr. Griles was finally shown documents previously denied him, it helped him remember some aspects of issue. |
| Gun Lake Tribe application to place land into trust for gaming purposes. | Did not recall issue or involvement; no evidence that his recollection was incorrect. |
| Bay Mills Indian Tribe.[22] | Did not recall issue or involvement; no evidence that his recollection was incorrect. |
| Tigua water issue.[23] | Did not recall issue or involvement; no evidence that his recollection was incorrect. |
| Mashpee tribe name recognition.[24] | Did not recall issue or involvement; no evidence that his recollection was incorrect. |

---

[18] *Id.* at p. 93-95.

[19] *Id.* at p. 37.

[20] *Id.* at p. 30-31.

[21] *Id.* at p. 102-03.

[22] *Id.* at p. 46-47.

[23] *Id.* at p. 48-49.

[24] *Id.* at p. 49.

Mr. Griles was shown five documents,[25] and at times was asked to answer questions about documents from which excerpts were read to him but which he was not permitted to see.[26] He repeatedly stated that he could assist the Senate Committee more thoroughly if he were shown documents to refresh his recollection.[27] The confusion and frustration that developed during the interview was palpable.

An excerpt from a particular exchange is instructive. In the interview, Mr. Griles was asked about a contact Mr. Abramoff had with Mr. Griles in 2001 regarding an election taking place in the Northern Mariana Islands:

**Mr. Carillo:**  Do you recall having spoken to Mr. Abramoff about the Commonwealth of the Northern Mariana Islands?

**Mr. Griles:**  I don't recall him ever discussing that with me. I didn't have any, you know issues there. You know it was managed by other people. He may have. I just don't recall the conversation with him about it.

**Mr. Carillo:**  Information that we have suggests that you may have helped -- helped Mr. Abramoff with the governor's race in the Commonwealth of the Northern Mariana Islands.

. . .

**Mr. Griles:**  **If you have something that -- you say something in your possession, it would be useful for me to see. It would simply help me recall anything of that substantive nature.**  (No document provided).

---

[25] *See* Exhibits attached to Executive Session Transcript at Exhibit Vol. II, Exhibit C-7. The Senate Committee released thousands of documents at the hearing and in connection with its Final Report.

[26] *See Id.* at p. 32. Mr. Carillo described a draft "thank you" letter from Mr. Abramoff to Mr. Griles regarding the Northern Mariana Islands election issue but did not show it to him.

[27] Mr. Griles made this request repeatedly during the Executive Session testimony. *See, e.g.,* Executive Session Tr. at Exhibit Vol. II, Exhibit C-7, pp. 31, 36, 46, 49, 52.

*See* Executive Session Tr. at Exhibit Vol. II, Exhibit C-7 p. 30-32 (emphasis and parenthetical added).  Mr. Griles' request to see any documents to refresh his recollection about this matter was denied.

Mr. Griles was also asked whether he spoke with Italia Federici regarding issues that involved Mr. Abramoff.  *See*  Executive Session Tr. at Exhibit Vol. II, Exhibit C-7, at p. 50.  Mr. Griles testified that he recalled speaking with Ms. Federici on one or two occasions, but also stated that "I just don't recall specifically."  *Id.*

Mr. Griles became increasingly frustrated at the interview, and struggled to remember events of many years past.  He repeatedly but unsuccessfully asked for documents so he could be more forthcoming.[28]  Although we do not question the Senate Committee for their tactical decision in this regard,  we do believe it is a mitigating factor that the Court can consider in determining the appropriate sentence to impose.

### d.    Mr. Griles' Testimony Before the Senate Committee

When he testified before the Senate Committee, Mr. Griles again expressed his concern about being able to recall events completely.[29]  He answered just as he did before the Senate Committee Staff.   At the public hearing, three particular incidents increased Mr. Griles' level of frustration that had previously developed during his interview with the Senate Committee Staff.  First, as he sat down at the witness table to testify, Mr. Griles was handed a three-inch binder

---

[28] When asked whether Mr. Griles received direct communications with Mr. Abramoff:  "[w]ell, I don't – if you have something specific that would say that.  I mean I have tried to recall the instances in this entire conversation this morning, or when I had interactions that would have been tribal. . . . And I think I have relayed to you all the ones I recall."  Executive Session Tr. at p. 52.  It should be noted that on this particular issue, when Mr. Griles was finally allowed to see a letter he had signed five years before on this subject, it triggered his memory and he readily acknowledged it, just has he would have done had it been shown him by the Committee Staff.

[29] Mr. Griles remarked about this lack of documents from the Committee during the public hearing: "I have not seen any other documents, Senator . . . to help with that [further recollections after the Executive Session testimony.]" *See* Public Hearing Tr. at Exhibit Vol. II, Exhibit 2 at p. 89.

containing hundreds of documents that he had been denied access in advance of his testimony. He was directed to six specific documents not shown him before, and under the television lights and cameras, asked to review, remember and respond to them.[30] This experience was unlike Mr. Griles' prior experience of testifying before Legislative Committees, when he was always provided documents and information in advance to adequately prepare for the hearing.[31] Thus, Mr. Griles was confused and angry.

Second, one of the issues raised by the Senate Committee Staff and at the hearing related to whether Mr. Griles and Mr. Abramoff had "employment discussions" relating to Mr. Abramoff's law firm, Greenberg Traurig, and the timeline for those discussions. Mr. Griles told the Staff that he recalled an instance where, at Mr. Abramoff's restaurant, Mr. Abramoff asked Mr. Griles if he would consider coming to work for his Firm.[32] Mr. Griles recalled telling Mr. Abarmoff that he had no plans to leave the federal Government.[33] He also told the Staff that this conversation occurred in the presence of one Mr. Abramoff's partners, who Mr. Griles later understood to be Greenberg Traurig's Chair of the National Governmental Affairs Practice, Fred Baggett.

---

[30] *See Id.* at p. 93. For example, Mr. Griles was asked about an email between Ms. Federici and Mr. Abramoff discussing Mr. Griles, that Mr. Griles had not been provided before the hearing and was not shown during the Executive Session testimony. *Id.* Mr. Griles later stated that "I cannot reconcile what Mr. Abramoff put in e-mails to anyone. Today, based on what I heard, I do not know if anybody can. I do not know the nature of those e-mails and what the subject was right now. They are out of context for me. I do not believe your staff showed them to me." *Id.* at 102.

[31] Mr. Griles has a long history of testifying before Legislative Committees in Virginia and even before the same Senate Committee that is the subject of this case. In every prior testimony, Mr. Griles was supplied documents and information in advance to assist the subject Committee in the most thorough and extensive manner possible.

[32] Executive Session Tr. at p. 94.

[33] *Id.* Mr. Griles also testified that he recalled bringing this to the attention of Department of Interior ethics officials to see if he needed to undertake any sort of recusal. *Id.* at 94-95.

At the public hearing, Mr. Griles was again asked about this incident.[34]  Curiously, Mr.

Baggett testified on the Panel preceding Mr. Griles, but was not asked about this issue.[35]  Mr.

Griles was asked about it, with the implication being that he was somehow negotiating for a job

and therefore should have recused himself from matters involving Mr. Abramoff's clients.[36]

During his testimony, Mr. Griles specifically referred to Mr. Baggett who he knew would

corroborate his recollection that no such negotiations occurred and that Mr. Griles had rejected

overtures from Mr. Abramoff.

Finally, prior to and at the hearing Mr. Griles was shown an email from Mr. Abramoff to

a third party saying that Mr. Griles was "our guy" at the Department of the Interior. It was not

until after the hearing that Mr. Griles discovered that the Senate Committee Staff had withheld

another email from Mr. Abramoff to Ms. Federici stating that:

> "Are you around for a chat?  I am in a most difficult situation regarding Interior and need
> your advice.  Steve is nothing but a gentleman and a great guy to me, *but he can't (or at
> least won't) discuss any of my clients with me. . .*  The problem is that, since he won't do
> so, and since you are not able to chat with him now, I am left in a real dilemma. . . . It is
> as if the Clinton guys are back in power."

*See* July 17, 2003 e-mail from Jack Abramoff to Italia Federici at Exhibit Vol. II, Exhibit C-9.

(emphasis added).

Mr. Griles' frustration over the perceived unfairness of the process cemented his view

that he would avoid answering questions on personal matters that he deemed irrelevant, and to

avoid embarrassing himself and others.  Although Mr. Griles remained committed to fully

---

[34] *See* Public Hearing Tr. at Exhibit Vol. II, Exhibit C-2, p. 104.

[35] *See* Final Report before the Committee on Indian Affairs, June 22, 2006.

[36] Mr. Griles was scrupulous in working with the Senate Ethics Office to recuse himself where appropriate. *See* excerpts from Mr. Griles' ethics file at Exhibit Vol. II, Exhibit 8.  Mr. Griles was not permitted to see his entire file.

answering questions about the contacts he had with Mr. Abramoff to the best of his ability, Mr. Griles admits he was wrong to decide for himself what was material to the Senate Committee.

**e.    Post-Hearing Investigation into Mr. Griles' Testimony and Contacts with Mr. Abramoff**

After the hearing, Mr. Griles again sought documents from the Department of the Interior to clarify any issues raised during the hearing, and finally had the chance to review some of the thousands of documents previously withheld. Some information helped Mr. Griles recall events and he submitted two clarification letters to the Committee that provided additional information. *See* January 3, 2006 and April 6, 2006 letters from Barry M. Hartman to Senator John McCain at Exhibit Vol. II, Exhibits C-11 and C-12. Even today, however, the Department of the Interior Inspector General has refused to provide certain documents, claiming an investigatory exemption under FOIA,[37] notwithstanding the fact that the investigation as to Mr. Griles is over and the DOJ has expressed no interest in the requested documents. These documents would, if provided, demonstrate that it was part of the Mr. Griles' job to be receptive to inquiries about Departmental activities from many lobbyists, private individuals, and public officials.[38]

---

[37] *See* May 7, 2007 letter from Sue Ellen Sloca, FOIA Officer, Office of the Secretary, to Barry M. Hartman at Exhibit Vol. II, Exhibit C-13.

[38] Mr. Griles responded to inquiries from citizens, lobbyists, Members of Congress and others and was particularly accessible as a public official as demonstrated by his calendar. *See* Exhibit Vol. II., Exhibit C-10 (*see* asterisks for meetings with lobbyists). Lobbyist Terry O'Connor stated that Mr. Griles was very approachable while at the Department of the Interior, and his "constants were always his candor and honesty, coupled [with] his approachability with an *open door policy to meet with and listen to any stakeholder*, irrespective of his or her point of view on the policy subject at hand." Terry O'Connor letter at Exhibit Vol. I, Exhibit A-59. (emphasis added). In fact, Mr. Griles met with dozens if not hundreds of lobbyists while he was Deputy Secretary, and he had a meeting scheduled with lobbyists on every page of his weekly calendar. *See* Steve Griles' calendars showing meetings with lobbyists other than Jack Abramoff (noted with an asterisk) at Exhibit Vol. II, Exhibit C-10. Mr. Griles had extensive contacts with lobbyists and advocacy groups ranging from the Wilderness Society to Indian Tribes, through meetings, letters, phone calls and e-mails. As lobbyist William P. Horn stated: "I continued to work with

17

Mr. Griles also asked for an opportunity to review and comment on the Report prior to publication, but this was declined. *See* June 16, 2006 letter from Barry M. Hartman to Senators John McCain and Byron Dorgan and June 19, 2006 letter from Senators John McCain and Byron Dorgan to Barry M. Hartman at Exhibit Vol. II, Exhibits C-14 and C-15.

During the post-hearing investigation into Mr. Griles' testimony and contacts with Mr. Abramoff, Mr. Griles was provided documents by the DOJ that helped him remember the details of events that he did not recall at the time of the hearing and that might reflect further the scope of contacts he had with Mr. Abramoff. Upon reflection and after review of certain documents, Mr. Griles was finally able to recall additional information regarding the contacts. He also learned facts that he still does not recall but recognizes as true. Regarding Mr. Griles' contacts with Mr. Abramoff, Mr. Griles has been advised by the DOJ that it is not alleging and has no evidence that any of these contacts were unlawful or improper.

Mr. Griles recognizes that the Senate Committee Report on tribal lobbying matters opined on his credibility. The Senate Committee knew that Mr. Griles had met Mr. Abramoff through Ms. Federici, but did not know that Ms. Federici was someone with whom Mr. Griles had a personal and sometimes romantic relationship, and was the only lobbyist that Mr. Griles had met this way.[39] Mr. Griles acknowledges that the failure to inform the Senate Committee of

---

Steve in his new role [as Deputy Secretary] and had occasion, as a private attorney, to bring issues before the Department and him. Our communications consisted of phone calls, emails, faxed notes, substantive memoranda or 'white papers' and formal letters – *all of the routine methods used to inform and persuade decision makers.*" William P. Horn letter at Exhibit Vol. I, Exhibit A-40. (emphasis added). Perhaps most importantly on the direct issue of Mr. Griles' relationship with Mr. Abramoff, former Assistant Attorney General for the United States Department of Justice Tom Sansonetti stated in his letter to the Court: "When I was interviewed by federal agents during the investigation of Steve and his dealings with Jack Abramoff, I was asked if Steve had used his high office to try and influence me on matters dealing with Indian tribes and their affairs before the Justice Department. The answer was a resounding 'no.'" *See* Tom Sansonetti letter at Exhibit Vol. I, Exhibit A-89.

[39] Mr. Griles testified that he and Ms. Federici were "friends," and that they were in fact "close friends." Executive Session Tr. at Exhibit Vol. II, Exhibit C-7 at p. 106. When Mr. Griles was asked whether he was "romantically involved" with Ms. Federici, Mr. Griles declined to answer. *Id*. at 131. The issue was dropped, and Mr. Griles

this fact may have or had the effect of, or was capable of influencing the Senate Committee's assessment of Mr. Griles' overall credibility.  FBP at ¶¶ 11, 12.

Other than as outlined in the factual basis for the Plea Agreement, Mr. Griles in good faith informed the Senate Committee about the contacts with Mr. Abramoff he could recall to the best of his ability, and in good faith sought information to help him in this effort, but plainly he did not recall everything.  The factual basis for the Plea Agreement does not suggest otherwise.  The factual basis for this plea does not suggest that Mr. Griles was intentionally untruthful about these specific contacts with Mr. Abramoff.[40]

### 2.    History and Character of the Defendant

James Steven Griles is a son of a southern Virginia sharecropper and postal clerk whose achievements were forged by hard work, commitment, and a dedication to public service.  His distinguished thirty-seven year career includes twenty-four years in various federal and state positions, including the Deputy Secretary of the Interior from 2001 to 2005.  The multitude of letters from various individuals show that Mr. Griles has been a dignified and proud public servant, principled private sector member, and a loving and caring family man and friend.

Mr. Griles' life should not be measured by his one truly aberrational act that related to the unfortunate intersection between one's personal life and public service, but by his otherwise distinguished and proud history and character as set forth below.

---

assumed, wrongly, that the issue was less important to the staff of the Committee than it was.  In fact, the Committee did not ask any questions about the relationship during the public hearing.

[40] *See* Note 6, *supra*.  Thus, it is unnecessary to this proceeding to delve into the specific facts of the contacts based on evidence not made available to Mr. Griles when he testified.  Nevertheless, Mr. Griles reserves the right to challenge any suggestion that his failure to be forthcoming about the unique circumstances of how he met Mr. Abramoff resulted in his being intentionally less than forthcoming about the actual contacts he had with Mr. Abramoff, directly or indirectly, on any issue.

### a.    <u>Childhood and Upbringing in Rural Virginia</u>

Mr. Griles was born in Clover, Virginia, a small rural area of southern Virginia. His father worked as a sharecropper and tobacconist, and his mother was a postal clerk. Many generations of the Griles family lived in this southern Virginia enclave. It is a proud town with traditional values. Mr. Griles grew up with his two brothers, who continue to reside in the Clover area. Mr. Griles' family instilled a strong worth ethic in their sons, and Mr. Griles worked on farms and a local business for summer and after-school employment.

Mr. Griles' passion for leadership and service began in high school. He was active in athletics, President of his Senior class and recipient of the Danforth Leadership Award, a prestigious national award given to individuals who exhibited leadership through service. Mr. Griles' Assistant Principal at Halifax County High School, Worth Hudson wrote that "[h]is character was exemplary and his leadership abilities were evident at this young age. . . . Leadership roles would be come the norm for Steve." Worth Hudson letter at Exhibit Vol. I, Exhibit A-41.

### b.    <u>Education and Beginning of Public Service</u>

After graduating from high school in 1966, Mr. Griles attended the University of Richmond. He received a Bachelor of Arts degree in Psychology and Economics in 1970. Mr. Griles partially funded his own education by working as a counselor with the YMCA, the Director of a Community Pool, and as a counselor with the Richmond Home for Boys. These community-based jobs not only assisted with paying for Mr. Griles' education, but also began his interest in public service.

After graduating from the University of Richmond, Mr. Griles quickly found his calling –
finding solutions to the intricate and often complex balance between economic development and
environmental preservation. Indeed, he began this career in 1970 just as the modern day
environmental movement was born[41] by joining the Commonwealth of Virginia Department of
Conservation and Economic Development ("Department"), Division of Water Resources. His
first job was a water resource technician.

His public service was soon interrupted by training in the Virginia National Guard from
August 1970 to February 1971, where he received several honors, including Honor Graduate of
his training brigade, Class President, and Distinguished Graduate of his Advanced Training
Class.  He served in the National Guard for seven years, which included two weekends a month
and two weeks every summer on active duty.  He attained the rank of E-7 Staff Sergeant[42] at the
time of his Honorable Discharge in 1977.

Mr. Griles returned to the Virginia Division of Water Resources in 1971 after he
completed his initial military training and was prepared for active National Guard duty.  He spent
nearly ten years as a career public servant with the Department of Conservation, and was
promoted to the level of Executive Assistant Director.  Mr. Griles was given the responsibility
for public policy and management of fourteen separate programs including Virginia's parks,
mining, forestry, water resources, and energy.

During his tenure at the Department, Mr. Griles added and expanded numerous parks
throughout the Commonwealth, and strengthened Virginia's environmental controls on coal

---

[41] The National Environmental Policy Act was enacted in 1969, followed quickly by the Clean Air Act and Clean Water Act. *See* 42 U.S.C. §4321 *et. seq.*; 42 U.S.C. §7201, 33 U.S.C. §1251, *et. seq.*

[42] The Final Pre-Sentence Report states that Army records only record a rank of E-4.  Mr. Griles believes this is incorrect.

mines and the hard rock mining industry.  Between 1972-1978, Mr. Griles was also instrumental in the enactment and implementation of new legislation to regulate the environmental impacts of surface mining in Virginia.

Letters from people who worked with Mr. Griles recount his hard work and dedication to the Commonwealth of Virginia and environmental issues.  Former Secretary of the Commonwealth of Virginia and Cabinet member of Governor Chuck Robb, H. Benson Dendy III stated that "[d]uring his time in the Virginia State Government . . .  [Mr. Griles] was known for his effective efforts to protect Virginia's environment and at the same time to help businesses understand how to comply with environmental regulations." H. Benson Dendy III letter at Exhibit Vol. I, Exhibit A-18.  Former Deputy Director of the Department of the Interior Office of Surface Mining Dean Hunt stated that he worked with Mr. Griles while he was a consultant to the Commonwealth and was impressed with his performance:

> I had been retained as an outside consultant to assist Virginia in developing certain regulatory programs governing coal mining.  This work involved numerous difficult and complex technical and regulatory issues. . . . In every instance, Mr. Griles dealt with the issues requiring resolution in a manner that was both fair to all parties and all constituency groups, and in accordance with the statutory requirements.  During this time I developed an immense respect for Mr. Griles on both a professional and personal level.

Dean K. Hunt letter at Exhibit Vol. I, Exhibit A-42.  Attorney and personal friend Rebecca Oblak wrote that Mr. Griles "began his career with the Commonwealth of Virginia and authored many of the mining industry statutes and regulations that were ground-breaking in our industry." Rebecca Oblak letter at Exhibit Vol. I, Exhibit A-60.

Deputy Director of the Virginia Department of Mines, Minerals and Energy Benny R. Wampler reflected on Mr. Griles' character in serving the Commonwealth of Virginia:

> [w]hile working with Steve over a period of years, I found him to be highly intelligent, honest, and one of the hardest working governmental employees I had ever known then and since.  He taught me a great deal as my mentor to avoid potential areas of conflict, to

abide by the state requirements, and to be straightforward in my actions. He is a very dedicated public servant.

Benny R. Wampler letter at Exhibit Vol. I, Exhibit A-82. James W. McGlothlin, who was CEO

and Chairman of the Board at the United Company, Mr. Griles future employer, remarked about

Mr. Griles' work while with the Commonwealth of Virginia: "[Mr. Griles] worked diligently to

promulgate new rules to protect the environment and to enforce those rules and regulations

concerning mining in our state. During that time, he was viewed as an official with the utmost

integrity and was a strict enforcer of the requirements of the law in favor of the state." James W.

McGlothlin letter at Exhibit Vol. I, Exhibit A-53.

### c.        Initial Federal Service

Mr. Griles' experience and success in the state environmental and energy regulatory

arenas opened up opportunities for federal public service. Beginning in 1981, Mr. Griles served

in the Department of the Interior as the Deputy Director of the Office of Surface Mining

Reclamation and Enforcement. The first major federal legislation designed to address the

environmental impacts of coal mining, the Federal Surface Mining Control and Reclamation Act

of 1977 ("SMCRA"), 30 U.S.C. §§1201-1328, was being implemented. Mr. Griles was

substantially involved in this effort while at the Department of the Interior.

In 1983, Mr. Griles became the Deputy Assistant Secretary for Lands and Mineral

Management, and in 1985 was nominated by the President to be Assistant Secretary for Lands

and Minerals Management in the Department of the Interior. His legislative work including

advocating for changes to SMCRA, such as advocating for the elimination of a mining

exemption (the so-called "string of pearls") that was abused by some in the coal mining industry.

Mr. Griles also worked on regulations to keep small oil field companies in business so

that oil field workers could keep their jobs. Marc Himmelstein, who worked for the American

Petroleum Institute while Mr. Griles was the Assistant Secretary, stated that

> [w]ith a number of folks inside and outside the government, Steve put together a package
> of regulatory concepts that would provide incentive to those in the industry to stay in
> business. His care for the average person has stayed with me all these years. His works
> translated into families staying together and workers keeping their jobs.

Marc Himmelstein letter at Exhibit Vol. I, Exhibit A-37. Mr. Griles also added sixteen million

acres to federally designated wilderness areas, acquired additional lands for recreational use and

ensured "wild and scenic" river designation for portions of the Rio Grande River in New

Mexico.

In September 1988, Mr. Griles received an Outstanding Service Award from the

Secretary of the Interior. As a testament to Mr. Griles' work and dedication in his initial federal

service, two Secretaries of the Interior who Mr. Griles served under during his initial federal

service wrote sentencing support letters for the Court's consideration. Secretary William P.

Clark (who was also a former member of the California Supreme Court) wrote that "Mr. Griles

served admirably under my association. More importantly, his loyalty, integrity, and discretion

always remained above question." William P. Clark, Jr. letter at Exhibit Vol. I, Exhibit A-14.

Secretary Donald P. Hodel, who succeeded Secretary Clark, had extensive contact with Mr.

Griles and "formed a high opinion of his abilities and his integrity." Donald P. Hodel letter at

Exhibit Vol. I, Exhibit A-38. Secretary Hodel stated that Mr. Griles had "great latitude in his

actions as Assistant Secretary" and "*was one of my most trusted and effective Assistant

Secretaries.*" *Id.* (emphasis added). Secretary Hodel's Deputy Undersecretary, Keith Eastin,

also reflected on Mr. Griles' commendable federal service: "Steve made the hard decisions that

made the Department function. . . . he always did his job and made decisions in the best interest

of the Department and, by extension, the American public."  Keith Eastin letter at Exhibit Vol. I,

Exhibit A-20.

Mr. Griles' outstanding service at the Department of the Interior has been recognized not

only by those for whom he worked, but by those who worked for him.  Former Department of

the Interior employee Ownie McBride Smolko stated that:

> Steve was my boss in that, my first, position in the public sector.  As a boss, mentor and
> coach, Steve always insisted that I, the rest of the team and his peers do the right things
> for the right reasons.  Although we were dealing with very difficult and controversial
> issues, Steve encouraged us to be courageous and to not shy away from the challenges,
> while at the same time making certain that we faced them with fairness, integrity and
> honesty.

Ownie McBride Smolko letter at Exhibit Vol. I, Exhibit A-72.  A career federal public servant at

the Departments of the Interior and Energy, Dr. Abraham E. Haspel, stated that when he and Mr.

Griles met to discuss an issue, Mr. Griles would often ask "what's the right thing to do for

America?" and Mr. Griles was "respectful of, and sought the best judgments of, the career civil

servants."  Dr. Haspel letter at Exhibit Vol. I, Exhibit A-35.

Another colleague who then served as Associate Solicitor for Energy and Resources at

the Department of the Interior summarized Mr. Griles' work ethic during his initial federal

service:

> I spent hundreds of hours with Steve in meetings of various sizes on a daily basis
> discussing potential policies and his authority to implement those policies under the law.
> During that time period, I came to appreciate many of Steve's admirable traits.  He is a
> loyal individual to not only the presidents and cabinet secretaries he has served but to all
> of those political and career employees that have served under him.  He is honest and
> straightforward.  He hears people out.  He runs an efficient meeting. He makes decisions
> in a firm, clear and decisive manner that leaves no doubt what he desires to accomplish.
> His leadership skills are augmented by an effusive, happy personality that makes people
> want to work for him and accomplish common goals.

Thomas Sansonetti letter at Exhibit Vol. I, Exhibit A-89.  Thus, Mr. Griles' dedication to public

service was recognized and valued by those he worked for, and those who worked for him.

**d.**     <u>**Private Industry Work After His Initial Federal Service**</u>

In January 1989, Mr. Griles left Washington, D.C. for Bristol, Tennessee and accepted employment with the United Company, a natural resources company in Bristol, Virginia. Mr. Griles used his extensive experience of federal and state mining and related laws and programs to help the company improve its compliance with a vast array of environmental laws. Among other things he helped the company reduce the incidents of environmental violations at its operations. Former CEO and Chairman of the Board of the United Company James McGlothlin stated that Mr. Griles "did an excellent job for our company to bring us to the forefront of environmental compliance. When he left our company, we were proud of our position within the industry as a company who could stand out in terms of compliance with the environmental rules and regulations. James McGlothlin letter at Exhibit Vol. I, Exhibit A-53.

Although Mr. Griles was no longer employed as a public servant, he remained active in his community through a variety of volunteer efforts. Retired Executive Vice-President and General Counsel of the United Company Wayne Bell stated that Mr. Griles had a very positive impact on Bristol: "[w]hen he came to Bristol, he was almost immediately embraced by the community. He became actively involved in the Chamber of Commerce and quickly assumed the chairmanship of the Tourism Committee. . . . he was a key to unifying the soccer leagues and organizing a region-wide tournament that brought over 125 soccer teams to Bristol. Wayne Bell letter at Exhibit Vol. I, Exhibit A-7. Mr. Bell stated that although these small community-based initiatives may be small compared to federal service, "I believe that it may be the smaller matters of life that may best be a measure of one's character." *Id.* Mr. Griles also served as President of the Bristol Soccer Association, and as a Board member for the Bristol Tennessee Electric Co-Operative.

Mr. Griles left the United Company in 1995, and returned to Washington, D.C. He joined National Environmental Strategies ("NES"), a consulting firm that focused on environmental and energy issues. At NES, Mr. Griles counseled companies and trade associations regarding policy, regulatory, environmental, and energy issues at the federal and state level. While at NES, Mr. Griles worked on several important projects, including creating a remedial health and safety program for a company with worker safety issues, helping to develop and obtain regulatory approval for a remediation plan for a superfund site, and helping private landowners obtain legislation recognizing their ownership of mineral rights.

As Mr. Griles told the Senate Committee, he was also involved in not-for-profit public policy initiatives. It was during his time in the private sector that he became a supporter of The Council of Republicans for Environmental Advocacy ("CREA"), helping it to raise money and educate the public on environmental issues. Mr. Griles called on his fellow private sector contacts to support CREA. For example, to ensure that CREA was operating properly, he enlisted the help of private attorney Ben Ginsburg.[43]

Throughout Mr. Griles' limited private sector work, he maintained the qualities of integrity and fair dealing that he forged during his public service. Daniel Scherder of Scherder and Associates stated that while in the private sector, "Steve was always considered the 'honest broker' who worked to resolve differences between the parties to reach a reasonable solution."

---

[43] The plea agreement in this matter explicitly states that Mr. Griles "began assisting Person A [Ms. Federici] in raising funds to support Organization A [CREA] *until Mr. Griles was confirmed as DOI Deputy Secretary.*" Griles Plea Agreement, ¶3. Mr. Griles acknowledged during the Senate Committee Executive Session the one occasion he recalled in which he had any understanding of Mr. Abramoff's role with funding CREA while he was Deputy Secretary: "Italia called me one – one time on my cell phone at night, pretty late. And was very upset. And said – you know I'm [sic] really don't know what to do. Mr. Abramoff – Jack is not funding my – giving us funds. And I've got to go back and find more money in order to keep the activities. . . . *I never discussed who was funding her efforts or anything with her when I was Deputy Secretary. I just didn't think that would be appropriate.*" " Executive Session testimony at Exhibit Vol. II. Exhibit C-7, p. 76. (emphasis added).

Daniel Scherder letter at Exhibit Vol. I, Exhibit A-71. Mr. Scherder also provided an example of an issue he and Mr. Griles worked on while Mr. Griles was in the private sector: "Steve was representing several oil and gas companies. Because of Steve's knowledge, integrity and personality he was able to help bring the parties together to agree on complex legislative language that worked for both coal and gas companies and was good for the state of Wyoming." *Id.*

Respect for Mr. Griles crosses political boundaries. John Northington, former Department of Energy and Interior appointee by President Clinton, stated that when Mr. Griles took clients to visit with Department officials, "[w]hat always impressed me in meetings with Steve is the respect that the career employees showed towards Steve. . . They likely didn't agree with him on matters of policy or politics, but they respected him – because he respected them and the value of their work." John Northington letter at Exhibit Vol. I, Exhibit A-57.

### e.    <u>Service as Deputy Secretary of the Interior</u>

In March, 2001, Mr. Griles was nominated by President George W. Bush to serve as the Deputy Secretary of the Interior. As the Deputy Secretary of the Interior, Mr. Griles was responsible for the daily management of the Department, which included eight bureaus, 70,000 employees and a ten billion dollar budget.[44]

Mr. Griles entered the Department in the midst of a massive and longstanding legal dispute over whether the Department had breached its trust obligations to individual Indians.[45] The issue had been brewing for many years, and when Mr. Griles arrived, over five years of

---

[44] The eight bureaus of the Department of the Interior that Mr. Griles was responsible for are Fish and Wildlife, Service, Minerals Management Service, Office of Surface Mining, Bureau of Land Management, Bureau of Reclamation, Bureau of Indian Affairs, United States Geologic Survey, and the National Park Service.

[45] The litigation is still pending and is currently styled *Cobell, et. al. v. Kempthorne,* Civil No. 96-1285 (D.D.C).

bitter litigation had already been waged.  Mr. Griles quickly became committed to trying to

resolve this litigation, and he spent more time on this issue than on any other issue during his

tenure. As a result he developed a profound, genuine, and permanent sensitivity and concern for

American Indians and the federal government's significant role in their lives.

      To help resolve these serious issues, Mr. Griles undertook a major reorganization of

Indian Trust administration to abate conflicts and inefficiencies in the way the Bureau of Indian

Affairs and Office of the Special Trustee for American Indians performed Indian-related duties.

Over *$100 million* was added to the Department of the Interior's budget for Indian trust

management and accountability.

      Former Secretary of the Interior Gale Norton stated that Mr. Griles' work on Native

American issues was extensive and critically important:

> He [Mr. Griles] took on some of the toughest and least rewarding projects.  In particular,
> we faced the daunting challenge of reforming over a century of bureaucratic management
> of lands and funds held in trust for tribes and individual Indians.  He put together a
> diverse group of tribal leaders to explore and negotiate agency reorganizations. and
> operational improvements.  *There is little way to really express the magnitude of the
> challenge*. .  . Steve's dedication and leadership brought improvements far beyond
> anything ever achieved in recent decades.

Former Secretary of the Interior Gale Norton letter at Exhibit Vol. I, Exhibit A-58 (emphasis

added).  Associate Deputy Secretary of the Interior James E. Cason stated that Mr. Griles' efforts

with various tribal leaders "have created a foundation for a much needed bridge between Indian

Tribal communities and officials at DOI." James E. Cason letter at Exhibit Vol. I, Exhibit A-12.

      Governor Bill Anoatubby of the Chickasaw Nation in Oklahoma expressed his

appreciation for Mr. Griles' work for Indian tribes:

> In observing Mr. Griles in working with tribal governments in general, he was
> instrumental in assuring that tribal governments were included in decision-making that
> would determine how best to reorganize the Bureau of Indian Affairs and the Office of

> Special Trustee for American Indians.  When he made a promise, he kept his word. . . .
> *Many tribal officials appreciated his commitment and his integrity.*

Governor Bill Anoatubby letter at Exhibit Vol. I, Exhibit A-4.  (emphasis added).

Mr. Griles also worked to resolve issues involving the protection of endangered species on the Missouri River.  Maintaining water levels to ensure transportation and recreation were required, but those levels threatened certain species (piping plovers and pallid sturgeon) that needed lower levels to nest and spawn.  Mr. Griles brought together officials from the Fish and Wildlife Service and the Army Corps of Engineers to reach a resolution to maintain minimum flows for the purposes required, but also preserve the habitats necessary for the species to thrive.  Again this issue had been divisive long before Mr. Griles joined the Department, and he was instrumental in moving it toward resolution.

Former General Counsel of the United States Environmental Protection Agency and Counselor and Special Assistant to the Secretary of the Interior Ann Klee wrote that Mr. Griles was instrumental in achieving a positive result notwithstanding all the obstacles and different interests involved:

> Steve convened several all day meetings with key staff from the Fish and Wildlife Service, the Corps of Engineers, and the interested States. . . . He demonstrated again and again that he was prepared to stand up to any attempt to exert political pressure on the Service and defend the scientific judgments of the Service, which he did.  At the same time, he was able to move the parties together towards a consensus approach, one that respected the concerns of the down-stream States, the farmers, and barge operators, while also protecting the fish and wildlife on the River.  Because he was willing to work hard and be creative, Steve was able to produce a result that protected the interests of the Department of the Interior when such a result had previously seemed impossible.  It was inspiring to watch him work on that project and achieve the result that he did.

Ann Klee letter at Exhibit Vol. I, Exhibit A-47.

Mr. Griles believed then and believes now that the best first step to protect our natural resources and outdoors is to ensure that the public understands and appreciates them.  As a result

he was instrumental in the re-launching of the Department of the Interior's "Take Pride in America" campaign. The national partnership and volunteering campaign was instituted in 1985 during Mr. Griles' initial federal service, and Mr. Griles was responsible for revitalizing the campaign while he was Deputy Secretary. Mr. Griles worked with the private sector to educate the public about the outdoors and encourage volunteerism and participation in public and private lands. Mr. Griles enlisted the assistance of spokesperson Clint Eastwood to provide valuable Public Service Announcements and commercials, and the campaign has retained its vitality today.

Letters from those Mr. Griles worked with at the Department of the Interior during his tenure as Deputy Secretary attest to his dedication to public service, his integrity, and his ability to handle serious and difficult issues.

Former Secretary of the Interior Gale Norton stated that:

[w]hen I was selected as Secretary of the Interior, Steve was an obvious choice for my Deputy Secretary. He had experience and a deep understanding of Interior issues, but he retained his idealism to believe that we could make a difference. He shared my view that finding ways to protect the environment while providing for the economic and recreational needs of Americans was an important undertaking. . . . We had one of the best, if not *the* best, working relationships of any Secretary and Deputy Secretary in the Administration.

Former Secretary of the Interior Gale Norton letter at Exhibit Vol. I, Exhibit A-58 (emphasis in original).

Former Deputy Secretary of Energy and current Chairman and CEO of The Home Depot Francis S. Blake stated that:

[w]hat I saw from numerous inter-agency 'Deputies' Meetings' was that Steve was always an active participant in policy debates and brought a fair-minded and fact based approach on every issue. Among his "Deputy" colleagues, Steve had a reputation for candor and openness, and from my own perspective he consistently focused on the public interest.

Francis S. Blake letter at Exhibit Vol. I, Exhibit A-8. Mr. Griles' Associate Deputy Secretary of

the Interior James E. Cason stated that:

> I have been with Steve on numerous occasions as he wrestled with the complexities of
> establishing and implementing public policy positions that were inescapably
> controversial. He is thoughtful, pragmatic, firm, committed, creative and consistent.
> Over the years, both in the private and public sector, Steve has been an effective advocate
> for responsible development and use of natural resources in the U.S.

James E. Cason letter at Exhibit Vol. I, Exhibit A-12. Former Assistant Attorney General Tom

Sansonetti stated that:

> Steve [was] the consummate public servant. He took on huge, complicated, and often
> unpopular, tasks for Secretary Norton within the Interior building, such as the high-
> profiled *Cobell* case involving the management of Indian Trust Fund monies. He did so
> without complaint while managing his regular portfolio of assignments as well.

Thomas Sansonetti letter at Exhibit Vol. I, Exhibit A-89. Former Assistant Secretary for

Fish, Wildlife and Parks, and California Superior Court Judge Craig Manson stated that:

> [t]hroughout his tenure as Deputy Secretary, I observed Steve Griles exercise leadership
> skills superior to any I had ever seen in the military, in state government, or in the private
> sector. He has a special skill of motivating people to get things done for the common
> good. My impression is that he never cuts corners, but gets the most difficult tasks
> done.

Craig Manson letter at Exhibit Vol. I, Exhibit A-50.

Mr. Griles' character and dedication may be best illustrated by an event wholly unrelated

to the daily work of the Department of the Interior. The tragic attacks of September 11, 2001

gave Mr. Griles an opportunity to show his commitment to his country and his dedication to

public service. On the day of the attacks, Secretary Norton was taken to an undisclosed location

and Mr. Griles was responsible for directing the Department of the Interior's emergency

response efforts through evacuation orders and the establishment of communications and

operations outside of Washington, D.C.

Over the next few days, Mr. Griles arrived at the Department at 6:00 a.m. and stood outside the building, personally welcoming each employee back to work and thanking them for returning to work. At 8:30 a.m. on September 12, 2001, Mr. Griles received a call from Secretary Norton from her undisclosed location to direct all employees to the basement of the Department due to a perceived threat. Mr. Griles quickly dispatched a response team, and gathered approximately 1,500 employees to the basement. He comforted the employees in this time of uncertainty, and when he was later informed that it was a false alarm, he gave employees the option of going home, but also encouraged them to return to work if they felt able to. The vast majority of the employees returned to work.[46]

This event is recounted because of the numerous letters submitted in connection with his sentencing that detail Mr. Griles' actions during those difficult days. Current Department of the Interior employee Sandra Streets stated that:

> [d]uring the 9/11 crisis, Steve's leadership and compassion helped DOI employees through a stressful and dangerous situation. He was personally involved in insuring that employees at the Main Interior Building were safe and well informed. After the crisis, he and Secretary Norton stood at the entrance and welcomed employees back into the Main Interior building – letting employees know that their leaders were concerned for their safety and were there for him.

Sandra Streets letter at Exhibit Vol. I, Exhibit A-75. Former Department of the Interior Senior Executive Timothy Vigotsky stated that Mr. Griles' leadership on September 11 was a "calming influence necessary during this horrific crisis." Timothy Vigotsky letter at Exhibit Vol. I, Exhibit A-81. Mr. Vigotsky stated that Mr. Griles:

---

[46] After these immediate efforts, Mr. Griles was asked to serve on a task force headed by former Pennsylvania Governor and then-Homeland Security Advisor to the President Tom Ridge to develop and manage the federal government's response to the attacks. Mr. Griles also managed the response from the Department of the Interior by reassigning law enforcement officials within the Department to needed security duties.

comforted and provided assurance that all employees would be safe and secure and that everything would be done to contact families to ascertain that spouses and children were located and also safe. . . . While leading the effort locally, Mr. Griles was also directing managers all over the country including law enforcement personnel to elevate to the highest alert level and provided clear and precise guidance to protect the land and treasures the Interior oversees.

*Id.* Mr. Griles' former employer at NES Marc Himmelstein stated that "He [Mr. Griles] inspired the employees and calmed their fears. People at the Department of the Interior still talk about that day and Steve's handling of an unprecedented situation." Marc Himmelstein letter at Exhibit Vol. I, Exhibit A-37.

## f.    Commitment to Volunteerism

Mr. Griles did not cease his volunteerism when he returned to the public sector. While Deputy Secretary, Mr. Griles accepted an invitation to be on the Advisory Board of the Jepson School of Leadership Studies for the University of Richmond,[47] and served on the Jamestown 400 Commission to properly celebrate the founding of Jamestown, Virginia.

The Chairman of the Jamestown Commission, Frank Atkinson, stated that:

Mr. Griles was a very active, engaged and substantively contributing member of the Commission from its inception until his resignation earlier this year. . . . He was active in facilitating both public and private support for commemorative programs and beneficial collaboration among multiple levels and agencies of government. . . . He did not seek the limelight, but instead lent his valuable time, considerable experience, and uncommon insights into the substantive work of the Commission.

Frank B. Atkinson letter at Exhibit Vol. I, Exhibit A-5. H. Benson Dendy also reflected that he worked with Mr. Griles on the Jamestown 400 Commission, and that:

[h]e [Mr. Griles] has given generously of his time and has worked hard to assure that the commemoration include and honor all three cultures which met at Jamestown: the Virginia Indians, the Africans, and the English. He was been deeply committed to our educational programs for young students.

---

[47] Mr. Griles' service to the Jepson School was done completely from his own resources and he volunteered his time to this important function.

H. Benson Dendy III letter at Exhibit Vol. I, Exhibit 3.[48]

Mr. Griles also showed support for American troops stationed in Iraq while he served as Deputy Secretary and after he left and encouraged others to do the same. Mr. Griles worked with "Operation Hardwood, Hoops with the Troops" a troop-morale program supported by the USO and Armed Forces Entertainment Division that sent NCAA Division I basketball coaches to the Middle East to meet with soldiers and participate in a March Madness-style co-ed basketball tournament. In August 2005, eight coaches from leading college programs went to Kuwait for the initial tournament to coach teams comprised of armed services personnel.[49] The success of the initial tournament has led to three additional tournaments, with an additional one scheduled to take place in Balad, Iraq.[50]

The individual who created Operation Hardwood, Rick Kell, wrote that "I am credited with starting Operation Hardwood. However, without Steve sharing the vision and his willingness to stand alongside and push a huge rock up a very steep hill for nearly eight months the program never would have launched. . . . Steve's footprint is all over this thinking." Rick Kell letter at Exhibit Vol. I, Exhibit B-7.

Mr. Griles also worked with other Department of the Interior employees to "adopt" units of the 101st Infantry Division and the 10th Mountain Division by providing money and goods for

---

[48] Mr. Griles remained on the Commission after he left public office, but he was not able to see this effort through to its recent fruition, highlighted by the visit of Queen Elizabeth. To avoid distracting the public's interest in this important event, Mr. Griles resigned from the Jamestown 400 Commission when the fact of his investigation was leaked to the press, apparently by government agents.

[49] The tournament was covered by ESPN and numerous commentators wrote about their experiences. An excerpt from ESPN College Basketball columnist Jay Bilas regarding the profoundly positive impact of the Operation Hardwood trip to Kuwait in 2005 is attached at Exhibit Vol. II, Exhibit B-8.

[50] Mr. Griles wishes to continue his work for an organization related to Operation Hardwood in his community service proposal. *See* Section III(B)(4), *infra*.

the troops.  Retired career Department of the Interior Senior Public Affairs Officer John Wright

wrote about the initiative to support the troops and Mr. Griles' role:

> The vision of this bold new initiative was to provide support for the soldiers serving in
> Iraq as well as their families back home.  As a basic component of the initiative, we
> adopted units of the 101st Infantry Division and the 10th Mountain Division for special
> support.  Once this initiative was up and running, Steve volunteered to spearhead this
> important effort.  We conducted a number of voluntary collections of money and goods
> or our troops for which Steve played a pivotal role.  Steve took special pride in his
> support for what our men and women in uniform were doing in Iraq and around the
> world.

John Wright letter at Exhibit Vol. I, Exhibit A-84.

Finally, Mr. Griles also participated in smaller acts of volunteerism and kindness.  Career

Department of the Interior employee Victoria Dixon wrote that "[a]s an active participant in the

Department's volunteer projects, we knew we could always count on his [Mr. Griles'] help on

the weekends and after hours, he was always ready to help, be it picking up trash along the

Potomac river in Anacostia or distributing food baskets to disadvantaged families during the

holidays."  Victoria Dixon letter at Exhibit Vol. I, Exhibit A-19.  This type of hands-on, "sweat

equity" volunteerism exemplifies Mr. Griles' life.  Although he has also provided monetary

support to numerous charitable organizations, it is his actual work for those in need that is more

valuable and instructive of his character.

Mr. Griles' federal service has been marked by honor, integrity, and dedication to the

American public and the federally-protected land of the Department of the Interior.  This

distinguished career is a far better benchmark against which this Honorable Court should view

Mr. Griles than the act of truly aberrant conduct for which he has accepted responsibility.

g.    **Return to Private Sector after Federal Service**

After Mr. Griles left the Department of the Interior in January 2005,[51] he formed a

consulting partnership, Lundquist, Nethercutt and Griles ("LNG"). While at LNG, Mr. Griles

continued working on environmental and energy issues.[52]  He helped resolve a long-term health

care issue regarding "orphaned miners," those miners who were retired from bankrupted or

reorganized mining companies that no longer provided them with the health care they needed.

Mr. Griles was able to solve this large and complicated issue by advocating for legislation to

protect the miners with a lifetime of medical benefits.

Representative Barbara Cubin of Wyoming stated that Mr. Griles was instrumental in

solving a difficult issue involving the coal industry:

> Our shared expertise and interest in how best to utilize this nation's natural resources
> brought us together time and again.  During years of work his insight helped bring about
> solutions to supply this nation with the energy it needs.  His work in helping to craft
> compromises which benefited health programs for coal miners and financial concerns for
> coal companies ended with successful legislation for both union and management in a
> milestone reauthorization of the Federal Abandoned Mine Lands Program.

Representative Barbara Cubin (R-WY) at Exhibit Vol. I, Exhibit 87.

The President of the Bituminous Coal Operators' Association, Inc., David Young, praised

Mr. Griles' work on the "orphan miners" issue, stating that:

> [f]or the last 18 months, I have worked daily with Steve in a health care coalition to
> benefit coal miners and their widows.  With Steve's leadership, the coalition was
> successful in restoring lifetime health care for 50,000 beneficiaries within the coal
> industry. *Without Steve's commitment to help these families, our cause would not have
> prevailed.*

---

[51] Mr. Griles was careful to follow ethics rules when he began consideration of post-government employment. *See*
Exhibit Vol. II, Exhibit C-8.

[52]  After leaving federal service, Mr. Griles was approached by a number of Indian Tribes to provide services to
them on gaming issues.  Unlike others who left the Department, he as consistently declined to advise or represent
them on Indian Gaming issues, despite the considerable financial rewards that it offered.

David Young letter, Exhibit Vol. I, Exhibit A-85 (emphasis added). A member of the coalition also remarked on Steve's character and integrity in this important issue: "Steve's client was one of the largest coal companies in the United States, but he never lost sight of the need to ensure that the final legislative compromise addressed the needs of these 'orphan' miners and their families." Jeffrey L. Turner letter, Exhibit Vol. I, Exhibit A-80.

The President and Chief Executive Officer of Consol Energy, J. Brett Harvey, wrote that Mr. Griles was instrumental to the success of the legislation being passed:

> [M]y company retained Steve and his firm to craft a fair solution to the difficult issue of funding health care benefits for retired miners who worked for companies that were no longer in business. Thousands of miners and their dependents were at risk of losing their health care benefits unless a solution was found. Steve was principally responsible for crafting a solution that was fair to all parties and, more importantly, provided a long term solution to the problem. . . . During the time in which he worked on this issue, he was open and honest with all the diverse interests who had a stake in the outcome. He was ultimately able to bring, and to keep, all the parties at the table for a final resolution.

J. Brett Harvey letter, Exhibit Vol. I, Exhibit A-34.

CNX Gas Corporation President and Chief Executive Officer Nicholas J. DeIuliis stated that Mr. Griles assisted his company with a major pipeline construction project, and "provided the highest quality counsel" that was "according to the highest ethical standards." Nicholas J. DeIuliis letter at Exhibit Vol. I, Exhibit A-17.

Mr. Griles commitment to volunteerism and public issues continued as well while in the private sector. Among other things he continued his work for wounded war veterans, and assisted in the "Wounded Warrior" program by raising funds for service members injured in combat.

Mr. Griles resigned from LNG in January 2007 as a result of this case.

**h.      Overall characteristics of Honesty and Integrity**

The overriding themes expressed in the ninety-one sentencing support letters are Mr. Griles' honesty, integrity, and commitment to public service.

Former Congressman and current Governor of Idaho C.L. "Butch" Otter stated that "I still believe he [Mr. Griles] is an honest, compassionate and generous individual. . . . I have come to recognize that he is a genuine man who is proud of his service to the people of our nation.  I know that he cares greatly for our country and is remorseful for his actions."  Governor Otter letter at Exhibit Vol. I, Exhibit A-61.

Mr. Griles best showed his character when "no one was looking."  Former Secretary of the Interior Donald P. Hodel stated that Mr. Griles did not accept any meals or lodging from Mr. Hodel at a ski resort once he was the Deputy Secretary of the Interior, even though Secretary Hodel and Mr. Griles were friends before Mr. Griles re-entered federal service.  Donald P. Hodel letter at Exhibit Vol. I, Exhibit A-38.  David Parker of the American Gas Association stated that even though he and Mr. Griles were long-term social friends, and Mr. Parker's organization did not have any business pending before the Department of the Interior, Mr. Griles refused to share a condominium on the Delaware shore with Mr. Parker.  David Parker letter at Exhibit Vol. I, Exhibit A-62.  Furthermore, Peter Frank of the former Kerr-McGee Corporation stated that he and Mr. Griles frequently participated in social events together, and after every instance "I would receive a call from Steve or his assistant asking the cost of the round of golf, meal, ticket, etc. . . On many occasions Steve could have let this matter slip as often it was just he and I who had participated, *but never once did he do so*."  Peter Frank letter at Exhibit Vol. I, Exhibit A-21 (emphasis added).

Former Assistant Secretary for Fish, Wildlife and Parks Craig Manson stated that his wife worked for a large non-profit that held a fundraiser involving golf cards for greens fees on prestigious golf courses, and although Mr. Griles is an avid golfer, he would not accept a free golf card. Craig Manson letter at Exhibit Vol. I, Exhibit A-50. Attorney and friend Rebecca Oblak stated that even though she was a friend, Mr. Griles refused to allow her to buy her lunch, stating that "when he took out his wallet and threw down a twenty dollar bill in my lap and said 'I can't accept even this luncheon, because I don't ever want anyone to try to make it appear improper, because you are a representative of the mining industry.' Steven would not leave the restaurant until I placed the twenty dollar bill in my purse." Rebecca Oblak letter at Exhibit Vol. I, Exhibit A-60.

Finally, William P. Horn, a former Department of the Interior employee who became a private attorney having matters before the Department, stated that:

> [A]lthough we have enjoyed a special professional and personal relationship dating back years, he did no special favors for me. He was always scrupulous about being above board, operating 'by the book' and making sure that there were neither improprieties nor appearances of any ethical improprieties.

William P. Horn letter at Exhibit Vol. I, Exhibit A-40.

Mr. Griles also prided himself on being a mentor to those who were starting their careers and providing them with insight and contacts for potential employment opportunities. Sarah Altmeyer, Mr. Griles' executive assistant at LNG, wrote that "[h]e was a wonderful mentor who wanted me to become successful in my career and life. . . . He is a close friend, mentor and was an incredible boss." Sarah Altmeyer letter at Exhibit Vol. I, Exhibit A-2. Former Assistant Secretary for the Senate Majority Denise Ramones wrote that Mr. Griles was influential to many who sought career advice and mentoring:

> When I left government almost four years ago I also left Washington, D.C. I was
> impressed with the number of people I would run into "outside the beltway" whose lives
> had been improved because Steve took the time to help them. There is the person Steve
> helped get transferred because his wife was an artist and wanted to be in Santa Fe. There
> is the person he helped get a job with industry here [Santa Fe] so that he could relocate to
> be with his aging mother. There are the Hill interns and young DOI employees who
> Steve wrote letters of recommendation for who are now practicing attorneys, geologists
> or public land specialists. . . . Since I moved . . . I have encountered many career
> Department of Interior employees who Steve mentored, supported and helped.

Denise Ramonas letter at Exhibit Vol. I, Exhibit A-66.[53] Al Collins, a former employee at NES,

wrote that Mr. Griles "was an excellent teacher and mentor to me, but also for many others.

Steve was always willing to advise folks on their careers and to forward resumes of worthy

candidates when he thought there would be a good match. I feel very lucky to have had his

guidance and advice. Al Collins letter at Exhibit Vol. I, Exhibit A-15. Mr. Collins also wrote

that Mr. Griles was instrumental in helping him find employment after he left NES:

> After working with Steve for a couple years, he suggested that I interview for a position
> with a very good company where I was hired and am currently employed. The job and
> the company are a good fit and I am extremely happy. When I was promoted a couple of
> years back, no one except perhaps my mother, was more proud of me than Steve.

*Id*. A list of individuals who Mr. Griles referred for employment unrelated to Mr. Abramoff over

the years to acquaintances, friends and colleagues for potential employment opportunities is

attached at Exhibit Vol. II, Exhibit C-16.

---

[53] Importantly, one individual who Mr. Abramoff recommended to Mr. Griles to serve at the Department of the
Interior, Mark Zachares, was not hired by Mr. Griles. Mr. Zachares ultimately pled guilty before this Court to
conspiracy to commit honest services fraud and received numerous gifts from Mr. Abramoff while he served as a
staff member to a Congressional committee. *See* Section III(6)(a), *infra*.

i.    **Support of a Loving Family**

Mr. Griles passion about public service and natural resources is significant, but pales in comparison to his commitment to his family. He is a loving and caring family man who managed to raise four children despite two difficult divorces and the long work days required in his career.

Mr. Griles' daughter Kimberly Griles Harter wrote about her father's integrity and the values he instilled in her:

> Through how he lived his life he instilled in each of us confidence in our own abilities, teaching us to dream big and reach high . . . As a father he built our family's foundation through words of truth and actions of integrity. I have committed to take those values that my father instilled in me on into my adulthood applying them in my professional and personal life. . . . He became a friend, confidant, and mentor. His love for public service inspired me to pursue a career in the federal government at the Commodities Futures Trading Commission. . . . No matter what position of authority, or power he has held in his career, his family always came first.

Kimberly Griles Harter letter at Exhibit Vol. I, Exhibit A-33.    Timothy Griles wrote that:

> [a]s his oldest son, I have 35 years of exposure to my father's behaviors and have witnessed countless examples of his dedication to living a life of honor and service. . . . [my father] taught me three things that have guided me through my life: 1) there is no right way to do a wrong thing, 2) when your values are clear, making decisions is easy, 3) always give more than you take in everything you do.

Timothy Griles letter at Exhibit Vol. I, Exhibit A-30. Timothy Griles also named his son Steven in honor of his father and the values he provided him. *Id.* Mr. Griles son Matthew wrote that his father's work inspired him to pursue a career in environmental preservation:

> My dad has passed his work ethic to me in my line of work. I am currently writing this letter from the Peruvian Amazon where I am working on an environmental remediation project that involves a Peruvian regulatory agency, an Argentine petroleum operations contractor, and a number of local native tribal groups. All of these shareholders have different agendas and interests in cleaning the water supply. I look to my father's example for inspiration on a daily basis and he is someone that guides me through both my defeats and victories here. He has taught me that through hard work, patience and

determined endurance, we can tackle complex problems with integrity and come out with positive resolutions.

Matthew Griles letter at Exhibit Vol. I, Exhibit A-28.  Mr. Griles' youngest daughter Maegan

Griles wrote that:

> My love for my father spreads beyond the paternal bonds as I have come to respect him. He has brought to my life a sense of determination, ambition and drive.  He has taught me that advancement comes from the merits of hard work.  He has provided each of his children with every opportunity, tool and advantage to succeed.  He put me through college, supported my studies, introduced me to the professional world and advised me at every turn.  His pride in my accomplishments and those of my siblings overwhelms me.

Maegan Griles letter at Exhibit Vol. I, Exhibit A-29.

Mr. Griles' friend John Ablon wrote that Mr. Griles is a dedicated and loving father to his children:  "When I initially met Steve, I was immediately impressed with his devotion as a father to his four children.  I observed as he instilled in them the lessons of hard work and perseverance – qualities he exhibits as a self-made man."  John Ablon letter at Exhibit Vol. I, Exhibit A-1. Another friend of Mr. Griles and employee of the Coors Brewing Company Richard Crawford wrote that: "I have had many opportunities to see Steve in a personal setting. . . . He is a good father . . . . He has raised four very responsible kids who are productive members of society." Richard Crawford letter at Exhibit Vol. I, Exhibit A-88.

Mr. Griles' two brothers and mother also wrote letters of support that show Mr. Griles' integrity and character.  Joe Griles, Deputy Superintendent of Halifax County School District, stated that:

> Steve's leadership, compassion, loyalty, and honor are characteristics that have made him a successful son, brother, father, grandfather, uncle, nephew and public servant. These qualities were developed at home from our parents and were expanded through church, high school, college and life.  He has always been a leader with high expectations of his family, associates and himself.  Along with high expectations, Steve is a caring person who loves his family, community, and country.

Joseph L. Griles letter at Exhibit Vol. I, Exhibit A-27.   Dwayne Griles wrote that his brother was

"more of a father figure in my life," and he has "benefited greatly from the sound advice that he

has given me over the years." Dwayne Griles letter at Exhibit Vol. I, Exhibit A-25.  Dwayne

Griles also stated that his brother has stepped in to assist with the financial needs of their mother,

including providing her money to buy Christmas presents for her expanding family.  *Id.*

      Mrs. Elsie Neal Griles wrote that her son is a "most considerate and devoted father of

four wonderful children and three grandchildren, all of whom love and respect him now as an

honorable and generous man." Elsie Neal Griles letter at Exhibit Vol. I, Exhibit A-26.  Mrs.

Griles also wrote that she knows her son as a "person of high integrity who has given the best

that he has for God, his family and his country."  *Id.*

      Based on Mr. Griles' lengthy and dignified record of public service, his service to the

community, his long-standing record of charitable works, and the multitude of letters of genuine

support for Mr. Griles from all stages of his life, incarceration would be far greater than

necessary to satisfy the Court's sentencing obligations in this case. *See United States v. Jemal*,

Criminal No. 05-0359 (D.D.C. 2007) (the court sentenced the 64-year-old business developer

convicted of wire fraud after trial to five years probation and a $175,000 fine rather than three-

year advisory guideline sentence based on his distinguished career filled with charitable acts and

service to the community); *United States v. Arthur*, U.S. Dist. LEXIS 93819 at *27-32 (E.D.

Wis. Dec. 22, 2006) (the guideline range was greater than necessary to satisfy sentencing

purposes, and the court found that "the guidelines did not account for the defendant's

significantly positive personal characteristics, as reflected in her good works and the many letters

received" which showed that the defendant was "caring, responsible, and eager to help others");

*United States v. Toback*, 2005 U.S. Dist. LEXIS 6778, at *10-16 (S.D.N.Y. 2005) (first-time

offender's distribution of a controlled substance was an aberration spanning a "short period of time" among an otherwise "law-abiding life" devoted to his family, and  the court imposed three years of probation and home confinement rather than the advisory guidelines range of 10 to 16 months of imprisonment); *United States* v. *Kuhn,* 351 F. Supp. 2d 696, 705 (E.D. Mich. 2005) (downward departure from 21 to 27 months to six months in a community correctional center based on defendant's community involvement and employment history in the public sector exemplified by "a large volume of letters submitted on the defendant's behalf from individuals, including community and civic leaders, that are compelling and urge leniency").

### 3.    The Need for the Sentence Imposed

Since *Booker*, courts are permitted to engage in more "individual outcomes and the traditional goals of retribution, deterrence, incapacitation and rehabilitation" rather than uniform sentencing under the Guidelines.[54]

A prison sentence is not needed to punish Mr. Griles and ensure that this crime will never be repeated. Mr. Griles is 59 years old.  He has spent two-thirds of his career as a public servant. The prospects of resuming public service after this conviction are dim if not nonexistent.  It is equally unlikely that Mr. Griles will ever be able to pursue a career as a lobbyist as he has been convicted of obstructing the same body he would be lobbying for clients.  Mr. Griles also faces collateral civil consequences such as not being able to vote, which is particularly important for a man who has been active in political issues for over thirty years and has consistently exercised this privilege.  Thus, sentencing Mr. Griles to prison in order to ensure that he does not repeat his crime serves no purpose.

---

[54] Mark Bosler, Uniformity and Traditional Sentencing Goals in the Age of Feeney, 16 Fed. Sent. R. 253 (April 2004).

The fact that Mr. Griles has pled guilty to a felony and has effectively ended his career is significant and sufficient deterrence to others who are contemplating responding to a Congressional subpoena or voluntarily appearing before the body – incarceration is simply not necessary to achieve this goal. *See United States v. Myers*, 353 F. Supp 2d 1026, 1031-32 (S.D. Iowa 2005) (three months of probation rather than a 20-30 month advisory guideline sentence was sufficient for punishment and deterrence where the defendant was of strong character, posed no threat to the community, and would be described as a felon for the remainder of his life).

Mr. Griles respectfully submits that a sentence of imprisonment could have a different and unintended deterrent effect – it could deter others from testifying before Congress. Congressional committees have an important and crucial role in our system of government. Congress cannot be expected to consider and enact new legislation or improving existing laws without having an adequate understanding of what issue must be addressed, why they must be addressed and how best to address them.  Congressional investigations are sometimes crucial to that effort, and the willingness of the individuals to come forward and testify is sometimes essential if any investigation is to be meaningful.

But Congress is not a courtroom. It does not operate under the same rules. Witnesses are not always given the opportunity to be fully prepared.  They have no right to the evidence being considered by their questioners.[55]  Competing issues sometimes constrain Congressional fact

---

[55] *See* Roberto Iraola, Self-Incrimination and Congressional Hearings, 54 Mercer L. Rev. 939, 958 (2003) ("Court's have recognized that a witness's right to due process in the context of a congressional investigation differs significantly from that of a criminal investigation.  For example, witnesses appearing before congressional committees typically are not afforded the opportunity to present evidence or to cross-examine other witnesses who they believe may have defamed them.").

finding efforts. As a result, more and more witnesses are refusing to testify, making Congress'
job more difficult.[56]

      This issue has been recently debated in connection with the failure of a former official
in the Department of Justice to testify before Congress for fear of a "perilous environment in
which to testify," forcing a political standoff in which the former official was granted
immunity.[57]  Charges of lying to and obstructing Congress have been thrown about against the
very authorities seeking to impose a prison sentence on Mr. Griles.

### 4.    The Kinds of Sentences Available

      Mr. Griles acknowledges that he has pled guilty to a serious offense, and that the
maximum penalties are five years of incarceration and a $250,000 fine.  Mr. Griles also
acknowledges that the applicable advisory guideline range is 10-16 months incarceration, and
that the government is seeking a 10 month "split sentence."  Mr. Griles respectfully submits that

---

[56] Indeed the Final Senate Report noted that "In the course of the Committee's investigation, several witnesses
declined to provide the Committee with important information under oath, citing their right to self-incrimination
under the Fifth Amendment to the U.S. Constitution, or indicated that they intended to assert their Fifth Amendment
right if called to testify." *See* Final Report before the Committee on Indian Affairs, June 22, 2006. *See* R. Iraola,
*supra* note 55 at p. 968-969 ("Congressional investigations and their attendant hearings are a permanent fixture of
our democracy. Unquestionably, they can accomplish a range of objectives broader than any single criminal
prosecution or series of prosecutions.  In recent years, the congressional preference to forego full-blown and timely
hearings by declining to immunize witnesses for fear of the impact such immunity will have on a possible future
criminal prosecution displays a cynicism about Congress because 'it suggests that little worthwhile can come of a
congressional hearing, and that any prospect of a criminal conviction should be enough to forego the pointless
spectacle of hearings.' When subpoenaed witnesses are derided and disparaged for invoking their constitutional
privilege against self-incrimination that cynicism inevitably grows").

[57] *See* "Aide to Gonzalez Won't Testify," *Washington Post*, March 27, 2007.  The article cited an attorney for
another witness who did testify before Congress stating that "[h]earings in a highly politicized environment like this
can sometimes become a game of 'gotcha,' which may force people not to testify at all if they fear incarceration if
they fail to state certain pieces of information; *see also* "Dealer's Choice," *Legal Times*, May 28, 2007 (Former
Executive Assistant to presidential adviser Karl Rove Susan Ralston seeking immunity before testifying before
Congress even though her counsel stated that "Susan did not violate the law in any way. However. . . she is not
comfortable answering further questions without some comfort that her words won't be used to hurt her unfairly.").
A recent editorial in the Washington Post also reflects this concern:  "[n]o lawyer is going to be thrilled about letting
a client testify in today's political environment."  Richard Cohen, "Candor? Call the Special Prosecutor,"
*Washington Post*, April 17, 2007.  Mr. Cohen also wrote that "only a fool would appear before Congress without
attempting to bargain for immunity by first invoking the Fifth Amendment." *Id*.

in this case, the appropriate sentence is probation, three months of home confinement, 500 hours of community service and a reasonable fine.[58]

The Court has the opportunity to permit Mr. Griles to create something positive from his failure to be fully forthcoming with Congress by permitting him to serve his sentence under probation with three months of home confinement, 500 hours of community service and a reasonable fine.

Mr. Griles' unique and valuable skills and experience should be put into action for the community rather than wasted during a period of incarceration.[59] *See United States v. Posner*, 694 F.Supp. 881, 883-84 (S.D. Fla. 1988) (defendant received probation with community service for tax fraud in lieu of prison due to "the public nature of his sentence and service" and his "extraordinary financial, managerial, and organizational talent" which was "capable of providing an immense benefit to the community" in working 20 hours a week for homelessness prevention organizations); *United States v. Mitsubishi International Corp., et. al.*, 677 F.2d 785, 787 (9th Cir. 1982) (corporate defendant required to loan a company executive for one year to the National Alliance for Business in its development of its Community Alliance Program for Ex-Offenders and contribute to that program); *United States v. Arthur*, 602 F.2d 660, 664 (4th Cir. 1979) (defendant sentenced to probation with the condition that he accept full-time employment without salary at a charitable organization – court held that "[t]he donation of charitable services

---

[58] Although Mr. Griles has certain assets, his prospects of future employment in his profession are dim. He has sold his car and sold real estate, and cashed in certain life insurance policies. He incurred significant legal fees in connection with his efforts to testify before the Senate Committee, and in connection with this investigation. The assets he has left may well need to support him for the rest of his life, as he will likely no longer be employed as a lobbyist. Therefore, a fine at the high-end of the advisory fine guideline is not appropriate, and Mr. Griles respectfully requests a reasonable fine of $15,000.

[59] Governor Butch Otter of Idaho states in his support letter (unsolicited by Mr. Griles) that "[c]ommunity service will fulfill the public interest in rehabilitating the man and in restoring the people's faith in a valuable public servant." *See* Governor Otter letter at Exhibit Vol. I, Exhibit A-61.

to the community is both a deterrent to other potential offenders and a symbolic form of restitution to the public for having breached the criminal laws").

In connection with this request, Mr. Griles proposes that he undertake up to 500 hours of community service for two non-profit organizations, one dedicated to educating underprivileged children on the values and importance of our natural resources, Wonderful Outdoor World ("WOW"), and the other dedicated to assisting soldiers wounded in the Iraq war ("Operation Coaches and Warriors"). Each is described below and in Exhibit Vol. II, Exhibits B-1-4 and B-7-8. Mr. Griles has skills and experience that are uniquely suited for both organizations. Neither organization could afford to 'hire' the kind of expertise Mr. Griles can provide, and he respectfully submits that significant community service to these organizations is a more productive and fruitful way to make amends for the conduct than is incarceration.

First, Mr. Griles proposes that he perform his community service for WOW. WOW is an outdoor outreach program that began in 1995 and seeks out inner-city youths for camping trips and to educate the youths on the benefits of exploring the outdoors. *See* Information on WOW and its programs at Exhibit Vol. II, Exhibit B-1.[60] WOW currently conducts a variety of outdoor educational and recreation activities for youths in the District of Columbia, California, Utah and New Mexico. WOW seeks to expand its operations to other states, and also seeks to expand is program offerings including "WOW on the Water" and "WOW on the Road" to take urban youths on water-based trips and road trips to various park locations.

---

[60] For more information on WOW, please see www.funoutdoors.com/coalitions/wow; last visited on June 8, 2007; *see also* "Groups Aim to Plant Seeds With Kids," *USA Today*, November 22, 2006, at Exhibit Vol. II, Exhibit B-2, and "Nature Programs' Goal: No Child Left Inside," *USA Today*, November 22, 2006, at Exhibit Vol. II, Exhibit B-3.

WOW needs an individual with Mr. Griles management experience and knowledge of the outdoors to plan and implement the expansion of its program as outlined in its November 2006 WOW Futures Task Force Report. *See* Copy of November 2006 Task Force Report at Exhibit Vol. II, Exhibit B-4. WOW's Board of Directors has authorized the request that the position of National Counselor and Strategic Planning Coordinator be assigned to Mr. Griles as community service in this case. Mr. Griles' functions will be three-fold: (1) identifying new public and private partners for WOW operations in existing cities and for start-up cities; (2) improving the communication of existing programs with government entities and media, and (3) securing financing to implement the "WOW on the Road" program to expand operations to additional cities. *See* WOW Position Description at Exhibit Vol. II, Exhibit B-5. WOW founder Derrick Crandall also wrote a support letter for Mr. Griles, stating that "I have always found him [Mr. Griles] to be honest, committed to the core mission of my organization (connecting Americans with our legacy of the Great Outdoors) and hard-working. . . . Steve has joined us for WOW programs here in DC, helping to introduce Anacostia kids to the fun of canoeing and camping. We are preparing to dramatically augment WOW beginning this summer, and Steve has helped us consider ways to do this." Derrick Crandall letter at Exhibit Vol. I, Exhibit A-16 .[61]

Second, Mr. Griles can dedicate substantial time to a program called "Operation Coaches and Warriors." Operation Coaches and Warriors is an outgrowth of the successful Operation Hardwood Program, which is supported by the USO and the Armed Forces Entertainment Division. The new program is designed to help create a connection and morale builder between an injured soldier and a college or university through its athletic programs. The program would

---

[61] Photographs of WOW events are attached at Exhibit Vol. II, Exhibit B-6 for the Court to review regarding Mr. Griles' community service proposal.

start by providing the wounded soldier information and memorabilia from their favorite college or university team signed by the coach and would also offer them the opportunity to create a relationship with that coach and the university and to attend events at the school when their injuries permit.

Operation Hardwood founder Rick Kell stated that Mr. Griles has been supportive of this new program and that: "to build out this program properly will take significant time and effort. . . . His [Mr. Griles'] integrity and sense of honor for country have been and will remain among his greatest assets that he so willingly brings to the correct tables." Rick Kell letter at Exhibit Vol. II, Exhibit B-7.  Mr. Kell proposes that Mr. Griles volunteer his time to recruit and build the database of participating coaches for the program, coordinate public relations activities, and facilitate the communication between the coaches and the soldiers.  *See* Description of the Operation Coaches and Warriors Program and Mr. Griles' proposed role with the organization at Exhibit Vol. II, Exhibit B-8.

This Court has been receptive to requests to serve alternative sentences including home confinement and community service when called for by the individual circumstances of the case, notwithstanding when incarceration is requested by the government.  *United States v. Agee*, Criminal No. 05-351 (D.D.C. 2006) (well-respected family man with a dignified career as a DEA agent made a lapse of judgment by falsifying forms for reimbursement of official expenditures – the court imposed four years of probation including 300 hours of community service and 6 months of home confinement); *United States v. Johnson*, Criminal No. 05-240 (D.D.C. 2005) (the government recommended a prison sentence at the low end of the advisory guidelines range of 6 to 12 months for wire fraud, and the court sentenced the defendant to three years of probation including 6 months of home confinement and 180 hours of community service);

*United States v. Barker*, Criminal No. 05-0021 (D.D.C. 2005) (although the government argued for one month of imprisonment for making false statements in a passport application, the court sentenced the defendant to two years of probation including one month of home confinement); *United States v. Robb*, Criminal No. 03-254 (D.D.C. 2003) (defendant received three years probation with six months of home monitoring and 50 hours of community service for a four-year course of conduct involving submitting false vouchers for CJA Panel investigative work).

Other cases in this District show that home confinement and community service are appropriate sentencing alternatives. *See United States v. Hsia*, Criminal No. 98-00057 (D.D.C. 2001), *aff'd*, 30 F.App'x. 1 (C.A.D.C. 2001) (unpublished) (Political fundraiser sentenced to three years of probation including 90 days of home confinement and 250 hours of community service for five counts of filing false statements with a government agency over government's request for incarceration); *United States v. Kanchanalak*, Criminal No. 98-00241 (D.D.C. 2000) (Political fundraiser sentenced to three years of probation and 200 hours of community service for participating in a conspiracy to cause false statements to be made to the Federal Election Commission in connection with $690,000 of foreign political contributions).[62]

---

[62] Another sentence from this District that is instructive is that of Former National Security Advisory Sandy Berger, who received a $50,000 fine and 100 hours of community service for violating 18 U.S.C. §1924 (unauthorized removal and retention of classified material) in connection with his role in removing documents from the National Archives in connection with his testimony before the September 11 Commission. *See United States v. Berger*, Crim. No. 05-157M (D.D.C. Sept. 13, 2005). Mr. Griles respectfully suggests that his conduct is somewhat analogous to Mr. Berger's in its isolated and aberrant nature, and recognizes that because Mr. Berger pled guilty to a misdemeanor and Mr. Griles to a felony, Mr. Griles should be sentenced to home confinement and a lengthier community service period.

**5.     Applicable Advisory Guideline Range**

As noted above, the applicable advisory guideline level is 12 with a corresponding sentencing range of 10-16 months.  The DOJ has agreed to a recommend a low-end split sentence and will not seek an upward variance. Mr. Griles seeks a variance from this advisory Guideline range to request a sentence of probation with three months of home confinement, 500 hours of community service and a reasonable fine.

Following the Supreme Court's holding in *Booker*, this Court is "no longer . . . tied to the sentencing range indicated in the Guidelines." *Cunningham v. California*, 127 S.Ct. 856, 857 (2007); *see also  Dorcely,* 454 F.3d at 375 ("In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it.").  Thus, the sentence requested in this case is permitted pursuant to 18 U.S.C. §3553. *See United States v. Pasquantino*, 2007 WL 1149917 (4th Cir. 2007) (unpublished) (variance of more than two-thirds from the bottom of the applicable advisory Guideline range upheld under sentencing goals of 18 U.S.C. §3553).

The Guidelines are merely one of seven factors for the Court to consider, and although Mr. Griles acknowledges that this factor suggests a period of incarceration, this is the only factor that supports such a result, and the totality of all the applicable sentencing factors favors a sentence of probation with three months of home confinement, 500 hours of community service and a reasonable fine.

6.      **Need to Avoid Unwarranted Sentence Disparities**

    a.      **Home Confinement, Community Service, Probation and a Fine Are Appropriate when Mr. Griles' Conduct is Compared to Others Convicted in the "Abramoff Scandal"**

       Three months home confinement, probation and community service rather than incarceration is appropriate when Mr. Griles' wrongdoing is compared with others who have been convicted or pled guilty based on conduct related to the so-called "Abramoff scandal." These other individuals share several things in common: (1) they took something of value from Mr. Abramoff; (2) they had interactions with Mr. Abramoff that were improper, (3) in most cases involved wrongdoing based on patterns of conduct; and (4) all were employed in government service when they committed their offenses.[63] Mr. Griles did none of these things.

       When compared to the other criminal actors in the "Abramoff scandal," a sentence of probation is appropriate for Mr. Griles. Mr. Griles did not take anything of value and in fact expressly and affirmatively rejected an overture by Mr. Abramoff that Mr. Griles go on the

---

[63] *See United States v. Zachares*, Criminal No. 07-106 (ESH) (D.D.C. 2007) (received gifts such as $10,000 cash, numerous free rounds of golf, and more than forty free tickets to sporting events and concerts – Mr. Zachares falsified forms to conceal the gifts and developed a two-year plan in which he would work for Mr. Abramoff's interests on Capitol Hill); *United States v. Heaton*, Criminal No. 07-042 (ESH) (D.D.C. 2007) (received gifts such as an all-expenses-paid golf trip to Scotland by private jet worth over $160,000, an all-expenses-paid gambling trip, and the use of box suites at sporting events – Mr. Heaton falsified forms to conceal the true amount of money received from Mr. Abramoff); *United States v. Volz*, Criminal No. 06-119 (ESH) (D.D.C. 2006) (same); *United States v. Ney*, Criminal No. 06-00272 (ESH) (D.D.C. 2006) (took numerous things of value such as an all-expenses paid golfing trip, vacations, tickets to sporting events and concerts, and numerous meals and drinks at Mr. Abramoff's restaurant and engaged in an ongoing course of criminal conduct in his dealings with Mr. Abramoff); *United States v. Rudy*, Criminal No. 06-082 (ESH) (D.D.C. 2006) (received gifts such as an all-expenses-paid trip to California by private jet and the use of a box suite for a bachelor party and perpetrated a fraud with Mr. Abramoff to receive charitable contributions); *see also United States v. Safavian*, 2006 U.S. Dist. LEXIS 83170 (November 16, 2006) (Friedman, J.) (Mr. Safavian traveled to Scotland with Mr. Abramoff and other individuals and "engaged in a series of separate concealments and falsifications" that were "done in a different year, each … directed at a different entity, and each . . . done in a wholly different fashion."); *United States v. Stillwell*, Criminal No. 06-300M (D.D.C. 2006) (Department of the Interior employee received sporting event and concert tickets from Mr. Abramoff and did not properly report the gift pled guilty to a misdemeanor and was sentenced to probation).

infamous Scotland trip.[64]  Also, as the DOJ will acknowledge, *none of Mr. Griles interactions with Mr. Abramoff are alleged to be improper.*

     **b.**     **Home Confinement, Community Service, Probation and a Fine Are Appropriate when Mr. Griles' Conduct is Compared with Other §1505 cases**

Viewed in the context of other §1505 cases from this jurisdiction, a sentence of probation is appropriate for Mr. Griles. Our research indicates that only two defendants have been sentenced to incarceration for §1505-related convictions in this District[65] while the majority of cases have been resolved with alternatives to incarceration.[66]

The case most analogous but far more serious than Mr. Griles' case was resolved with a $10,000 fine and not even a sentence of probation. *United States v. Cisneros*, 26 F.Supp. 2d 24 (D.D.C. 1998). In *Cisneros*, Mr. Cisneros was charged with 18 felonies including a conspiracy to withhold information from and make false statements to various governmental entities as well as payment of "hush money" to a woman with whom he was having an affair so Mr. Cisneros would be nominated Secretary of Housing and Urban Development. Mr. Cisneros pled guilty to one count of a false statement and received a $10,000 fine with no incarceration or probation.

---

[64] Mr. Griles stated the following about Mr. Abramoff's offer: "I said, Mr. Abramoff, if I go to Scotland I'm going on a commercial flight, and I'll pay for my green fees." *See* Excerpt from Executive Session Testimony at Exhibit Vol. II, Exhibit C-7, p. 119.

[65] *See United States v. Safavian*, 2006 U.S. Dist. LEXIS 83170 (November 16, 2006) (Friedman, J.) (18 months for a series of separate concealments and falsifications involving his relationship with Mr. Abramoff); *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994) (forty-three month sentence for an egregious conspiracy involving bribery, kickbacks, deception of investigators, falsification of documents, and the concealment of material facts through intimidation of witnesses)

[66] *See United States v. Landis*, 04-CR-098 (D.D.C. 2006) (two years probation, $10,000 fine and 260 hours of community service for obstructing an Securities and Exchange Commission investigation into a securities fraud); *United States v. Levine*, 94-CR-00034 (TPJ) (D.D.C. 1996) (three years probation, six months home confinement and 500 hours of community service for testifying falsely about illegal payments made to FDA chemists before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce); *United States v. Cuozzo*, 92-CR-00491 (GAG) (D.D.C. 1993) (two years probation, six months of home confinement, and 187 hours of community service for instructing his secretary to destroy a log book of compensatory time the defendant had taken once he learned of an Inspector General investigation).

Like Mr. Cisneros, Mr. Griles concealed a personal relationship. However, no one was paid "hush money" to conceal this relationship and there was nothing illicit about Mr. Griles' relationship with Ms. Federici since Mr. Griles and Ms. Federici were both single consenting adults.

Mr. Griles conduct in this case is also far different than two of the more noted §1505 cases from this jurisdiction. *United States v. North*, 910 F.2d 843 (D.C. Cir.1990) *superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (removing, destroying and altering documents in connection with a Congressional investigation); *United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) (conduct included instructing a witness to alter, destroy or conceal documents in connection with a Congressional subpoena). As serious as Mr. Griles misconduct in this case is – concealing the true nature and extent of his relationship with Ms. Federici, who introduced Mr. Griles to Mr. Abramoff, how and why his relationship with Mr. Abramoff thereafter developed, and the nature of Mr. Abramoff's access to Mr. Griles – it is far less serious than paying hush money to silence a witness, affirmatively altering destroying evidence when an investigation is pending or for a Congressional subpoena, and falsely testifying about illegal payments made to government employees. Thus, Mr. Griles' crime is arguably the least serious of all the §1505 defendants that have been sentenced in this District, and his sentence should reflect this fact.

Comparing the conduct here with that of other defendants in either the Abramoff related cases and the other §1505 cases from this District, compels the conclusion that probation with three months of home confinement, 500 hours of community service and a reasonable fine is the sufficient and proper sentence. Moreover, sentencing Mr. Griles to prison as the DOJ contends would create an unwarranted disparity when compared to other relevant cases.

### 7.    The Need to Provide Restitution to any Victims of the Offense

Mr. Griles did not take anything of value from Mr. Abramoff or any of his clients and his misconduct did not cause any financial damages to any victim.  Thus, there is no restitution owed in this matter.

### IV.    Conclusion

Mr. Griles respectfully requests that he be sentenced to a term of probation with three months home confinement, 500 hours of community service and a reasonable fine.  This sentence accurately reflects the sentencing factors of 18 U.S.C. §3553.

Respectfully Submitted,

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

Dated:  June 8, 2007                          By: *Barry M. Hartman*
                                                   Barry M. Hartman, Esq.
                                                   Brian W. Stolarz, Esq.

                                                   Counsel for James Steven Griles
                                                   1601 K Street, NW
                                                   Washington, DC 20006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Memorandum and corresponding Exhibit Volumes were mailed, postage prepaid, this 8th day of June, 2007 to: Armando Bonilla, Trial Attorney, Public Integrity Section, Criminal Division, United States Department of Justice, 1400 New York Avenue, NW, Washington, DC 20005.  A courtesy copy will also be hand-delivered by messenger upon filing of the Memorandum.

_____
Brian W. Stolarz

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................ 1

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY ................ 4

III. SENTENCING STANDARDS PURSUANT TO 18 U.S.C.§3553…...……5

    A. Legal Standard for Sentencing.............................................. 5

    B. Sentencing Factors Under 18 U.S.C. §3553(a).................................. 6

        1. Nature and Circumstances of the Case.......................................... 6

            a. Mr. Griles' Voluntary Decision to Testify before the Senate Indian Affairs Commitee ........................................... 7

            b. Mr. Griles' Preparation for his Interview with the Senate Committee Staff and Testimony before the Senate Committee. 9

            c. Mr. Griles' Interview by the Senate Committee Staff .............. 11

            d. Mr. Griles' Testimony before the Senate Commitee ................ 14

            e. Post-Hearing Investigation into Mr. Griles' Testimony and Contacts with Mr. Abramoff .................................... 17

        2. History and Character of the Defendant ........................................... 19

            a. Childhood and Upbringing in Rural Virginia........................... 20

            b. Education and Beginning of Public Service............................. 20

            c. Initial Federal Service................................................ 23

            d. Private Industry Work After His Initial Federal Service ........................................................ 26

            e. Service as Deputy Secretary of the Interior.............................. 28