# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :
:
:
v.      :      Criminal No. 07-CR-079 (ESH)
:
:
JAMES STEVEN GRILES,      :
:
       Defendant.      :

## DEFENDANT'S REPLY MEMORANDUM TO THE UNITED STATES' MEMORANDUM AID OF SENTENCING

James Steven Griles, through undersigned counsel, respectfully submits the following

Reply Memorandum to the United States' Memorandum in Aid of Sentencing ("DOJ Mem.").

Mr. Griles' concealment of the unique way in which he met Mr. Abramoff through a

third person with whom he had a personal and at times romantic relationship was wrong and may

have affected the Senate Committee's view of his credibility. But the DOJ is wrong when it says

that Mr. Griles' misconduct prevented the Senate Committee from discovering the true number

and types of interactions between Mr. Griles and Mr. Abramoff. DOJ Mem at 3. The DOJ seeks

to justify its sentence based on facts and events that Mr. Griles did not conceal from the Senate

Indian Affairs Committee ("Senate Committee). In fact, if the Senate Committee had simply

agreed with Mr. Griles' repeated requests to see the hundreds of documents in its possession, or

in some cases actually asked a question about a particular subject, Mr. Griles may have been able

to supplement his answers and possibly provided the Senate Committee with the very

information that DOJ now presents to the Court.

We respectfully urge the Court to resist the DOJ's tactics for two reasons. First, as demonstrated in the opening Memorandum in Aid of Sentencing ("Griles Mem."), this case is not about whether Mr. Griles interacted with Mr. Abramoff. He did, and he told the Senate Committee that he did. The DOJ does not dispute this fact. The DOJ does not dispute that Mr. Griles repeatedly asked the Senate Committee and the Department of the Interior to give him documents to help him remember details and other potential contacts with Mr. Abramoff.[1] Rather, this case is about the proper sentence to be imposed on Mr. Griles for concealing the unique way in which he met Mr. Abramoff.

Second, the DOJ recognized that there was nothing illegal 'per se' about the contacts between Mr. Griles and Mr. Abramoff. Nevertheless, the DOJ provides the Court with incorrect and misleading facts in an effort to characterize the interactions between Mr. Griles and Mr. Abramoff as somehow secretive or nefarious. This Reply briefly corrects these errors and misstatements. Once considered, we believe the Court will be in a position accurately to assess the extent to which Mr. Griles' concealment of the unique circumstances under which he met Mr. Abramoff affected the Senate Committee's ability to determine the true nature and extent of their relationship.

Finally, we address the DOJ's suggestions that recent precedent does not justify the requested sentence.

---

[1] The fact that Mr. Griles pleaded with the Senate Committee for documents and also sought documents from the DOI before he testified belies the assertion that Mr. Griles intended to hide or conceal his specific contacts with Mr. Abramoff. The DOJ's suggestion that Mr. Griles could have chosen to refuse to answer questions on relevancy grounds is also astounding. DOJ Mem. at 43. Under 2 U.S.C. §192, any person who refuses to answer pertinent questions on any grounds other than asserting the Fifth Amendment may be guilty of contempt of a Congressional proceeding. 2 U.S.C. §192 (2007).

## I.    Mr. Griles Did Not Conceal the Details of His Interactions with Mr. Abramoff

The DOJ presented evidence that Mr. Griles (1) talked to Mr. Abramoff about issues pending before the Department of the Interior; (2) referred him to various people within DOI on specific issues; (3) sent him resumes of two people; (4) discussed with him a third party's interest in starting a charitable organization for children of American soldiers killed in the war; (5) was allegedly aware that Mr. Abramoff or his clients were contributing to CREA, and (6) at one point was the recipient of overtures about potential future employment opportunities.

Mr. Griles has never disputed that these contacts occurred.  Mr. Griles told the Senate Committee that he talked to Mr. Abramoff about several issues pending before the Department several years before when he was Deputy Secretary.  Griles Mem. at 11-12.  He told the Senate Committee he had some discussions with Ms. Federici.  Griles Mem. at 14, Exhibit Vol. II, Exhibit C-2 at 89-90.  He told the Senate Committee he was aware at some point that Mr. Abramoff had contributed money to CREA.  *Id.* at 27, Fn. 43.  He told the Senate Committee that Mr. Abramoff made overtures about potential future employment opportunities, which Mr. Griles rejected.  *Id.* at 12.  Mr. Griles was never even asked about several other contacts[2] recounted by the DOJ and he did not remember them without being asked since they occurred years before he testified and were trivial.

---

[2] Mr. Griles was not asked about the *National Treasure* permit issue, the charity for children of deceased American soldiers, and whether he sent Mr. Abramoff two resumes of friends looking for jobs.  On the issue of sending resumes of friends looking for jobs, Mr. Griles acknowledged that he sent at least one of these person's resumes to several law firms.  In fact, as noted in his Sentencing Memorandum, Mr. Griles has given career advice and help to many people over the years, including the two cited by the DOJ. *See* Griles Mem. at 40-41. The DOJ does not respond to or contest this.

Exhibit 1 contains a chart, part of which was in our opening Memorandum, that illustrates (a) what issues Mr. Griles was asked about by the Senate Committee; (b) whether the Senate Committee had related documents that would have helped Mr. Griles recall his contacts with Mr. Abramoff; (c) whether these documents were shown to Mr. Griles; (d) whether the contacts between the two were "secretive," and (e) any "actions" taken by Mr. Griles.

Mr. Griles does not wish to engage in a lengthy discussion of each of these contacts. Indeed, given that Mr. Griles did not conceal the facts and events recounted in these documents, no discussion of them is warranted. Moreover, the undisputed facts demonstrate that despite Mr. Griles' concealment of the unique circumstances of how he met Mr. Abramoff through Ms. Federici, the Senate Committee had the ability and opportunity, perhaps through Mr. Griles, to learn much of what the DOJ now recounts about the specific contacts between Mr. Abramoff and Mr. Griles. The Senate Committee decided not to let Mr. Griles see documents that would have helped him remember the details of his contacts. Nonetheless, because the DOJ now raises these issues, it is necessary to advise the Court why the DOJ is incorrect in most if not all of its assertions as to the significance and relevance of these facts.[3]

## II.    Factual Inaccuracies and Unsupported Inferences Drawn by the DOJ

As stated in our opening Memorandum, Mr. Griles had an open door policy for anyone who wanted to raise an issue with him and he was responsive to many people. Griles Mem. at 17, Fn. 38. Nonetheless, the DOJ characterizes every instance of Mr. Griles' returning a call to Mr. Abramoff or referring him to another official as a "favor" and seeks to create a nefarious

---

[3] Mr. Griles agrees with the DOJ that the Court is in the "best position to assess [his] candor before the Senate Committee for purposes of this sentencing hearing." *See* DOJ Mem. at 6. We agree with this assertion because the Court can see by viewing the testimony that Mr. Griles is frustrated and concerned about his ability to respond to questions without access to documents in the possession of the Senate Committee. Additionally, it is noted that at the twenty minute mark of the testimony when for the first time a large three-ring binder of documents is given to Mr. Griles.

overtone that is absurd and divorced from reality.[4]  Specifically, Mr. Griles responded to

inquiries from citizens, lobbyists, Members of Congress and others and was particularly

accessible as a public official as demonstrated by his calendar.[5]  Mr. Griles testified that it was

his job to return calls and to refer those who called him to the proper person to address their

inquiry. *See* Griles Mem. at 17, Exhibit Vol. II, Exhibit C-2 at p. 89 ("I returned calls directly.

If people called, I had those calls returned by others who had direct responsibilities").  When Mr.

Abramoff sent names of persons interested in working for the Administration, Mr. Griles sent

those names on to the appropriate person, just as he did when he received names from many

others.[6]  When an inquiry was made about the so-called Coushatta Land Dispute issue, or a tribal

insurance issue, or a Park Service permit, Mr. Griles referred it to the responsible person.   None

of these interactions were concealed from the Senate Committee, and most importantly, none

were illegal.  Mr. Griles' goal was to put his contacts with Mr. Abramoff in context of contacts

with others and his work as Deputy Secretary and Chief Operating Officer[7] at the 70,000 person

Department of the Interior so the Senate Committee could decide for itself whether the specific

---

[4]For example the DOJ refers to "white papers" being submitted by Mr. Abramoff to Mr. Griles or others and
describes them as something nefarious because they lack identification.  DOJ Mem. at p. 11, Fn. 11.  In fact, DOJ
prosecutors often receive white papers from persons being investigated and they are commonly used with other
agencies as well. As noted in the opening Memorandum, William Horn wrote that "I continued to work with Steve
in his new role [as Deputy Secretary] … Our communications consisted of phone calls, emails, faxed notes,
*substantive memoranda or 'white papers'* and formal letters – *all of the routine methods used to inform and
persuade decision makers.*"  William P. Horn letter at Griles Mem. Exhibit Vol. I, Exhibit A-40. (emphasis added).

[5] *See* Griles Mem. at Exhibit Vol. II, Exhibit C-10.

[6] Had Mr. Griles been given access to the records he sought, he would have been able to document the numerous
times when he referred potential candidates to the White House Office of Presidential Personnel both while he was
Deputy Secretary and after he left public service.

[7]The DOJ derisively asserts that Mr. Griles "self-proclaimed" himself as the Chief Operating Officer of the DOI.
DOJ Mem. at 4.  The Department of Interior Manual, not Mr. Griles, designates the Deputy Secretary as the Chief
Operating Officer. *See* Exhibit 2.

contacts with Mr. Abramoff were somehow unusual when compared to those he had with other lobbyists.

The DOJ's assertion that Mr. Abramoff's access to Mr. Griles was "secretive" and "unfettered" is also misleading and inaccurate. DOJ Mem. at 2. As stated in the opening Memorandum, Mr. Abramoff himself states in July 2003 that he could not get Mr. Griles to talk to him about *any issue* – hardly "unfettered access." Griles Mem. at 16. Although the DOJ does not like this email, the text of it is clear: "Steve is nothing but a gentleman and a great guy to me, *but he can't (or at least won't) discuss any of my clients with me. . . ."* *See* Griles Mem. Exhibit Vol. II, Exhibit C-9 (emphasis added). Mr. Abramoff wrote two additional emails to Ms. Federici after this email that show the continuation of Mr. Abramoff's lack of access. On July 31, 2003, Mr. Abramoff wrote to Ms. Federici that *"I can't chat with Steve, as you know."* Exhibit 3. Mr. Abramoff then writes a month later that "I am in a real bad situation on this cost share. We had the chairmen write to the Secretary, but no one is responding to them, *and I can't get a meeting with anyone.* Any ideas?" Exhibit 4. Mr. Abramoff was not the only member of his "team" that lamented the lack of access to Mr. Griles. In February 2002, Todd Boulanger wrote to Mr. Abramoff that "I want to light a fire under Griles's ass." Exhibit 5. These emails certainly do not show "unfettered access" to Mr. Griles.

As to "secrecy," as demonstrated on Exhibit 1, there is a Department of Interior record on every issue in which Mr. Griles and Mr. Abramoff interacted, as well as on the so-called job overtures, and even on the resumes Mr. Griles sent to Mr. Abramoff on behalf of friends. Mr. Griles and Mr. Abramoff's contacts were anything but secretive.

### A.    Mr. Abramoff's Interactions with Mr. Griles Before Mr. Griles Took Office

Mr. Griles was not asked anything by the Senate Committee regarding Mr. Abramoff's apparent efforts to get support for Mr. Griles' nomination. None of the documents upon which the DOJ relies on to demonstrate that Mr. Abramoff supported Mr. Griles' nomination had been provided to Mr. Griles before he testified. DOJ Mem. at 12.[8] When Mr. Abramoff asked Mr. Griles about an insurance issue[9] before Mr. Griles was confirmed as Deputy Secretary, Mr. Griles declined to deal with it and instead referred him to the appropriate person at the Department of the Interior. DOJ Appendix A-7.

### B.    *National Treasure*-Much Ado About Nothing

When he testified in 2005, Mr. Griles was not asked about whether Mr. Abramoff inquired in 2003 about someone acting under a Park Service permit and whether they could move their truck being used to make a movie. When reminded of this incident a year after he testified, Mr. Griles remembered it and acknowledged that he asked someone from the Park Service to look into the complaint. He also recalls other instances in which he sought assistance from the Park Service.[10]

The National Park Service official who "investigated" Mr. Abramoff's complaint wrote a letter on Mr. Griles' behalf to inform the Court of the true nature and circumstances of this

---

[8] Had Mr. Griles been asked, he would have told the Senate Committee that when he was nominated, he received calls from dozens if not hundreds of people indicating a desire to support his nomination and offering to help. He was not always aware of, nor did he have any control over, contacts that private citizens may have made to Members of Congress in this regard. Mr. Griles readily admits that he was appreciative of anyone who wanted to support his nomination, and that every nominee for a Senate confirmable position would have a similar view. Had Mr. Griles been shown the email suggesting that Mr. Abramoff was one of many people who supported his nomination six years ago, he probably would have remembered it.

[9] Mr. Griles recalled this instance to the Senate Committee but did not recall the timing. Griles Mem. at 12.

[10] For example, Mr. Griles asked Mr. Smith for assistance with various National Park Service issues including a historical hotel in Stanton, Virginia, a merchandising issue involving a likeness of Abraham Lincoln, and tourist helicopters at the Grand Canyon.

wholly inconsequential and meaningless event. *See* P. Daniel Smith letter at Exhibit 6.  Mr.

Smith wrote that:

> Steve Griles simply asked me to look into a situation involving a National Park Service
> permit for the film crew of "National Treasures" at the Navy Memorial on Pennsylvania
> Avenue, adjacent to "Signatures" restaurant.  The problem was that the production
> vehicles for the film company were obstructing access to the restaurant and prohibiting
> the valet parking immediately in front of it.  I met with the restaurant manager and the
> film assistant director and discussed the problem.  There was an easy and sensible
> solution that involved moving one vehicle to the other end of the block on Pennsylvania
> Avenue and closing the distance between two other vehicles. *All of this was
> accomplished in 10-15 minutes . . . .* I let Steve know that I had taken care of the situation.
> I am now aware of Mr. Abramoff's interest in the restaurant; *however, I would resolve
> this problem for any restaurant owner that encountered this situation because of a
> National Park Service permit.*

*Id.* (emphasis added).  Mr. Smith also wrote that "[m]y experience with Steve Griles at the

Department of the Interior has always been in the highest tradition of public service." *Id.*

### C.    Gun Lake Tribe of Michigan

The DOJ asserts that Mr. Griles was involved in some way with the Gun Lake Tribal

application to put land in trust for gaming, which would have been detrimental to one of Mr.

Abramoff's other tribal gaming clients.  DOJ Mem. at 21-22.  In support of this, the DOJ cites

the following statement by Mr. Abramoff:  "I had lunch with Steve today, *but we didn't really

chat about it [Gun Lake]*."  DOJ Appendix at E-4 (emphasis added). As further evidence to

support its inference that this is an example of Mr. Abramoff's secretive and unfettered access to

Mr. Griles, the DOJ suggests, with no support, that a "secretive" conversation occurred during,

of all places, a Holiday party attended by hundreds of people at which Mr. Abramoff allegedly

spoke with Mr. Griles about the issue.

### D.    The Jena Application to Place Land into Trust for Gaming Purposes

Mr. Griles was asked by the Senate Committee about his recollection of activities

surrounding the efforts of a tribe to have land placed in trust for gaming, and Mr. Abramoff's

efforts to halt it. Mr. Griles did not recall being involved in that issue in 2002, which was confirmed by the official with responsibility for it. *See* Testimony of Michael Rossetti before Senate Committee at 99, Griles Mem., Exhibit Vol. II, Exhibit C-2. Moreover, the date of the initial recommendation to the Secretary to deny the application was February 22, 2002, *six days before Mr. Abramoff sent Mr. Griles a note inquiring about it. Compare* Exhibit 7 *with* DOJ Mem. at 18. There is no basis to infer either that Mr. Griles concealed this from the Senate Committee, or that he somehow intervened or influenced the decision in order the benefit Mr. Abramoff's clients.

The second time this issue arose – in late 2003 – again, Mr. Griles remembered what he could when he testified two years later before the Senate Committee. He said he received a binder about the issue. He gave it to the person responsible for Indian Gaming issues. Griles Mem., Exhibit Vol. II, Exhibit C-7 at p. 57-8. The DOJ now casts a nefarious shadow using a single, two-minute cell phone entry and emails[11] that were withheld from Mr. Griles to imply that he knew more about this incident than what he told the Senate Committee two years after the occurrence.[12] Given the Senate Committee's decision not to let Mr. Griles see those documents, the DOJ's argument that Mr. Griles' 2005 testimony concealing how he met Mr. Abramoff in 2001 somehow prevented the Senate Committee from learning how a binder was sent from Mr. Abramoff to Mr. Griles in 2003 should be rejected.

---

[11] Mr. Griles was not a party to these emails.

[12] The DOJ also fails to tell the Court that this second decision rejected Mr. Abramoff's position. Moreover, Abramoff's apparent assumption (inexplicably credited by the DOJ, even though they have no credible evidence) that Griles was the reason the "first" Jena Compact was rejected (even though Griles had *nothing to do with it* and Department employee Michael Rossetti confirmed this fact) should inform the Court about the lack of veracity and trustworthiness of Mr. Abramoff 's assumptions about Mr. Griles involvement in the second Jena decision in September, 2002 (*See* DOJ Appendix at D-38-D40), which the DOJ is presenting against Griles as "proof" of some [unnamed] malfeasance on Mr. Griles' part. None of these documents were shown to Mr. Griles before he testified.

**E.    The DOJ's Groundless Inferences Regarding Mr. Griles' Knowledge of CREA Contributions**

The DOJ asserts that it "stand[s] to reason" that Mr. Abramoff gave funds to CREA to maintain his access to Mr. Griles but has no evidence to support its assertion. DOJ Mem. at 12. Mr. Griles told the Senate Committee what little he knew about CREA fundraising activities after he became Deputy Secretary. Griles Mem. at 27, Fn. 43. Mr. Griles helped CREA raise funds before he became Deputy Secretary and stopped when he took office. Griles Plea Agreement, ¶ 3.

The DOJ cited an October 2001 email that purports to show that "defendant Griles was aware of Abramoff's continuing efforts to drum up CREA donations from his [Mr. Abramoff's] tribal clients." DOJ Mem.at 30, DOJ Appendix at I-4.   The email implies no such thing.  The email, sent to Mr. Abramoff's client, states that Mr. Abramoff saw Mr. Griles and Mr. Griles told him that the DOI Secretary was "gushing about Choctaw" and was very grateful.  It did not say what she was grateful for, nor does it indicate that Mr. Griles was even told about a CREA contribution.

The DOJ then cites another email from September 2002, almost a year after the email noted above, also to purportedly show Mr. Griles' knowledge of donations to CREA. DOJ Appendix I-5. The email is from Mr. Abramoff to Ms. Federici in which Mr. Abramoff asks Ms. Federici to ask Mr. Griles to tell a tribal member who was meeting with the DOI that "we have mutual friends." *See* DOJ Appendix at I-5. This communication does not show or even remotely hint that Mr. Griles had *any* knowledge of CREA donations or that he was even told about them.

**F.**    **The DOJ's Inaccurate Inferences Regarding the Alleged "Job Offer" Overture by Mr. Abramoff**

It is completely groundless for the DOJ to suggest that Mr. Griles' conduct prevented the Senate Committee from learning more about the overtures made by Mr. Abramoff regarding future employment. The witness to these so-called discussions testified before the Senate Committee on the *same day* as Mr. Griles. Griles Mem. at 12, 15. Mr. Griles pointed that out to the Senate Committee, "I met with Mr. Abramoff and one of the former witnesses that was sitting here earlier." Griles Mem., Exhibit Vol. II, Exhibit C-2 at 104. The Senate Committee decided not to question that witness on this issue. In a subsequent letter to the Committee, Mr. Griles again pointed this out, noting his belief that the witness would support Mr. Griles' statement that no job negotiations took place. Griles Mem., Exhibit Vol. II, Exhibit C-11 at 6. Again, the Senate Committee decided not to follow up. Under these circumstances, suggesting that Mr. Griles concealment of how he met Mr. Abramoff in 2001 had any impact on the Senate Committee's ability to learn about these 2003 discussions is completely disingenuous and without basis.

The DOJ's suggestion that there were "five months of negotiations" is also completely unsupported by the evidence. First, the DOJ notes that in April 2003, Mr. Griles emailed a friend bemoaning the cost of college tuition for his children, and somehow this email is evidence that Mr. Griles engaged in employment negotiations with Mr. Abramoff in September of 2003. DOJ Mem. at 36. The DOJ then stated that Mr. Griles mentioned to "Person B" that he might "either return to his old lobbying firm or go to work with Abramoff at Firm A," citing an email from *March 2004*. This assertion is completely fabricated. The cited email says nothing about working for Mr. Abramoff at all. Further, it was written two months after the DOJ agrees Mr. Griles *rejected* Mr. Abramoff's overtures. DOJ Mem. at 36-37, DOJ Appendix at M-28.

Finally, as the DOJ well knows, Mr. Griles' 2005 testimony on the 2003 contacts was simply and legitimately confused. He remembered a conversation with Mr. Abramoff and Mr. Baggett in September of 2003. As it turns out, there were two conversations (hardly continuing negotiations) one in September of 2003, and one in January of 2004. The first conversation was an inquiry about what Mr. Griles planned to do when he left government. This is an often-asked question of political appointees. Mr. Griles speculated about rekindling his old practice. He also indicated that he had not made up his mind whether or when he was leaving government. After another four months had lapsed, in the meeting where Mr. Baggett is present, Mr. Griles had made up his mind that he was not leaving government until after the election and told Mr. Abramoff and Mr. Baggett when they discussed whether Mr. Griles would consider Greenberg Traurig.

Mr. Griles' confusion could have been avoided if only the Senate Committee had granted Mr. Griles' request for the documents that may have allowed him to clear this up. There was, however, *never* a discussion of any of the hallmarks of employment negotiation -- *none* – of salary, benefits, schedule, duties, start dates, hourly requirements, business plan, associates, work space, support needs, or anything else. There is simply nothing that would indicate negotiations, despite the DOJ's repeated claims to the contrary.[13]

---

[13] *See U.S. v. Schaltenbrand*, 930 F.2d 1554, 1559 (11th Cir. 1991) (District Court's definition of "negotiate" as "simply to converse with somebody else, carry on a conversation about something that you hope or intend to do" was rejected – the employee negotiated by seeking out employer, filling out application, submitting himself for interview, having a detailed discussion of qualifications for the position, and taking Spanish courses to meet a condition of employment); *CACI, Inc. v. U.S.*, 719 F.2d 1567, 1577-1578 (Fed. Cir. 1983) (employees did not negotiate where general discussions occurred about positions that might be available or the possibility of joining the firm, but no specific position, salary or start time discussed).

### III.    Legal Inaccuracies and Failures to Address Cited Legal Precedent

#### A.    Mr. Griles' Distinguished Public Service and Good Works are Not Considered in the DOJ's Sentencing Recommendation

Mr. Griles' long and distinguished record of government service and the reputation for honesty and integrity that the almost 100 people who wrote on his behalf unanimously verified has not been disputed by the DOJ. The DOJ states that its sentencing recommendation contained herein "generously accounts for defendant Griles' good works[14] and public and charitable service. DOJ Mem. at 44. Nevertheless, the DOJ's "generosity" does not impact case law both before and after *United States v. Booker*, 543 U.S. 220 (2005) that permits the Court to review a defendant's good works and charitable contribution to provide a reduction in sentence.[15]

#### B.    The DOJ Fails to Distinguish the Other "Abramoff Scandal" Cases or the §1505 Cases That Involved No Incarceration

The DOJ ignores the majority of the §1505 cases from this District that involved far more egregious conduct than Mr. Griles that were resolved with alternatives to incarceration. *See* Griles Mem. at 55. In fact, the DOJ fails to distinguish or analyze the §1505 case most analogous to Mr. Griles' conduct, *U.S. v. Cisneros*, 26 F.Supp.2d 24 (D.D.C 1998), which

---

[14] This is a curious factual assertion as the DOJ was not aware of many of Mr. Griles' charitable works until *after* it agreed to recommend a split sentence.

[15] Even when the guidelines were mandatory, courts recognized that exceptional charitable acts alone can serve as the basis for a reduced sentence. *See* 173 A.L.R. Fed. 667 § 3(a) (2001); U.S.S.G., § 5H1.11 (2004) (the pre-*Booker* sentencing guidelines stated that "prior good works are not ordinarily relevant" to a downward departure, and most courts interpreted this to mean that good acts would warrant a downward departure in exceptional circumstances). The extraordinary and consistent history of Mr. Griles' good works are sufficient to take him "outside the heartland" of an ordinary defendant to warrant a reduced sentence. *U.S. v. Serafini*, 233 F.3d 758, 773 (3rd Cir. 2000) (state legislator convicted of perjury had "extended himself to [friends and constituents] in unique and meaningful ways during times of serious need," and accordingly the Third Circuit affirmed the downward departure); *U.S. v. Takai*, 941 F.2d 738, 743-44 (9th Cir. 1991) (the court affirmed a downward departure because the defendant had engaged in "outstanding good deeds" during his lifetime). Although courts were not encouraged to depart downward pre-*Booker* based on good acts, courts are now required to consider the defendant's history and character as one of the 18 U.S.C. § 3553 factors.

- 13 -

involved an 18-count indictment premised on concealing a personal relationship and was resolved with a $10,000 fine and no incarceration.

Instead of addressing the clear precedent that supports Mr. Griles' position, the DOJ cites two cases that are dramatically different and resulted in prison terms after multiple guilty verdicts at trial. First, the DOJ asserts that Mr. Griles' conduct is similar to that of recently convicted and sentenced defendant I. Lewis "Scooter" Libby in that "the defendant's lies and concealment of material information prevented investigators from learning the truth about what was being investigated." DOJ Mem. at 47. The DOJ then cites *U.S. v. Safavian*, 2006 U.S. Dist. LEXIS 83170 (November 16, 2006) (Friedman, J.), and states, without any discussion, that the "defendant cites but incorrectly characterizes as being incongruous to this case and more severe than what is needed here." *Id.*

Mr. Griles' case is far different than both Mr. Libby's and Mr. Safavian's. Mr. Libby was convicted after trial of multiple counts of obstruction of justice, making false statements, and perjury in a grand jury investigation related to a very serious issue of National security and covert operations in foreign countries. *U.S. v. Libby*, Crim. No. 05-394 (D.D.C.).[16] Mr. Griles' concealment of a personal relationship and how it led to his meeting and knowing Mr. Abramoff is hardly comparable.

Mr. Safavian's conduct was also far more egregious than Mr. Griles'. Mr. Safavian was convicted of three counts of false statements and one count of obstruction of a GSA-OIG and

---

[16] The DOJ's sentencing memorandum shows the dramatic difference between his conduct and Mr. Griles': "He [Mr. Libby] lied repeatedly to FBI agents and in sworn grand jury testimony, and he lie about multiple facts central to an assessment of his role in the disclosure of Ms. Wilson's CIA employment. He lied about when he learned of Ms. Wilson's CIA employment, about how he leaned of her CIA employment, about who he told of her CIA employment, and about what he said when he disclosed it. In short, *Mr. Libby lied about nearly everything that mattered.*" *See* May 25 2007 DOJ Sentencing Memorandum in *United States v. Libby*, Crim. No. 05-394 (D.D.C) (emphasis added).

- 14 -

Congressional investigation. *Safavian*, 2006 U.S. Dist. LEXIS 83170 at *1.   According to the

Court in its Sentencing Opinion, Mr. Safavian:

> was not engaged in a single scheme to conceal and falsify facts or obstruct government bodies.  Rather, he engaged in a *series of separate concealments and falsifications*, either in response to the various investigative bodies looking into Jack Abramoff, or in an initial effort to take the trip to Scotland without arousing suspicion. . . . His lies, concealments, and obstruction were intermittent.  Each was done in a different year, each was directed at a different entity, and each was done in a wholly different fashion.

*Id*. at *27-28.  Mr. Safavian engaged in a course of criminal conduct over a number of years

which is far different from Mr. Griles' conduct.  In an effort to "dress up" the time frame of Mr.

Griles' crimes, the DOJ states that his Mr. Griles has admitted that his conduct lasted "[t]wo

weeks and two fora." DOJ Mem. at 42.  This assertion is incorrect as Mr. Griles testified on two

occasions over two separate days for a total of less than five hours before one body – the Senate

Committee and its Staff.

**IV.**     <u>**Conclusion**</u>

Based on Mr. Griles' opening Sentencing Memorandum, and the arguments and

responses to the DOJ's Memorandum provided herein, it is respectfully requested that this Court

sentence Mr. Griles to three months of home confinement, 500 hours of community service, and

a reasonable fine.

Respectfully Submitted,

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

Dated:  June 19, 2007       By:    *Barry M. Hartman*
_____
Barry M. Hartman, Esq.
Brian W. Stolarz, Esq.

Counsel for James Steven Griles
1601 K Street, NW
Washington, D.C. 20006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 19, 2007, a copy of the foregoing Reply Memorandum was dispatched for hand delivery to: Armando Bonilla, Trial Attorney, Public Integrity Section, Criminal Division, United States Department of Justice, 1400 New York Avenue, NW, Washington, DC 20005. The Reply Memorandum was also served by ECF with notification to all parties.

Brian W. Stolarz

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA     :
:
:
v.     :     Criminal No. 07-CR-079 (ESH)
:
:
JAMES STEVEN GRILES,     :
:
       Defendant.     :

**EXHIBITS 1-9 OF DEFENDANT'S REPLY MEMORANDUM TO THE
UNITED STATES' MEMORANDUM AID OF SENTENCING**

Dated: June 19, 2007                   KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
Barry M. Hartman, Esq.
Brian W. Stolarz, Esq.

Counsel for James Steven Griles
1601 K Street, NW
Washington, D.C. 20006

# EXHIBIT 1

**EXHIBIT 1 TO GRILES REPLY MEMORANDUM IN AID OF SENTENCING**

| Subject | Interview and Response | Did the Senate Committee Have Documents Related to the Subject? | Were the documents shown to Mr. Griles before he testified/before the Committee completed its Report | Were the contacts with GT/JA to Anyone at DOI on this subject recorded in Departmental records | Action by Mr. Griles |
|---|---|---|---|---|---|
| A dinner sponsored by The Council of Republicans for Environmental Advocacy ("CREA"). | Asked. Remembered and acknowledged event and general circumstances at interview but did not remember details. | Yes – Griles Reply Mem. Exhibit 8 at 322-328 | No | Yes – (See DOJ App.) B-1, B-2, B-3, B-4, B-5, B-6, B-7, B-8, B-9, B-20, C-1 | Attended dinner; had Assistant Secretaries follow same process as Secretary did for her approval to attend. |
| A photo opportunity for one of Mr. Abramoff's tribal clients with the Secretary of the Interior. | Asked. Remembered event and general circumstances at interview. When Mr. Griles was finally shown documents previously denied him, it helped him remember some additional details. | Yes | No | Yes – (See DOJ App.) D-2, D-3, D-4, D-5, D-6, D-7, D-8, D-9 | Recounted Secretary's public position on gaming outside of state lines. |
| Efforts by the Jena Band of Choctaw Indians to acquire land for gaming purposes. | Asked. Remembered portions of event and circumstances at interview. | Yes – Exhibit 8 at 340 | No | Yes – (See DOJ App.) D-25, D-26, D-28, D-29, D-30, D-31, D-32, D-51, D-52 | Not involved in Jena I; made binder part of public record in Jena II; not involved in decision. See M. Rossetti testimony, Griles Mem. Exhibit Vol. II, Exhibit C-2. |
| The Saginaw Chippewa Indian Tribe school construction demonstration program. | Asked. Remembered portions of event and circumstances at interview. | Yes – Exhibit 8 at 338 | No | No | Referred matter to DOI official to comply with the law and inform Congress that appropriation language did not meet the standards in the law regarding funding of Tribal School Construction Projects. |

DC-926804 v3

**EXHIBIT 1 TO GRILES REPLY MEMORANDUM IN AID OF SENTENCING**

| Subject | Interview and Response | Did the Senate Committee Have Documents Related to the Subject? | Were the documents shown to Mr. Griles before he testified/before the Committee completed its Report | Were the contacts with GT/JA to Anyone at DOI on this subject recorded in Departmental records | Action by Mr. Griles |
|---|---|---|---|---|---|
| The Coushatta Tribe of Louisiana leadership dispute. | Asked. Remembered portions of event and circumstances at interview. | Yes | No | Yes – (See DOI App.) H-5 The Senate Committee also had record of 13 additional contacts to others at DOI both prior and after Abramoff contact with Griles not included in DOI exhibits; see Exhibit 9 hereto. | Referred matter to DOI official to determine whether the Department had obligation to try to resolve the inter-Tribal dispute. Note that within weeks of dispute arising, local US Attorney's office involved to try to end dispute. |
| Discussions with Mr. Abramoff about his law firm, Greenberg Traurig. | Asked. Recalled a meeting and conversation but was confused at interview. When Mr. Griles was finally shown documents previously denied him, it helped him remember some additional details. | Yes | No | Yes – (See DOI App.) M-8, M-9, M-10, M-12, M-13, M-23, M-24, M-25, M-26, M-27 | No employment negotiations and no indicia of any negotiations required by statute and prevailing case law. |

2

EXHIBIT 1 TO GRILES REPLY MEMORANDUM IN AID OF SENTENCING

| Subject | Interview and Response | Did the Senate Committee Have Documents Related to the Subject? | Were the documents shown to Mr. Griles before he testified/before the Committee completed its Report | Were the contacts with GT/JA to Anyone at DOI on this subject recorded in Departmental records | Action by Mr. Griles |
|---------|------------------------|------|-----|------|------|
| Efforts to have Mark Zachares hired at the Department in the Office of Insular Affairs at the Department of the Interior. | Asked. During the interview, Mr. Griles stated that "they [conversations with Mr. Abramoff about people being placed in the Department of the Interior] may not have occurred, and they may have occurred. I just – today I have not – until, if you have something that may refresh my memory, I will be more than willing to spend the time to try to review it and try to help you." Executive Session Tr. at Exhibit Vol. II, Exhibit C-7 at p. 36. | Yes | No | Yes -- (See DOJ App.) C-1 | Mr. Zachares was not hired. |

3

# EXHIBIT 1 TO GRILES REPLY MEMORANDUM IN AID OF SENTENCING

| Subject | Interview and Response | Did the Senate Committee Have Documents Related to the Subject? | Were the documents shown to Mr. Griles before he testified/before the Committee completed its Report | Were the contacts with GT/JA to Anyone at DOI on this subject recorded in Departmental records | Action by Mr. Griles |
|---|---|---|---|---|---|
| A letter regarding an election in the Commonwealth of the Northern Mariana Islands. | Asked. Did not recall at the time. When Mr. Griles was finally shown documents previously denied him, it helped him remember some additional details. | Yes, See, e.g., Griles Reply Mem. Exhibit 8 at 330. | No | Yes – (See DOI App.) C-1, C-3 | Mr. Griles wrote a letter to the White House about the subject Gubernatorial election of a Territory under DOI jurisdiction. |
| A tribal insurance issue. | Asked. Did not recall at the time. When Mr. Griles was finally shown documents previously denied him, it helped him remember some aspects of issue. | Yes | No | Yes – (See DOI App.) A-26, A-27 | Referred the matter to a DOI official as Mr. Griles was not confirmed as Deputy Secretary at the time. |
| Gun Lake Tribe application to place land into trust for gaming purposes. | Asked. Did not recall issue or involvement; no evidence that this recollection was incorrect. | Yes | No | No – No records showing any involvement/contact with Mr. Griles. | |
| Bay Mills Indian Tribe. | Asked. Did not recall issue or involvement; no evidence that this recollection was incorrect. | Unknown | No | No | |
| Tigua water issue. | Asked. Did not recall issue or involvement; no evidence that this recollection was incorrect. | Unknown | No | No | |
| Mashpee tribe name recognition. | Asked. Did not recall issue or involvement; no evidence that this recollection was incorrect. | Unknown | No | No | |
| National Treasure Permit Question | Not asked | Unknown | No | No | Referred matter to National Park Service Official. |

4

# EXHIBIT 1 TO GRILES REPLY MEMORANDUM IN AID OF SENTENCING

| Subject | Interview and Response | Did the Senate Committee Have Documents Related to the Subject? | Were the documents shown to Mr. Griles before he testified/before the Committee completed its Report | Were the contacts with GT/JA to Anyone at DOI on this subject recorded in Departmental records | Action by Mr. Griles |
|---|---|---|---|---|---|
| Setting up charity for children of deceased soldiers | Not asked | Unknown | No | Yes – (See DOI App.) J-1, J-2, J-3, J-4, J-5, J-11, J-12, J-13, J-14 | Discussed issue with Mr. Abramoff. |
| Referring two people for jobs | Not asked | Unknown | No | Yes – (See DOI App.) K-1, K-2, K-3, K-9, K-10, L-2, L-4, L-5, L-6 | Sent resumes to Mr. Abramoff. Mr. Griles routinely referred potential employees to a number of employers. See Griles Mem. at Exhibit Vol. II, Exhibit 16. |

5

# EXHIBIT 2

# Department of the Interior
# Departmental Manual

**Effective Date**: 3/4/05
**Series**:      Organization
**Part 109**:   Secretarial Officers
**Chapter 1**: Secretary of the Interior

**Originating Office**:  Office of Planning and Performance Management

**109 DM 1**

1.1     **Secretary**.  The Secretary of the Interior, as head of an Executive Department, reports directly to the President and is responsible for the direction and supervision of all operations and activities of the Department.  The Secretary also has certain powers or supervisory responsibilities relating to U.S. affiliated insular areas.

1.2     **Secretariat**.  The Secretary is assisted in the management and direction of the Department by the Secretariat.  The Secretariat is comprised of the following Secretarial Officers:

      A.      The Secretary

      B.      The Deputy Secretary, who assists the Secretary in supervising and administering the Department and in the absence of the latter performs the functions of the Secretary.  With the exception of certain matters specifically reserved to the Secretary, the Deputy Secretary has the full authority of the Secretary.  The Deputy Secretary is the Chief Operating Officer for the Department.

      C.      The Solicitor (described in 109 DM 3)

      D.      The Inspector General (described in 110 DM 4)

      E.      Assistant Secretaries (described in 109 DM chapters following Chapter 3).

1.3     **Assistants to the Secretary**.

      A.      A Chief of Staff serves as confidential advisor to the Secretary, supervises the staff of the immediate office of the Secretary, and performs other duties as assigned by the Secretary.

      B.      The Director, Office of Communications serves as principal advisor to the Secretary on public information matters (see 110 DM 5).

C.    The Director, Office of Congressional and Legislative Affairs serves as principal advisor to the Secretary on the Department's legislative program and carries out Congressional and intergovernmental liaison activities (see 110 DM 6).

D.    The Director, Office of the Executive Secretariat and Regulatory Affairs serves as principal advisor to the Secretary on regulatory matters, monitors, reviews, and coordinates all regulatory activities of the Department, and is responsible for correspondence control and processing (see 110 DM 17).

E.    Other Assistants, Counselors, and Advisors to the Secretary serve in varying capacities and as liaison with major program areas as specifically assigned.  All Assistants, Counselors, and Advisors to the Secretary may work directly with Assistant Secretaries in expediting and highlighting matters requiring immediate or specific attention.  Like the Assistant Secretaries, they may issue guidance with the full authority of the Secretary.

1.4    **Authority**.  Except for authority specifically delegated otherwise by statute, authority to carry out Departmental functions is delegated by the Secretary to the Secretariat who in turn redelegate appropriate authority to heads of bureaus and offices which they supervise.  All permanent delegations made by the Secretary and redelegations made by Assistant Secretaries are issued and documented in the Departmental Manual.  Program officials to whom authority has been delegated are held directly responsible for organization and performance in their assigned program areas.

3/4/05 #3671
Replaces 9/19/97 #3176

# EXHIBIT 3

514

| | |
|---|---|
| From: | Abramoff, Jack (Dir-DC-Gov) [/o=▮▮▮▮▮/ou=WDC/cn=Recipients/cn=abramoffj] on behalf of Abramoff, Jack (Dir-DC-Gov) |
| Sent: | Thursday, July 31, 2003 4:26 PM |
| To: | 'Italia Federici office' |
| Subject: | Saginaw Cost Share |

This is that tribe's key issue for the year. You might recall that Lynn Scarlett sent that letter, to which the chairmen of House and Senate Interior Approps responded strongly. Now we have heard nothing. I can't chat with Steve, as you know. what can we do? they are really pissed at me. anything possible?

GTG-E000024229

# EXHIBIT 4

172

---

**Italia Federici**

| | |
|---|---|
| From: | abramoffj@ ▓▓▓▓▓ |
| Sent: | Friday, September 05, 2003 3:20 PM |
| To: | Italia@ ▓▓▓▓▓ |
| Subject: | are you in town? |

---

**Italia Federici**

| | |
|---|---|
| From: | abramoffj@ ▓▓▓▓▓ |
| Sent: | Thursday, August 21, 2003 3:35 PM |
| To: | Italia@ ▓▓▓▓▓ |
| Subject: | FW: school cost share |

I hate to keep asking for your help, but I am in a real bad situation on this cost share. We had the chairmen write to the Secretary, but no one is responding to them, and I can't get a meeting with anyone.  Any ideas?

-----Original Message-----
From: Chris [mailto:cpetras@gte.net]
Sent: Thursday, August 21, 2003 1:41 PM
To: Abramoff, Jack (Dir-DC-Gov)
Cc: Boulanger, Todd (Dir-DC-Gov)
Subject: school cost share

Just received a message from Ken Roer. He stated that BIA officials are having a meeting next week (Wed-Thur) in New Mexico to discuss the school cost share issue. He indicated that Aureen Martin is handling the issue and that  they are taking their cues from her.

---

**Italia Federici**

| | |
|---|---|
| From: | abramoffj@ ▓▓▓▓▓ |
| Sent: | Sunday, August 17, 2003 1:51 PM |
| To: | Italia@ ▓▓▓▓▓ |
| Subject: | FW: Saginaw Cost Share |

Any updates on this one?

-----Original Message-----
From: Italia Federici [mailto:italia@ ▓▓▓▓▓
Sent: Saturday, August 02, 2003 6:58 PM
To: Abramoff, Jack (Dir-DC-Gov)
Subject: RE: Saginaw Cost Share

Hi Jack:

Just got this because I was not email accessible.  Please feel free to call me if there is an urgent matter.  I don't want your correspondence to go unanswered for days at a time.  I will try to talk to someone about this first thing.

--Italia
-----Original Message-----
From: abramoffj@ ▓▓▓▓▓  [mailto:abramoffj@ ▓▓▓▓▓
Sent: Thursday, July 31, 2003 5:35 PM
To: italia@ ▓▓▓▓▓
Subject: Saginaw Cost Share

3

SENCREA 10/04 000110

**EXHIBIT 5**

From:           Abramoff, Jack (Dir-DC-Gov)
Sent:           Thursday, February 14, 2002 9:22 AM
To:             Mike Scanlon office
Subject:        FW: CREA Request

This will help us get William scared about Blue Lake, hopefully increasing our budget.

-----Original Message-----
From:   Boulanger, Todd (Dir-DC-Gov)
Sent:   Thursday, February 14, 2002 10:15 AM
To:     Abramoff, Jack (Dir-DC-Gov)
Subject:    RE: CREA Request

Great...... Kevin is going to draft the CATs letter to the president and Norton saying "no more Indian gaming
expansion"...... I want to light a fire under Griles's ass.

-----Original Message-----
From:   Abramoff, Jack (Dir-DC-Gov)
Sent:   Thursday, February 14, 2002 10:13 AM
To:     Boulanger, Todd (Dir-DC-Gov)
Subject:    FW: CREA Request
Importance:    High

They are supposed to approve the CREA contribution this morning.

-----Original Message-----
From:   Boulanger, Todd (Dir-DC-Gov)
Sent:   Tuesday, February 12, 2002 9:31 AM
To:     'cpetras@███████
Subject:    CREA Request
Importance:    High

Chris, I just noticed that the CREA (Council for Republican Environmental Advocacy) contribution was inadvertently left
off the list (Remember we discussed it with Jack when Sub chief Otto was in town?). As you know, CREA is the group
which Secretary Norton was chairman of before she went to DoI and which she still strongly supports. A $50,000
contribution is required to be a trustee of the organization. All of our tribes have given at this level and have found it
very beneficial. Secretary Norton is very soon going to host another dinner of the trustees and we want to make sure
that the Saginaw Chippewa's tribal leadership is included.

We strongly recommend that the Saginaw Chippewa play an active role with this organization. What is your
recommendation on how to proceed?

I am sorry that this wasn't included in the most updated request matrix. This is my fault. -Todd

GTG-E00002504

**EXHIBIT 6**

## Stolarz, Brian W.

| | |
|---|---|
| **From:** | Hartman, Barry M. |
| **Sent:** | Tuesday, June 12, 2007 2:54 PM |
| **To:** | Stolarz, Brian W.; Hudson, Cynthia R. |
| **Subject:** | FW: Steve Griles Letter |

**Attachments:**    May 18 Judge Huvelle.doc



May 18 Judge
Huvelle.doc (29 K...

```
Barry M. Hartman
K&L Gates
1601 K Street, N.W.
Washington, DC  20005-1600
Telephone:  202.778.9338
Facsimile:    202.778.9100
Cellular:     202.256.1438
Email:        Barry.Hartman@klgates.com

If you have any questions regarding this email, please contact my assistant, Cyndi Hudson
at 202.778.9010 or cyndi.r.hudson@klgates.com


-----Original Message-----
From: P_Daniel_Smith@nps.gov [mailto:P_Daniel_Smith@nps.gov]
Sent: Tuesday, June 12, 2007 2:51 PM
To: Hartman, Barry M.
Subject: Steve Griles Letter

Barry,

Per conversation, see attached letter to Judge Huvelle.

P. Daniel Smith
Superintendent
Colonial NHP
P.O.Box 210
Yorktown, VA 23690
(757) 898-2401
(757) 898-6346 (FAX)
(757) 268-6464 (Cell)

(See attached file: May 18 Judge Huvelle.doc)
```

May 18, 2007


Judge Ellen Segal Huvelle
United States District Court for the District of Columbia
c/o Barry M. Hartman and Brian W. Stolarz
K&L Gates
1601 K Street, NW
Washington, DC 20006

Re: J. Steven Griles

Dear Judge Huvelle:

My name is P. Daniel Smith. I am writing in support of J. Steven Griles, who is to be sentenced before you on June 26, 2007. I write to respectfully request that you consider leniency for Steve when you sentence him for his admitted obstruction during Congressional testimony.

I have known Steve since 1981 working with him professionally at the Department of the Interior from 1981 until 1987. At that time he served as the Deputy Assistant Secretary for Land and Minerals, and subsequently as Assistant Secretary for Land and Minerals. I was initially Special Assistant to the Assistant Secretary for Fish and Wildlife and Parks, and subsequently as Deputy Assistant Secretary for Fish and Wildlife and Parks.

Steve and I again began working professionally again at the Department of the Interior in October 2003. As Deputy Secretary, Steve assisted me in returning to Federal Service following the attacks of September 11. I was assigned as Special Assistant to the Director, National Park Service to use my knowledge of government and law enforcement to assist in the mobilization of National Park Service Law Enforcement Rangers and United States Park Police to protect the icons within the National Park System and other Federal assets.

My experience with Steve Griles at the Department of the Interior has always been in the highest tradition of public service. Steve is known as a capable manager, a strong advocate for positions on issues that the Department coordinates within the Administration and with Congress, and as a results oriented professional. All of my direct contact with him in resolving policy or regulatory issues or in crafting legislation, were handled in a positive and constructive manner, and with an openness that considered all points of view in final decision making.

-2-

Your Honor, during the three years I served as Special Assistant to the Director, National Park Service, of the hundreds of things I coordinated, expedited, controlled, or facilitated within the National Park Service and Department of the Interior, and other Federal Agencies, with Congress, individuals, or special interest groups only one involved Steve Griles and Jack Abramoff. I was questioned about it by the Federal Bureau of Investigation, Department of the Interior Inspector General, and the Justice Department. I understand that this issue was considered of major concern to these investigators, but I would like to assure you that nothing unusual or unethical occurred in my resolving this situation, and that I would resolve this issue in the same manner if it occurred today.

Steve Griles simply asked me to look into a situation involving a National Park Service permit for the film crew of "National Treasures" at the Navy Memorial on Pennsylvania Avenue, adjacent to "Signatures" Restaurant. The problem was that the production vehicles for the film company were obstructing access to the restaurant and prohibiting the valet parking immediately in front of it. I met with the restaurant manager and the film assistant director and discussed the problem. There was an easy and sensible solution that involved moving one vehicle to the other end of the block on Pennsylvania Avenue and closing the distance between two other vehicles. All of this was accomplished in 10-15 minutes and to the best of my knowledge was not a problem for the duration of the filming permit. I let Steve know that I had taken care of the situation. I am now aware of Mr. Abramoff's interest in this restaurant; however, I would resolve this problem for any restaurant owner that encountered this situation because of a National Park Service permit.

I respectfully thank you for your consideration of this letter on behalf of J. Steven Griles.

Sincerely,


P. Daniel Smith
Superintendent
Colonial National Historical Park

# EXHIBIT 7

**Attorney Work Product**
**Attorney-Client Communication**

**Memorandum**

Date:        February 22, 2002

To:          Gale A. Norton,
             Secretary of the Interior

From:        Michael G. Rossetti,
             Counselor to the Secretary

Subject:     Tribal-State Gaming Compact: Jena Band of Choctaw and State of Louisiana

# Exemption 5

# Pages Withheld:  6

# EXHIBIT 8

# "Gimme Five"— Investigation of Tribal Lobbying Matters

## FINAL REPORT

BEFORE THE

## COMMITTEE ON INDIAN AFFAIRS

ONE HUNDRED AND NINTH CONGRESS

SECOND SESSION

JUNE 22, 2006

**PRINTED FOR THE USE OF THE COMMITTEE ON INDIAN AFFAIRS**

## (PART III ONLY)

# "GIMME FIVE"— INVESTIGATION OF TRIBAL LOBBYING MATTERS

# CONTENTS

|  | Page |
|---|---|
| TABLE OF NAMES | vi |
| TABLE OF ENTITIES | ix |
| INVESTIGATION HEARINGS | xii |
| INVESTIGATION STAFF LIST | xv |
| INTRODUCTION | 1 |
| EXECUTIVE SUMMARY AND FINDINGS | 9 |

### Part One - Fact Summary by Tribe

| | Page |
|---|---|
| I. MISSISSIPPI BAND OF CHOCTAW INDIANS | 15 |
| A. Introduction | 15 |
| B. Background on Tribe | 16 |
| C. Background on Abramoff and the Tribe's Relationship | 18 |
| D. Substantial Fees and Conduit Organizations | 23 |
| E. Abramoff Brings Scanlon to the Choctaw | 31 |
| F. Abramoff Directs Choctaw to Make Contributions | 36 |
| 1. 2000 Scotland Golf Trip | 36 |
| 2. Sports Suites | 36 |
| 3. Liberty Consulting Services | 37 |
| G. Conclusion | 38 |
| II. COUSHATTA TRIBE OF LOUISIANA | 40 |
| A. Introduction | 40 |
| B. Background on Tribe | 42 |
| C. Abramoff and Scanlon Get the Coushatta's Business | 44 |
| D. Scanlon's Grassroots Projects for the Tribe | 52 |
| E. Conclusion | 58 |
| III. SAGINAW CHIPPEWA TRIBE OF MICHIGAN | 59 |
| A. Introduction | 59 |
| B. Background on Tribe | 60 |

i

C. Christopher Petras—Abramoff and Scanlon's Access to the Tribe ........... 62
D. "Slate of Eight"—Abramoff and Scanlon's Trojan Horse ........................ 65
E. The Tribe Hires Abramoff and Scanlon ............................................... 74
F. Abramoff on Client Management—"keeping our people in power" .......... 79
G. Christopher Petras' Hearing Testimony Is Not Credible ......................... 86
    1. Petras' Relationship With Abramoff and Scanlon ......................... 87
    2. Problems With Petras' Testimony ............................................ 90
H. Abramoff and Scanlon Privately Express Contempt for the Tribe ............. 94
I. Conclusion ................................................................................... 97
IV. AGUA CALIENTE BAND OF CAUHILLA INDIANS ...................................... 99
A. Introduction ................................................................................ 99
B. Background on Tribe .................................................................... 100
C. Abramoff and Scanlon Offer the Promised Land ............................... 102
D. Scanlon Works on Patencio's and Siva's 2002 Elections ..................... 109
    1. Mail .................................................................................. 112
    2. Door-to-Door ..................................................................... 113
    3. Telephone .......................................................................... 114
    4. Candidates' Meeting ............................................................ 114
E. The Tribe Hires Abramoff and Scanlon ........................................... 115
F. Abramoff and Scanlon Seek Additional Money From the Tribe ............. 125
G. Abramoff and Scanlon's Work for the Tribe .................................... 127
H. 2003 Elections ........................................................................... 129
I. Chapman and Sierra Dominion ..................................................... 130
    1. Payments to Chapman ......................................................... 131
    2. Payments to Sierra Dominion ............................................... 136
J. Conclusion ................................................................................ 139
V. YSLETA DEL SUR PUEBLO (TIGUA) .................................................... 140
A. Introduction .............................................................................. 140
B. Background on Tribe ................................................................... 141
C. Abramoff, Scanlon, and Reed Work Against the Tigua ....................... 143
D. Abramoff and Scanlon Seek the Tribe's Money ................................ 147
E. Secrecy and Contributions ........................................................... 160
F. Abramoff and His Colleagues Set Their Plan in Motion in the House ........ 162
G. Scanlon Purportedly Sets the Plan in Motion in the Senate ................. 165
H. Things Begin to Unravel .............................................................. 169
I. Abramoff Asks the Tigua to Finance a Golfing Junket to Scotland .......... 172
J. The Tribe Meets Congressman Ney ................................................ 175
K. Election Reform Passes Without the Tigua Provision .......................... 177
L. The Elder Legacy Project ............................................................. 180
M. Abramoff and Scanlon Attempt to Obstruct the Investigation ............... 181
N. Conclusion ................................................................................ 182
VI. PUEBLO OF SANDIA OF NEW MEXICO ................................................ 183
A. Introduction .............................................................................. 183

B.  Background on Tribe  ..................................................................  183
C.  The Search for a New Lobbyist  ..............................................  185
D.  Implementing the Plan  ............................................................  188
E.  The Database  ...........................................................................  190
F.  Happy Ending in Spite of ...  ...................................................  193

**Part Two - "Gimme Five" - Analysis by Entity**

INTRODUCTION  .........................................................................................  195
I.  CAPITOL CAMPAIGN STRATEGIES  ...........................................................  202
   A.  Background  ............................................................................  202
   B.  Abramoff Conceals His Financial Relationship with Scanlon  ..........  204
   C.  Abramoff Induces the Tribes Into Hiring and Paying Scanlon  ..........  207
   D.  What Happened to the Money that the Tribes Paid Scanlon?  ..........  213
      1.  Snapshots of CCS' Representation of the Tribes  .........................  213
         a.  Transaction #1 (Miscellaneous) – Huge Profit Margins  .......  214
         b.  Transaction #2 (August 2002) – Louisiana Coushatta and Agua
             Caliente Pay CCS a Total of $5,000,000  .............................  216
         c.  Transaction #3 (October 2001 - January 2002) –
             Louisiana Coushatta Pays CCS $2,170,000  .........................  218
         d.  Transaction #4 (January - April 2002) – Several Tribes Pay
             CCS over $22,000,000  ...................................................  224
         e.  Transaction #5 (October 16, 2002) – Louisiana Coushatta Pays
             CCS $950,000 and the Agua Caliente Pays CCS
             $1,745,000 to CCS  .........................................................  230
         f.  Transaction #6 (January - March 2003) – Louisiana Coushatta
             Pays CCS $5,000,000  .....................................................  232
      2.  The "Database"  .......................................................................  235
         a.  The Pitch  .........................................................................  236
         b.  The Facts  .........................................................................  244
      3.  CCS' Use of Fictitious Grassroots Organizations  ..........................  248
   E.  Conclusion  .............................................................................  253
II.  AMERICAN INTERNATIONAL CENTER  .....................................................  255
   A.  Introduction  ...........................................................................  255
   B.  A Day at the Beach—How the AIC was started  .............................  256
   C.  Making It Look Real—Abramoff Has the AIC Post a Website  ..................  262
   D.  How Abramoff and Scanlon Used Conduits to Represent the Tribes  ........  268
   E.  AIC as a "Gimme Five" Entity  .................................................  273
   F.  Conclusion  .............................................................................  277
III.  CAPITOL ATHLETIC FOUNDATION  .........................................................  278
   A.  Introduction  ...........................................................................  278
   B.  General Background on CAF  ...................................................  279
   C.  Abramoff Attempts to Secure Federal Funding for the CAF, and Fails  .....  281

D. Abramoff and Scanlon Misappropriate Tribal Funds for CAF
     Money in 2001 ........................................................................ 282
     1. Abramoff and Scanlon Divert Coushatta Money to CAF ................. 282
     2. Abramoff's Misuse of CAF Money in 2001 ..................................... 287
E. In 2002, Abramoff and Scanlon Scam Other Tribes Into Paying CAF .......... 289
     1. Abramoff Deceives the Saginaw Chippewa into Partially Funding
        a Golf Trip to Scotland – June through November 2002 .................. 290
     2. Abramoff and Scanlon Deceive the Choctaw Into Sending
        $1 Million to CAF  – January and August 2002  .............................. 295
     3. Abramoff and Scanlon Misappropriate Another $1 Million from
        the Choctaw – October 2002 ........................................................ 299
     4. Abramoff's Misuse of CAF Funds in 2002 ...................................... 305
F. In 2003 Abramoff Funnels Tribal Money Through Conduits to CAF .......... 314
     1. Kaygold Sends Tribal Funds to CAF ............................................... 315
     2. Abramoff and Scanlon Use ARA as a Conduit to Funnel
        Coushatta Money to CAF ............................................................. 315
     3. Abramoff's Misuse of CAF Money in 2003 ..................................... 319
G. Conclusion ............................................................................... 321

**Part Three - Other**

I. COUNCIL OF REPUBLICANS FOR ENVIRONMENTAL ADVOCACY ..................... 322
     A. Background ........................................................................... 322
        1. Abramoff Has His Tribal Clients Pay CREA ................................. 324
        2. Federici Promises to Help Abramoff in Exchange for, or
           Because of, CREA Contributions .............................................. 328
     B. Abramoff and Federici Start Working Together ................................ 329
     C. Contributions in Exchange for Access? ......................................... 333
     D. What Did Federici Do For Abramoff's Clients at Interior? ................. 338
     E. What, If Anything, Griles Did for Abramoff's Clients Is Unclear ........... 342
     F. Conclusion ........................................................................... 350

**Part Four - Recommendations**

A. Introduction ............................................................................. 352
B. Contracting for Legal, Lobbying and Other Professional Services ........... 352
     1. No New or Revised Federal Legislation Needed .............................. 352
     2. Best Practices Recommendations ................................................ 353
        a. Contracting for legal, lobbying and other services should
           follow a specific, open and competitive process ....................... 353
        b. Contracting rules should be structured to prevent conflicts of
           interest .......................................................................... 353

      c. Contracting and conflicts of interest rules should include appropriate
         sanctions ....................................................................................... 354
      d. Tribes should consider working with tribal organizations
         or with universities, colleges and law schools to develop
         model codes and education programs addressing contracting
         and conflicts of interest rules ............................................... 354

C. Integrity of Tribal Elections ....................................................................... 354
D. Tribal Political Contributions ..................................................................... 355
E. Referrals to Other Committees ..................................................................... 357
    1. Possible Misuse of Tax Exempt Organizations ................................. 357

# TABLE OF NAMES

**Abramoff, Jack**
former lobbyist, Greenberg Traurig; Preston Gates Ellis & Rouvelas Meeds

**Baggett, Fred**
Chair, National Governmental Affairs Practice, Greenberg Traurig

**Ben Zvi, Shmuel**
former high-school friend of Abramoff

**Benn, Charlie**
Director of Administration, Office of the Chief, Mississippi Band of Choctaw Indians

**Biederman, Amy**
former associate, Capitol Campaign Strategies

**Boulanger, Todd**
former associate, Greenberg Traurig

**Bozniak, Allison**
former assistant to Abramoff, Greenberg Traurig

**Cathcart, Christopher**
former associate, Capitol Campaign Strategies

**Chapman, Michael**
former business associate of Abramoff and Scanlon

**Doolittle, Julie**
President, Sierra Dominion Financial Solutions

**Federici, Italia**
President, Council of Republicans for Environmental Advocacy

**Griles, J. Steven**
former Deputy Secretary, U.S. Department of the Interior

**Grosh, David**
former director, American International Center

**Halpern, Gail**
former tax advisor to Abramoff

**Hisa, Carlos**
Lieutenant Governor, Ysleta del Sur Pueblo of Texas

**Kahgegab, Maynard**
former Chief, Saginaw Chippewa Indian Tribe

**Kilgore, Donald**
Attorney General, Mississippi Band of Choctaw Indians

**Kuhn, Jennifer**
Vice-President, Finance and Development, Americans for Tax Reform

**Lane, Rodney**
former assistant to Abramoff, Greenberg Traurig; former business associate of Abramoff

**Lapin, Rabbi Daniel**
President, Toward Tradition

vi

**Lippy, Laura**
　　assistant to Abramoff

**Mann, Brian**
　　former director, American
　　International Center

**Martin, Phillip**
　　Chief, Mississippi Band of Choctaw
　　Indians

**Martin, Terry**
　　Governmental Affairs/Administrative
　　Liaison, Chitimacha Tribe of Louisiana

**McConnon, B.R.**
　　President, Democracy Data &
　　Communications

**Mielke, David**
　　outside counsel, Pueblo of Sandia

**Milanovich, Richard**
　　Chairman, Agua Caliente Band of
　　Cahuilla Indians

**Norquist, Grover**
　　President, Americans for Tax Reform

**Norton, Gale**
　　former Secretary, U.S. Department of
　　the Interior

**Otto, David**
　　former Sub-Chief, Saginaw Chippewa
　　Indian Tribe

**Paisano, Stuwart**
　　former Governor, Pueblo of Sandia

**Pego, Robert**
　　former council member, Saginaw
　　Chippewa Indian Tribe

**Petras, Christopher**
　　former legislative director, Saginaw
　　Chippewa Indian Tribe

**Patencio, Candace**
　　former council member, Agua Caliente
　　Band of Cauhilla Indians

**Reed, Ralph**
　　President, Century Strategies

**Ridenour, Amy**
　　President, National Center for Public
　　Policy Research

**Ring, Kevin**
　　former associate, Greenberg Traurig

**Rogers, Nell**
　　planner, Mississippi Band of Choctaw
　　Indians

**Rossetti, Michael**
　　former Counselor to the Secretary,
　　U.S. Department of the Interior

**Scanlon, Michael**
　　President, Capitol Campaign
　　Strategies; Scanlon Public Affairs;
　　Scanlon Gould Public Affairs;
　　American International Center;
　　Principal, Atlantic Research &
　　Analysis

**Schwartz, Marc**
　　President, Partners Group Consultants;
　　former spokesperson, Ysleta del Sur
　　Pueblo of Texas

**Short, Stephanie Leger**
　　former associate, Greenberg Traurig

**Sickey, David**
>Council member, Coushatta Tribe of
>Louisiana

**Sickey, Kevin**
>Chairman, Coushatta Tribe of
>Louisiana

**Siva, Virginia**
>Tribal Council Member, Agua Caliente
>Band of Cauhilla Indians

**Smith, Michael**
>former associate, Greenberg Traurig

**Sprague, Bernie**
>Sub-Chief, Saginaw Chippewa Indian
>Tribe

**Stetter, Aaron**
>former associate, Capitol Campaign
>Strategies

**Van Hoof, Kathryn**
>former outside counsel, Coushatta
>Tribe of Louisiana

**van Horne, Jon**
>former associate, Greenberg Traurig

**Vasell, Shawn**
>former associate, Greenberg Traurig

**Volz, Neil**
>former associate, Greenberg Traurig;
>former chief of staff, U.S.
>Congressman Bob Ney

**Worfel, William**
>former vice-chairman, Coushatta Tribe
>of Louisiana

viii

# TABLE OF ENTITIES

## ENTITIES OWNED OR CONTROLLED BY ABRAMOFF

**Aeneas Enterprises**
a consulting firm that received payments from another Abramoff controlled entity called Grassroots Interactive, which did business with, among others, Tyco International and International Interactive Alliance

**Archives**
a company that owned Stacks, formerly a kosher deli located in Washington, D.C.

**Beis Avrohom Chaim**
a company used to acquire real estate

**Capital Athletic Foundation ("CAF")**
a charitable foundation used to fund Abramoff's private Jewish boys' school, called the Eshkol Academy, and other projects with which he was in some way associated

**Eshkol Academy**
*See Capital Athletic Foundation, supra.*

**Grassroots Interactive ("GRI")**
*See Aeneas Enterprises, supra.*

**Kaygold**
a company used to collect "consulting fees" from entities owned or controlled by Scanlon

**Lexington Group**
a company that performed lobbying-type services

**Livsar Enterprises**
a company that owned Signatures, formerly a restaurant-bar located in Washington, D.C.

**Sports Suites**
a company that owned, with money provided by some of Abramoff's Tribal clients, sky boxes at sports and concert venues in Washington, D.C. and Baltimore, Maryland

# ENTITIES OWNED OR CONTROLLED BY SCANLON

**American International Center ("AIC")**
a supposed think tank used as to
collect money for services performed
by others and to secretly pay money to
Abramoff

**Atlantic Research and Analysis ("ARA")**
a company used to secretly pay money
to Abramoff

**Capitol Campaign Strategies ("CCS")**
a grassroots/political consulting firm
that secretly paid money to Abramoff

**Christian Action Network**
a fictitious grassroots organization

**Christian Research Network**
a fictitious grassroots organization

**Concerned Citizens Against Gaming
Expansion ("CCAGE")**
a fictitious grassroots organization

**Global Christian Outreach Network
("GCON")**
a fictitious grassroots organization

**Scanlon Capitol Management, LLC**
a company used to invest money

**Scanlon Gould Public Affairs**
a grassroots/political consulting firm
that secretly paid money to Abramoff

**Scanlon Venture Capital**
a company used to invest money

# OTHER

**Alexander Strategies Group ("ASG")**
a consulting firm owned or controlled by former Congressman Tom DeLay's chief of staff Ed Buckham to or through which Abramoff or Scanlon directed their Tribal clients to pay money

**Americans for Tax Reform ("ATR")**
an anti-tax non-profit organization headed by conservative activist Grover Norquist to or through which Abramoff or Scanlon directed their Tribal clients to pay money

**Capitol Media**
a grassroots/political consulting firm owned or controlled by former Christian Coalition Executive Director Ralph Reed

**Century Strategies**
a grassroots/political consulting firm owned or controlled by former Christian Coalition Executive Director Ralph Reed

**Council of Republicans for Environmental Advocacy ("CREA")**
an environmental non-profit organization to or through which Abramoff or Scanlon directed their Tribal clients to pay money

**Democracy Data and Communications ("DDC")**
a firm that built, operated and maintained political databases for Scanlon and his Tribal clients

**Greenberg Traurig ("GT")**
a lobbying firm with which Abramoff was associated during the relevant period

**Kollel Ohel Tiferet**
an entity used to enable the CAF to distribute money to a sniper workshop in Israel

**Liberty Consulting**
a consulting firm owned or controlled by former Congressman Tom DeLay's deputy chief of staff Tony Rudy to or through which Abramoff or Scanlon directed some of their Tribal clients to pay money

**National Center for Public Policy Research ("NCPPR")**
a non-profit educational foundation on whose board Abramoff sat, to or through which he or Scanlon directed some of their Tribal clients to pay money

# INVESTIGATION HEARINGS

## FIRST HEARING
*Oversight Hearing on In Re Tribal Lobbying Matters, et al.*
*Wednesday, September 29, 2004, 9:30am*
*Room 216 of the Hart Senate Office Building*

### Panel One
Mr. Jack Abramoff
Mr. Michael Scanlon, President, Capitol Campaign Strategies, LLC
    *Mr. Scanlon was invited, but did not appear before the Committee on this date.*

### Panel Two
The Honorable Richard Milanovich, Chairman, Agua Caliente Band of Cahuilla Indians
The Honorable Bernie Sprague, SubChief, Saginaw Chippewa Indian Tribe of Michigan

### Panel Three
Dr. Christopher Petras, Former legislative director, Saginaw Chippewa Indian Tribe of Michigan


## SECOND HEARING
*Oversight Hearing on In Re Tribal Lobbying Matters, et al.*
*Wednesday, November 17, 2004, 3:00pm*
*Room 216 of the Hart Senate Office Building*

### Panel One
Mr. Marc Schwartz, President, Marc Schwartz Partners, Inc.
The Honorable Carlos Hisa, Lieutenant Governor, Yselta del Sur Pueblo

### Panel Two
Mr. Michael Scanlon, President, Capitol Campaign Strategies, LLC

## THIRD HEARING
*Oversight Hearing on In Re Tribal Lobbying Matters, et al.*
*Wednesday, June 22, 2005, 9:30am*
*Room 216 of the Hart Senate Office Building*

**Panel One**
Mr. Charlie Benn, Director of Administration, Office of the Chief, Mississippi Band of Choctaw Indians
Donald Kilgore, Esq., Attorney General, Mississippi Band of Choctaw Indians
Ms. Nell Rogers, Planner, Mississippi Band of Choctaw Indians

**Panel Two**
Mr. Kevin Ring, Former Abramoff associate
Mr. Shawn Vassell, Former Abramoff associate

**Panel Three**
Mrs. Amy Ridenour, President, National Center for Public Policy Research
Ms. Gail Halpern, Abramoff's Former Tax Advisor
Mr. Brian Mann, Former Director, American International Center
Mr. David Grosch, Former Director, American International Center
Mr. Aaron Stetter, Former Scanlon associate, Capitol Campaign Strategies


## FOURTH HEARING
*Oversight Hearing on In Re Tribal Lobbying Matters, et al.*
*Wednesday, November 2, 2005, 9:00am*
*Room 216 of the Hart Senate Office Building*

**Panel One**
The Honorable Kevin Sickey, Chairman, Coushatta Tribe of Louisiana
Mr. David Sickey, Council Member, Coushatta Tribe of Louisiana

**Panel Two**
Mr. William Worfel, Former Tribal Council Member, Coushatta Tribe of Louisiana
Mrs. Kathryn Van Hoof, Former Outside Counsel, Coushatta Tribe of Louisiana
Mr. Fred Baggett, Managing Shareholder; Chair, National Governmental Affairs Practice, Greenberg Traurig

**Panel Three**
Mr. B.R. McConnon, President, Democracy Data & Communications
Mr. Christopher Cathcart, Former Associate, Capitol Campaign Strategies
Ms. Gail Halpern, Abram off's Former Tax Advisor

**Panel Four**

Mr. J. Steven Griles, Former Deputy Secretary of the Interior, U.S. Department of the Interior

Mr. Michael Rossetti, Esq., Former Counsel to the Secretary of the Interior, U.S. Department of
    the Interior

Ms. Italia Federici, President, Council of Republicans for Environmental Advocacy

  *Ms. Federici was invited, but did not appear before the Committee on this date.*


# FIFTH HEARING

*Oversight Hearing on In Re Tribal Lobbying Matters, et al.*
*Wednesday, November 17, 2005, 10:00am*
*Room 216 of the Hart Senate Office Building*

**Panel One**

Ms. Italia Federici, President, Council of Republicans for Environmental Advocacy

# INVESTIGATION STAFF

Pablo E. Carrillo, Esq.
*Chief Investigative Counsel for the Majority*
Bryan D. Parker, Esq.
*Deputy Chief Investigative Counsel for the Majority*

Jeanne L. Bumpus, Esq.
*Staff Director for the Majority*
Brandon I. Ashley
*Staff Assistant for the Majority*
Katherine B. Rossi
*Staff Assistant for the Majority*

Sara G. Garland
*Staff Director for the Minority*
David Montes
*Professional Staff for the Minority*
Eamon P. Walsh
*Research Assistant for the Minority*
Allison C. Binney
*General Counsel for the Minority*
Emmett M. O'Keefe
*Counsel for the Vice Chairman*

*A special thanks to the efforts and support of the entire staff of the Senate Committee on Indian Affairs through the course of this investigation.*

# INTRODUCTION

Etched in the history of our great nation is a long and lamentable chapter about the exploitation of Native Americans. It began with the sale of Manhattan, and has continued ever since. Every kind of charlatan and every type of crook has deceived and exploited America's native sons and daughters. While these accounts of unscrupulous men are sadly familiar, the tale we hear today is not. What sets this tale apart, what makes it truly extraordinary, is the extent and degree of the apparent exploitation and deceit.

> Opening Statement of Committee Chairman John McCain, during the Committee's September 29, 2004, hearing on the allegations made by Tribes against Jack Abramoff and Michael Scanlon

[It] [n]eeds to have a bit more about how the tribes in the past were left helpless at the whims and good will of non-tribal members. Some reference to the past and how they were always given the [short] end of the stick would be pretty important, I think.

> Email from Jack Abramoff to associate Todd Boulanger, "Maynard letter to both Post and McCain," February 26, 2004 (critiquing draft letter intended for *Washington Post* and Senate Indian Affairs Committee regarding Committee investigation)

Yes, I did wrong, but I did a hell of a lot right too. Basically, I was the best thing they had going. I knew it, they knew it. My mistake was not informing them (about Scanlon).

> Jack Abramoff to contributing editor David Margolick, *Vanity Fair*, "Washington's Invisible Man," April 2006

## Factual Background

On the afternoon of June 18, 2001, in Washington, D.C., racquetball was the order of the day.[1] Having brought former congressional communications director Michael Scanlon with him to the lobbying shop at Greenberg Traurig for what ended up as a brief stint, Jack Abramoff wanted to get together with Scanlon for a round.

---

[1]Email between Michael Scanlon, Capitol Campaign Strategies, and Jack Abramoff, Greenberg Traurig (GTG-E000011945) (June 18, 2001).

But, Scanlon, who was now out on his own, wanted to talk shop: "A few weeks ago you mentioned something to me—I took the concept and have put together a plan that will make serious money. We also talked briefly about it in the beginning of the year but I think we can really move it now."[2]

Scanlon went on to describe "the broad strokes": "I have been making contacts with some larger Public Affairs companies in town for a few months. I have two solid relationships that will seriously consider acquiring Capitol Campaign Strategies. The problem is that there is not much in CCS right now."[3]

"However," he continued, "if we build up Capitol Campaign Strategies enough I can get it acquired by a large firm by the end of next year at 3x [sic] the firm revenue. Bottom line: If you help me get CCS a client base of $3 million a year, I will get the clients served, and the firm acquired at $9 million. We can then split the [sic] up the profits. What do you think?"[4]

Abramoff's response was brief: "Sounds like a plan, but let's discuss when we are together."[5]

This appears to be the genesis of a partnership the two would infamously label later as "gimme five"—their secret plan "to put in $5[million] revenue/yr [in fees from tribes, into] CCS."[6] Later, the term "gimme five" came to mean kickbacks to Abramoff from payments made by any of Scanlon's Tribal clients to Scanlon.

By Spring 2003, Abramoff and Scanlon's secret financial arrangement was apparently straining. The two had failed to get a Tribal client's casino reopened. And, Scanlon, apparently awash in cash, seemed to have outgrown the partnership and appeared more interested in putting his ill-gotten gains to work.

He offered Abramoff, "I have a few real estate developments in the pipeline—One really big one—and a couple of small ones that I may need to raise outside capital for. I can guarantee

---

[2]*Id.*

[3]*Id.*

[4]*Id.*

[5]*Id.*

[6]Email from Jack Abramoff, Greenberg Traurig, to Rodney Lane (GTG-E000011577) (March 15, 2002).

2

the returns on rate and time, and if you wanted to do more down the road taking a run at the upside potential you could get into some of the longer term stuff ... (I'm turning a 100% return on a one year project next month)."[7]

Abramoff responded, "OK, let's chat when we are next together.  Meanwhile, let's get some more fucking money!"[8]

Making money was certainly nothing new to Abramoff.  When he left the premier Washington, D.C. offices of the lobbying firm Preston Gates Ellis & Rouvelas Meed in December 2000 for a relatively new Washington lobbying group at Greenberg Traurig, Abramoff brought with him a book of business worth more than $6 million annually, according to Abramoff's own estimates.[9]  This helped Greenberg Traurig generate a 500 percent increase in lobbying fees over the previous year.[10]  With that increase, Greenberg Traurig reportedly vaulted into the top ten Washington lobbying firms—jumping from sixteenth place to fourth.[11]  While Abramoff's impact on "K Street"[12] during this period is generally well-known, the precise nature of his relationship with Scanlon has been, until recently, a closely-held secret—concealed, most importantly from Abramoff and Scanlon's Tribal clients.

By February 5, 2004, time was running out for Abramoff and Scanlon's secret business

---

[7]Email from Michael Scanlon, Capitol Campaign Strategies, to Jack Abramoff, Greenberg Traurig (GTG-E000012012) (March 25, 2003).  Scanlon might have been referring to his resale of an expensive five-bedroom canal-front home near Rehoboth, Delaware, he had bought in November 2001, apparently with Tribal proceeds, in one of that area's most prestigious neighborhoods—reportedly for $1,200,000 more that he paid.  *See* Cris Barrish, *Abramoff cohort spent millions on Sussex homes—As a Rehoboth lifeguard last year, he made $11.35 an hour*, The News Journal, May 14, 2006.  Early in 2003, Scanlon also reportedly paid $1,600,000 in cash for a home on Baltimore Avenue (across the street from where he ran his supposed international think tank, the American International Center) where he later opened offices. *Id.*

[8]Email between Michael Scanlon, Capitol Campaign Strategies, and Jack Abramoff, Greenberg Traurig (GTG-000012012) (March 25, 2003).

[9]John Bresnahan, *Jack Doubles Down*, Washington Business Forward, November/December 2002 (citing estimates provided by Abramoff).

[10]*Id.*

[11]*Id.*

[12]"K Street" is a commonly used term for the numerous think tanks, lobbying firms, law firms and associations located on and around this major thoroughfare in Washington, D.C.

arrangement.  In a conference room at Greenberg Traurig, *Washington Post* reporter Susan Schmidt interviewed Abramoff on allegations that he and Scanlon may have bilked several Tribes out of millions of dollars in fees.[13]  With Abramoff were Greenberg Traurig spokesperson Jill Perry and associates Todd Boulanger, Kevin Ring, Allen Foster, and Jon van Horne.[14] Things apparently heated-up quickly.

Schmidt began, "As I'm sure you know I'm working on a story about your work with some of these gaming tribes and your relationship with Mike Scanlon and his company and the work that the two of you have done in tandem for some of the tribes and so that's what I want to talk to you about ... So, I want to ask you, basically what your relationship is with his firm, well he's got several firms.  As I understand it from the tribes that I've talked to, you guys work together and you recommend that they hire him."[15]

Abramoff deftly answered—truthfully but non-responsively:  "In terms of Mike or any other third party, you know the firm does not have any formal relationship, to my knowledge, with any third party vendor used by any of the tribes for some of their activities and so probably best to have you go ahead and check directly with him and if you have specific questions again, we'll take them and we'll look at them, but in general I think we feel at liberty to discuss in general our practice, which we're delighted to do, with the tribes."[16]

Schmidt pushed:  "Okay, but you basically recommend to these tribes that they hire him?"[17]

Once again, Abramoff strained to avoid answering the question, but was quickly running out of wiggle room:  "We have recommended that different tribes hire different vendors for different needs that they might have.  Again, I'm going to defer in terms of any discussion of Scanlon or his company or any specific third party vendor."[18]

---

[13]*See* Email from Linsey Crisler, Greenberg Traurig, to Jack Abramoff, Greenberg Traurig (GTG-E000010599-614) (February 3, 2004).

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]*Id.*

[18]*Id.*

4

Schmidt pushed more: "Well, do you recommend his company and do you know what they are doing for the tribes and do you endorse what he's doing?"[19]

Abramoff offered, "Well, again I think that some of this gets into the area of our confidential dealings with our clients so I'm happy, we'll go back and look at that question."[20]

Schmidt finally cut to the chase: "Do you have an ownership stake in Capitol Campaign Strategies or Scanlon Gould or any of Mike Scanlon's other ventures?"[21]

Even a pregnant pause here might be looked on with some suspicion. So, Abramoff had no choice: "No. No, I don't ...."[22]

As future events would soon reveal, this of course was a lie.

Perhaps mindful of his actual financial arrangement with Scanlon, which he withheld from Schmidt, Abramoff was very concerned about how the interview went. Among others, he wrote to Candace Patencio, an ally at the Agua Caliente Band of Cahuilla Indians.[23] The next race for chairman was the topic of conversation. Abramoff wrote, "I think you are right that we really need Richard [Milanovich] to beat [his opponent]. [His opponent] is poison. She has been feeding the *Washington Post* a hit piece about Scanlon and me. It's going to be horrible. It is so obvious it's her doing this too. Can't wait to see you on the 23rd."[24]

A couple of days later, on February 5, 2004, Abramoff's most senior associate, Todd Boulanger reached out to Abramoff and colleague Kevin Ring: "Someone on the [Saginaw Chippewa Tribal] council trashed us, our work, and [S]canlon .... We are going to get smoked here."[25] He added, "[Abramoff] should [file suit for slander] .... after what happened a couple of

---

[19]*Id.*

[20]*Id.*

[21]*Id.*

[22]*Id.*

[23]Email from Jack Abramoff, Greenberg Traurig, to Candace Patencio, Agua Caliente of Cauhilla Band (GTG-E000057926) (February 3, 2004).

[24]*Id.*

[25]Email between Todd Boulanger, Greenberg Traurig, and Jack Abramoff, Greenberg Traurig, and Kevin Ring, Greenberg Traurig (GTG-E000028537) (February 5, 2004).

months ago.  We are dead."[26]

Likely appreciating that the thrust of the pending *Post* story was true, Abramoff could only offer, "Where are you now?"[27]

Boulanger answered, "Going to bed.  I'mreally [sic] in a terrible mood."[28]

Abramoff could only reply, "Me too."[29]

## The Conduct of the Investigation and the Report

On February 22, 2004, *The Washington Post* published Schmidt's article, entitled "A Jackpot From Indian Gaming Tribes; Lobbying, PR Firms Paid $45 Million Over 3 Years." Based on the allegations of misconduct made by several Tribes, documented in the *Post* article, the Senate Committee on Indian Affairs initiated an investigation.  Ultimately, the Committee would examine Abramoff and Scanlon's dealings with six tribes:  the Mississippi Band of Choctaw Indians, the Coushatta Tribe of Louisiana, the Saginaw Chippewa Indian Tribe, the Agua Caliente Band of Cahuilla Indians, Ysleta del Sur Pueblo of Texas and the Pueblo of Sandia of New Mexico.

While a Department of Justice task force reportedly began a parallel inquiry into related matters, the Committee sought to answer several questions, including but not limited to the following: (1) are the Tribes' allegations of misconduct regarding Abramoff and Scanlon true; (2) if so, how much did those Tribes pay Abramoff and Scanlon's partnership, as well as third-parties at their direction, as a result of that misconduct; and (3) did those Tribes receive the intended benefit of the tens of millions of dollars that they paid Scanlon and Abramoff.  With this Report, the Committee attempts to set forth definitive conclusions and the bases for those conclusions regarding each of those areas, and others.

After an intensive two-year investigation—consisting of five hearings, 70 formal requests for documents, including subpoenas, resulting in the production of about 750,000 pages; and

---

[26]Email from Todd Boulanger, Greenberg Traurig, to Jack Abramoff, Greenberg Traurig, and Kevin Ring, Greenberg Traurig (GTG-E000028537) (February 5, 2004) (ellipses in original).

[27]*Id.*

[28]*Id.*

[29]*Id.*

6

about 60 depositions and witness interviews,[30] the Committee found that, as Scanlon's secret partner, Abramoff received about half of the profit that Scanlon collected from the $66 million in fees he obtained from six of his Tribal clients from 2001 through 2003.

Principally, this Report focuses on allegations of misconduct made by the Tribes covered in it. Generally, those allegations relate to the activities of entities owned or controlled by Abramoff and/or Scanlon, including Capitol Campaign Strategies, the American International Center and the Capital Athletic Foundation. This Report also addresses payments that those Tribes made at Abramoff or Scanlon's direction to particular third parties—payments that were apparently used by third parties, like the Council of Republicans for Environmental Advocacy, for purposes unintended by the Tribes. While some of the Tribes have expressed concern about discreet billing anomalies, those Tribes have generally not alleged wrongdoing arising from the federal lobbying activities of Greenberg Traurig, the firm with which Abramoff was associated. Therefore, this Report does not address those activities.

Also beyond the scope of this Report is an in depth discussion of the internal political or organizational conditions within each of the Tribes that may have rendered them susceptible to exploitation by Abramoff and Scanlon. Those are internal Tribal matters.

Part I of this Report, presented in chapters relating to each Tribe, provides the factual background as to how each Tribe came to hire Abramoff and Scanlon and discusses how Abramoff and Scanlon's representation of those Tribes caused unique harm to each of them. After the these chapters, the Report explicates Abramoff and Scanlon's "gimme five" arrangement and how it injured the Tribes generally. Each chapter in Part II addresses these issues by focusing on the relevant "gimme five" entity. Part III of this Report discusses ancillary issues that have arisen during the course of the investigation, namely, the Tribes' payment of money to a non-profit called the Council of Republicans for Environmental Advocacy

---

[30]Where witnesses who the Committee interviewed were not put under oath, they were reminded of the applicability of the False Statements Act, 18 U.S.C. sec. 1001, and the federal criminal statute prohibiting the obstruction of congressional investigations, under 18 U.S.C. sec. 1505. Because all witness interviews and depositions were conducted in executive session, the Committee will not release summaries or transcripts of those proceedings *in toto* unless said release is duly authorized.

In the course of the Committee's investigation, several witnesses declined to provide the Committee with important information under oath, citing their right against self-incrimination under the Fifth Amendment of the U.S. Constitution, or indicated that they intended to assert their Fifth Amendment right if called to testify. These witnesses include not only Abramoff and Scanlon but also former Abramoff associates Todd Boulanger, Kevin Ring, Shawn Vassell, and Neil Volz as well as former Scanlon associate Chris Cathcart. Cathcart did, however, submit to several informal interviews with staff.

("CREA").  Finally, Part IV of the Report contains the Committee's recommendations flowing from its investigation.

## Committee Action

On June 12, 2006, the Committee invited Members and any duly designated staff to review a completed draft of the Report in anticipation of a business meeting to be convened for the purpose of voting the Report out of Committee and filing it with the Senate.  It also gave Members the opportunity to accept a confidential copy of the draft in their offices on June 20, 2006.  On June 22, 2006, the Committee held a business meeting, at which time it voted _____ to _____ to approve this Report and file it with the Senate.  Voting with the majority were _____ . Voting in the negative were _____.    Senators _____ were not present for the vote but did **[did not]** submit additional views.

8

# EXECUTIVE SUMMARY AND FINDINGS

After (or at the same time when) several Tribes hired Abramoff as their federal lobbyist, Abramoff urged some of them to hire Scanlon to provide grassroots support. Abramoff, however, failed to disclose that he and Scanlon were partners. Evidence obtained over the course of a two-year investigation indicates that Abramoff and Scanlon had agreed to secretly split, between themselves, fees that the Tribes paid Scanlon from 2001 through 2003. Abramoff and Scanlon referred to this arrangement as "gimme five."

As a general proposition, the scheme involved the following: getting each of the Tribes to hire Scanlon as their grassroots specialist; dramatically overcharging them for grassroots and related activities; setting aside for themselves an unconscionable percentage of what the Tribes paid at a grossly inflated rate—a rate wholly unrelated to the actual cost of services provided; and using the remaining fraction to reimburse scores of vendors that could help them maintain *vis-a-vis* the Tribes a continuing appearance of competence. One example of this fee-splitting arrangement arises from a payment of $1,900,000 from the Saginaw Chippewa Tribe of Michigan. On or about July 9, 2002, Scanlon assured Abramoff, "800 for you[,] 800 for me[,] 250 for the effort the other 50 went to the plane and misc expenses. We both have an additional 500 coming when they pay the next phasem [sic]." Indeed, on July 12, 2002, after that payment arrived, Scanlon made three payments to Abramoff, including a payment of $800,000.

In some cases, Abramoff and Scanlon obtained lobbying and grassroots contracts by insinuating themselves into Tribal council elections and assisting with the campaigns of candidates who were calculated to support their proposals. In other cases, Abramoff and Scanlon were even more aggressive, for example, helping to shut down the casino of one Tribe, only to pitch their services—for millions of dollars—to help that same, now desperate Tribe reopen its casino.

Typically, the most expensive element of Scanlon's proposals to the Tribes related to a purportedly elaborate political database. But, in all cases, it appears that the degree to which Scanlon marked-up his actual costs was unconscionable. For example, while Scanlon told the Coushatta Tribe of Louisiana that their "political" database would cost $1,345,000, he ended up paying the vendor that actually developed, operated and maintained that database about $104,560. The dramatic mark-ups were intended to accommodate Scanlon's secret 50/50 split with Abramoff.

In total, six tribes paid Scanlon's companies, in particular a company called Capitol Campaign Services ("CCS") (which also did business as Scanlon Gould Public Affairs and Scanlon Public Affairs), at least $66,000,000 over the three-year period. By the Committee's reckoning, each Tribe paid CCS as follows: the Mississippi Band of Choctaw Indians

("Choctaw"), $15,900,000; the Coushatta Tribe of Louisiana ("Louisiana Coushatta"), $26,695,500; the Saginaw Chippewa Tribe of Michigan ("Saginaw Chippewa"), $10,000,000; the Agua Caliente Band of Cahuilla Indians ("Agua Caliente"), $7,200,000; the Ysleta del Sur Pueblo of Texas ("Tigua"), $4,200,000; and the Pueblo of Sandia of New Mexico ("Pueblo of Sandia"), $2,750,000. Of that $66,000,000, Abramoff secretly collected from Scanlon, through (among other entities) an entity called Kaygold, about $21,000,000. This constituted about one-half of Scanlon's total profit from the Tribes.

The $66,000,000 figure includes only those payments made by the Tribes to Scanlon for grassroots activities. The total cost of doing business with Abramoff and Scanlon was actually much higher. To determine that cost, one must add to the $66,000,000 figure, payments made by the Tribes to the lobbying firms with which Abramoff was associated and payments made by the Tribes directly to other entities owned or controlled by Abramoff, such as the Capital Athletic Foundation ("CAF"), or by Scanlon, such as the American International Center ("AIC").

Most of the money that the Tribes paid Scanlon appears to have been used by Scanlon and Abramoff for purely personal purposes—purposes unintended by the Tribes. Generally, Abramoff seems to have used his share of the proceeds he received from Scanlon to float his restaurant ventures and, through CAF, operate his Jewish boys' school in Maryland. Likewise, Scanlon seems to have used his share to purchase real estate and other investments. The Committee, therefore, finds that most of the Tribes received little of the intended benefit for the significant sums they paid to Scanlon and that most of the money paid by the Tribes was used for purposes unintended by the Tribes. Against that backdrop, understanding under what circumstances the Tribes paid Scanlon becomes important.

Probably Abramoff's most valued Tribal client was the Choctaw. Since 1995, when the Choctaw first hired Abramoff, a history of dramatic victories emerged, with Abramoff successfully advocating the Tribe's sovereignty and anti-tax interests before Congress. In many instances, Abramoff had the Tribe use conduits to conceal its grassroots activities from the world—activities often conducted by former Christian Coalition Executive Director Ralph Reed. After this history of success, in early 2001, things changed. Following Abramoff's guidance, the Tribe hired Scanlon. And, to implement its grassroots strategies, the Tribe, at Abramoff and Scanlon's direction, paid to or through conduits owned or controlled by Abramoff and Scanlon. As an example of how much Scanlon sought from the Choctaw, he had the Tribe pay him $4,500,000 for efforts related to a single program—a grandiose idea Scanlon called "Operation Orange." During the relevant period, Abramoff manipulated the Tribe into funding, among other things, a much reported golfing trip to Scotland. The Tribe thought that its money, which it paid to a non-profit on whose board Abramoff sat, would be used for anti-tax and other policy work. At the end of the day, having collected about $15,000,000 from the Choctaw during the relevant period, Scanlon secretly kicked back to Abramoff about $6,364,000—about 50 percent of his total profit from the Tribe.

Specifically citing the work he had done for the Choctaw, Abramoff subsequently secured contracts for himself and Scanlon from the Louisiana Coushatta. Regrettably, of all the Tribes that hired Scanlon, the Louisiana Coushatta ended up paying Scanlon the most. Initially, the Tribe hired Scanlon to help with its compact renegotiations with the State of Louisiana. But, after having successfully done so, Scanlon dramatically expanded his scope of work, which ranged from squelching supposedly ubiquitous threats to the Tribal casino's customer market share to supposedly getting the "right" candidates elected to the Louisiana State Legislature. To its detriment, the Tribe trusted Abramoff and Scanlon's expertise in Indian gaming and were captured by their lure of making the Coushatta "the Choctaw of Louisiana." Accordingly, it deferred to Abramoff and Scanlon's judgment when they recommended that it fund very expensive grassroots campaigns. Ultimately, having collected about $30,000,000 from the Louisiana Coushatta during the relevant period, Scanlon secretly kicked back to Abramoff about $11,450,000—about 50 percent of his total profit from the Tribe. This includes a payment of $1,000,000 that Abramoff and Scanlon manipulated the Tribe into paying to Abramoff's private charity, the Capital Athletic Foundation ("CAF").

Abramoff and Scanlon's efforts to sign on the Saginaw Chippewa and the Agua Caliente as clients are notable. With both Tribes, Abramoff and Scanlon insinuated themselves into Tribal Council elections to maximize their chance of getting hired afterwards. In particular, they provided, among other things, strategic advice and material support to some of the candidates. Those who ran in the Saginaw Chippewa election called themselves the "Slate of 8." The weight of evidence obtained by the Committee indicates that, in both the Saginaw Chippewa and Agua Caliente cases, those candidates who were elected to the Council with Abramoff and Scanlon's assistance ultimately supported Abramoff and Scanlon's contract proposals because of, or in exchange for, the assistance that Abramoff and Scanlon provided them.

Key to Abramoff and Scanlon's success in getting contracts with the Saginaw Chippewa and the Agua Caliente was the assistance of non-Tribal Members Christopher Petras and Michael Chapman, respectively. In the course of the Tribe's dealings with Abramoff and Scanlon, Abramoff and Scanlon apparently provided each things of value. Evidence indicates that, over the course of Abramoff and Scanlon's representation of the Saginaw Chippewa, Abramoff and Scanlon provided Petras with a great deal of attention during his frequent trips to Washington, D.C. (which, with private cars, tickets to sporting events and concerts, meals at posh restaurants, and meetings with prominent personalities, one former Abramoff associate described as a "dog and pony show") and some favors. Likewise, for the services that Chapman provided Abramoff and Scanlon over the course of the Agua Caliente retainer, Chapman received about $271,482.

From June 2002 through October 2003, the Saginaw Chippewa paid Scanlon about $3,500,000 for among other things "a strategy for making [the Tribe] the most dominant political entity in Michigan" that Scanlon called "Operation Redwing." Of those proceeds, Scanlon secretly kicked back to Abramoff about $540,000—about 50 percent of his total profit from the Tribe during this period. Similarly, from the Agua Caliente, Scanlon collected about $7,200,000

11

from the Agua Caliente during the relevant period and appears to have secretly split about 50 percent of his total profit from that Tribe with Abramoff.

How Abramoff and Scanlon had the Tigua hire them was particularly aggressive. In late 2001 through early 2002, (largely with the assistance of Ralph Reed) Abramoff and Scanlon successfully helped Texas authorities shut the Tigua's casino down, as violating federal law. Despite the fact that the Louisiana Coushatta's casino was in southwest Louisiana and the Tigua's was in El Paso, Texas, Abramoff and Scanlon succeeded in persuading the Louisiana Coushatta that the Tigua posed a threat to its customer market share. So, the Louisiana Coushatta largely funded the grassroots effort to help close their casino.

Having succeeded in helping shut down the Tribe's casino, Abramoff and Scanlon then pitched their services to help reopen it. In pitching their services, Abramoff offered to represent the Tribe on a *pro bono* basis if it hired Scanlon for millions of dollars to provide grassroots support for his federal lobbying effort. He did so without telling the Tribe of his financial arrangement with Scanlon.

After they signed the Tigua on as a client, Abramoff and Scanlon promised to, among other things, insert language allowing the Tribe to re-open its casino. Cumulatively, Scanlon called this plan "Operation Open Doors." Abramoff and Scanlon were ultimately unsuccessful, despite that they collected (and split between themselves) millions of dollars from the Tribe. Having collected about $4,200,000 from the Tigua during the relevant period, Scanlon secretly kicked back to Abramoff about $1,850,000—about 50 percent of his total profit from the Tribe.

The Pueblo of Sandia hired Abramoff and Scanlon to help them with the lobbying aspects of a legal dispute related to Sandia Mountain, revered by the Tribe as sacred. Abramoff pitched his and Scanlon's services as a "package deal," actually insisting that the Tribe hire Scanlon as its public relations specialist. He even offered to reduce Greenberg Traurig's retainer in contemplation of the Tribe's hiring Scanlon, but insisted that Scanlon's asking price could not be reduced further because his 10 percent profit margin was "locked in." After having paid Scanlon about $2,750,000 for grassroots work intended to support Abramoff's federal lobbying effort, the Tribe became dissatisfied with the quality of Scanlon's effort and ceased the representation. From those proceeds that Scanlon collected from the Pueblo Sandia during the relevant period, on information and belief, Scanlon secretly split about 50 percent of his total profit from the Tribe, with Abramoff.

A couple of "gimme five" entities—entities owned or controlled by Abramoff or Scanlon that they used in their kickback scheme—are especially worth noting. One is an "international think tank" called the American International Center ("AIC"). With two of Scanlon's beach buddies sitting on its board, AIC's purpose was actually to collect fees associated with activities conducted by others and, in some cases, divert those fees to entities owned or controlled by Scanlon or Abramoff. In other words, AIC was a sham. From 2001 through 2003, the Choctaw

and the Coushatta paid AIC about $6,308,854. While much of this money went to vendors such as Reed, to conduct grassroots activities supportive of the Tribes' gaming interests, as intended, millions did not.

CAF, Abramoff's private charity, is a particularly interesting "gimme five" entity. In total, four of the Tribes paid CAF about $2,075,000. The totals for each Tribe is as follows: the Louisiana Coushatta, $1,000,000; the Choctaw, $1,000,000; the Saginaw Chippewa, $25,000; and the Alabama Coushatta, $50,000, which was not even a client. Evidence obtained by the Committee indicates that Abramoff treated CAF as his own personal slush fund, using CAF for a number of activities wholly unrelated to its charitable mission and tax-exempt status. Such activities included, for example, evading taxes, financing lobbying activities and purchasing military-related equipment.

In 2001, the single largest contributor to CAF was the Louisiana Coushatta, supposedly giving CAF $1,000,000. However, the Tribe never intended to make a charitable contribution to CAF. While it thought that its money was going to fund its grassroots activities, the money simply padded the coffers of CAF for Abramoff's discretionary use.

In 2002, Abramoff and Scanlon manipulated the Choctaw into sending directly and indirectly $2,000,000 to CAF, making the Choctaw CAF's largest donor that year. However, the Choctaw never intended to contribute to CAF. The Tribe thought that its payments to CAF were going to pass through to grassroots organizations working to oppose the expansion of gaming in the Tribe's customer market. The Tribe's money was not used for its intended purpose.

As described above, Abramoff also deceived the Saginaw Chippewa into paying $25,000 to CAF that year. While the Tribe was led to believe that CAF "create[d] programs that teach leadership skills to disadvantaged youth in the D.C.-area in an effort to keep them off the streets and enhance their educational opportunities" and was a charity important to an important Member of Congress, the Tribe's "donation" was used to partially fund a widely publicized golf trip to Scotland for then-Congressman Tom DeLay and others.

For 2003, CAF's tax records do not list any Tribe as a donor. However, substantial evidence indicates that a $47,891 contribution to CAF listed as having been made by Abramoff's corporate alter ego, Kaygold, and a $950,000 contribution from a Scanlon-controlled entity called Atlantic Research & Analysis ("ARA") were actually funds from some of the Tribes, paid as a result of Abramoff and Scanlon's manipulation.

Among the third parties that Abramoff had some of his Tribal clients pay money was an environmental organization called the Council of Republicans for Environmental Advocacy ("CREA"). From 2001 through 2003, Abramoff managed to have these Tribes "contribute" at least $250,000 to CREA, sometimes under false pretenses. The Coushatta, for example, paid CREA $25,000 to help the Department of the Interior with a "national park study," which was

apparently never conducted. Likewise, the Saginaw Chippewa made a $25,000 donation, having been told that former Interior Secretary Gale Norton was "involved" with and supported CREA and that supporting such "a project" that the Secretary was involved with would "look good" for the Tribe. In both cases, the Tribes were deceived.

In any event, with the possible exception of the Choctaw, the Committee found no evidence that those Tribes that gave to CREA did so because of any interest in CREA's mission. In fact, Abramoff apparently had his clients contribute to CREA, whose president Italia Federici described as a "mom and pop" operation, because he believed that Federici would help him possibly influence tribal issues pending at the Department of the Interior. Ample evidence indicates that she repeatedly told Abramoff that she would talk with a particular senior Interior official to help ensure that the concerns of Abramoff's clients were addressed. However, what she, or her working contact at Interior, former Deputy Secretary J. Steven Griles, actually did at Interior for the benefit of Abramoff's tribal clients, remains unclear.

# PART III

## CHAPTER I

### COUNCIL OF REPUBLICANS FOR ENVIRONMENTAL ADVOCACY

Who writes $50,000 checks to people they don't know if it wasn't what Jack—Jack said these people have a lot of money, they want to give to Republicans, they're taking my advice, and they really just don't want to be bothered with executive directors [like me]. Fine, and then they sent their checks in.  And then what did these disappointed people think they were going to get, and you tell me who's committing fraud ....  I mean it all fit ....

> Deposition testimony of CREA President Italia Federici to Committee staff, October 7, 2005

You are an environmental organization.  You come into a lot of money from Indian tribes.  My guess is that that money had nothing to do with generosity, or had very little to do with energy or the environment, but had a lot to do with Mr. Abramoff saying to his contacts in these tribes, 'I want you to stick money into Ms. Federici's organization,' and they did.

> Comments from Committee Vice-Chairman Byron Dorgan to CREA President Italia Federici during  Committee hearing, November 17, 2005

## A.    Background

Among the issues investigated by the Committee is whether monies paid by the Tribes at Jack Abramoff or Michael Scanlon's direction, to or through particular entities, were used for purposes intended by the Tribes.  In that context, the Committee is concerned about "contributions" that some of the Tribes made at Abramoff's direction to an organization called the Council of Republicans for Environmental Advocacy ("CREA") and, in particular, the circumstances under which they made those contributions.

CREA was created in 1997 by Italia Federici.[1]  In her deposition with Committee staff, Federici stated that she originally formed the organization in the memory of her mother.[2]  According to Federici, her mother passed away two weeks before former Interior Secretary Gale

---

[1]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[2]*Id.*

Norton's 1996 campaign for the U.S. Senate ended.[3]  (Federici testified that she worked on Norton's failed Senate campaign "from the day that it started to the day that it ended."[4])  Federici stated that her mother "liked the notion, my idea of a Republican environmental organization, so I decided to kind of honor her memory by creating CREA in 1997."[5]  Subsequently, Norton and anti-tax activist Grover Norquist came on board as CREA's honorary national co-chairmen.[6]

According to Federici, CREA later closed "because we reorganized when we moved out here [to Washington, D.C.] in 1999 and [prominent Republican lawyer] Ben Ginsburg became our general counsel and he said, I want to reincorporate you guys in the District [of Columbia]."[7]

It did so.[8]  After having been registered as a 527 political fund-raising entity, it reorganized as a 501(c)(4) non-profit organization.[9]  According to CREA's website, its mission is

---

[3]*Id.*  During her deposition, Federici recalled first working with Norton on her race for Colorado attorney general, after a volunteer stint on the 1994 Jeb Bush for Governor campaign. *Id.* Federici testified that she later worked on Norton's failed 1996 U.S. Senate campaign "from the day that it started to the day that it ended." *Id.*

[4]*Id.*

[5]*Id.*  In her deposition, Federici could not recall having drawn a salary from the CREA from 1997-2000. *Id.* In 2001, she believed that "her income tax return said that [she] made like $25,000." *Id.* And, in 2002, she believed that she "might have made like 56 [thousand dollars]" and $85,000 in 2003. *Id.* It is noteworthy that Federici's salary from the CREA appears to have spiked during the period that Abramoff's Tribal clients contributed to the CREA.

[6]*Id.*  Federici described, in her deposition with Committee staff, that Norquist was instrumental to the CREA by including the CREA in his Wednesday policy meetings and introducing the CREA to Newt Gingrich, who served as CREA's "first kickoff speaker ever, which was huge." *Id.* She further described Norquist as "[j]ust always helpful, [providing] good advice." *Id.* According to an email dated January 8, 1999, Federici met Abramoff "at a football game with ... Norquist." Email between Susan Ralston, Greenberg Traurig, and Jack Abramoff, Greenberg Traurig, "Call from" (GTG-E000079149) (January 8, 1999).

[7]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[8]*Id.*

[9]Originally called the Coalition of Republicans for Environmental Advocacy, in mid-2000, CREA was renamed the Council of Republicans for Environmental Advocacy and registered as both a 527 political fund-raising entity and as a D.C.-based 501(c)(4), a nonprofit organization that may engage in some lobbying activities. Josephine Hearn, *DOJ subpoenas GOP group*, The Hill, March 1, 2005. However, last year, CREA reportedly edited a reference

"to foster environmental protection by promoting fair, community[-]based solutions to environmental challenges, highlighting Republican environmental accomplishments and building on our Republican tradition of conservation."[10]

### 1.    Abramoff Has His Tribal Clients Pay CREA

In testimony before the Committee, Federici revealed that, from 2001 through 2003, Abramoff or his clients "contributed" in total about $500,000 to CREA.[11] Evidence obtained by the Committee indicates that Abramoff directed some of his Tribal clients to "contribute" to CREA, occasionally under false pretenses. For example, to induce the Ysleta del Sur Pueblo of Texas ("Tigua") into giving $25,000 to CREA in 2002, Abramoff told a Tribal representative that CREA was "a DeLay organization."[12]

In March 2002, the Mississippi Band of Choctaw Indians ("Choctaw") contributed $50,000 to CREA.[13] In soliciting the Tribe for that contribution, Abramoff told that Tribe that CREA did work "in terms of liberalizing environmental rules and that was an activity the Tribe wanted to support."[14]

In 2001, the Coushatta Tribe of Louisiana ("Louisiana Coushatta") gave $50,000 and $100,000 in 2002.[15] Of the $50,000 that the Tribe paid CREA in 2001, it paid at least $25,000 in

---

on its website referring to it as a 501(c)(4), replacing the text with more vague language. *Id.*

[10]Website, Council of Republicans for Environmental Advocacy, "Mission Statement." http://www.crea-online.org/2222-20.html (last visited, June 3, 2006). Since its inception, CREA has met skepticism from other environmental groups. *See* Josephine Hearn, *DOJ subpoenas GOP group*, The Hill, March 1, 2005. For example, Republicans for Environmental Protection called the group a "greenscam" in 1998 after it was revealed that the group received significant funding from the mining, logging, chemical and coal industries. *Id.*

[11]"Tribal Lobbying Matters," *Hearings before the Committee on Indian Affairs*, 109th Cong. at 38-40 (November 17, 2005).

[12]*See* Interview of Marc Schwartz, president, Partners Group Consultants, by telephone (February 22, 2005).

[13]Interview of Nell Rogers, planner, Mississippi Band of Choctaw, in Choctaw, Mississippi (April 27, 2005).

[14]Interview of Nell Rogers, planner, Mississippi Band of Choctaw, in Choctaw, Mississippi (April 27, 2005).

[15]Interview of William Worfel, former Vice-Chairman, Coushatta Tribe of Louisiana, in Washington, D.C. (September 13-14, 2005).

connection with a private fund-raiser, held on September 24, 2001.[16]  During that dinner, Tribal Chief Lovelin Poncho met Norton and other senior Administration officials.[17]

In his interview, former Louisiana Coushatta Vice-Chairman William Worfel testified that the $25,000 that the Tribe paid to CREA was actually intended to support a "national park research study" that Interior was supposedly conducting—a "pet project."[18]  He was told that the Choctaw had contributed, or intended to contribute, $25,000 to CREA in support of the study[19] and that "Interior then would look and always consider you [that is, the Tribe] friends because you went out on a limb, you went out, reached in your pockets and helped a pet project of the U.S. Department of the Interior when they was [sic] strapped for funds."[20]

The Committee has seen no evidence that this study was ever conducted.  Worfel never saw this study and does not know whether such a study was actually conducted.[21]  Former Interior Deputy Secretary J. Steven Griles testified at a Committee hearing that he too is unaware of such a study and is highly skeptical about whether one was ever conducted.[22]

Apparently, Abramoff used a different pretext to induce the Saginaw Chippewa Indian Tribe ("Saginaw Chippewa") to contribute at least $50,000 to CREA.  In his interview with Committee staff, former Tribal Council member David Otto recalled that former Tribal legislative director Chris Petras told him that CREA was a group with which then-Interior Secretary Norton was "involved."[23]  Petras said that supporting a project the Secretary was

---

[16]*Id.*

[17]*Id.*

[18]*Id.  See* "Tribal Lobbying Matters" *Hearings before the Committee on Indian Affairs*, 109th Cong. at 45 (November 2, 2005).

[19]*Id.  See* Interview of Nell Rogers, planner, Mississippi Band of Choctaw, in Choctaw, Mississippi (April 27, 2005).

[20]Interview of William Worfel, former Vice-Chairman, Coushatta Tribe of Louisiana, in Washington, D.C. (September 13-14, 2005).

[21]"Tribal Lobbying Matters" *Hearings before the Committee on Indian Affairs*, 109th Cong. at 50-53 (November 2, 2005).

[22]*See id.* at 107 ("I do not have any recollection of that today at all.  At some point in my background, somebody may have told me something, but I was not at Interior, and I cannot imagine conducting a poll for Interior, Senator.").

[23]Interview of David Otto, former council member, Sagniaw Chippewa Indian Tribe, in Washington, D.C. (August 27, 2004).

involved with would "look good" for the Tribe, according to Otto.[24]  Otto also recalled that he was told that doing so would help them with appropriations for their school, drug abuse center, senior center, and other facilities.[25]

Documents reflect that after Norton became Secretary, Abramoff told Petras (and members of his own lobbying team) that Norton supported CREA.  In an attempt to get the Tribe to financially support the September 2001 CREA fund-raiser, Abramoff pitched CREA to Petras as "hav[ing] been incredibly helpful on certain specific tribal issues."[26]  He also identified CREA as "[Secretary] Norton's main group outside the department."[27]  Having sold CREA on Petras (who was to approach the Tribal Council for a contribution), Abramoff directed his assistant to amend a requested contribution list he was sending to the Saginaw Chippewa to "add in $50,000 for CREA and put a note in the candidate column as follows: Sec. Norton."[28]

The Committee has seen no evidence that Abramoff's representations about Norton's interest in CREA are true.  Nor has the Committee seen any evidence to suggest that Norton knew of, much less sanctioned, Abramoff's or anyone else's using her name in seeking fees and donations from Native Americans.[29]  However, it is clear that, at some point, Abramoff came to believe that CREA President Italia Federici had special access at Interior and that she was willing to use it for his or his clients' benefit.  That is reflected in numerous documents, described in this Chapter, illustrating how Abramoff repeatedly went to Federici urgently asking for her help with

---

[24]*Id.*

[25]*Id.*

[26]Email from Jack Abramoff, Greenberg Traurig, to Chris Petras, Sagniaw Chippewa Indian Tribe (GTG-E000105234) (September 20, 2001).

[27]*Id.*

[28]Email from Jack Abramoff, Greenberg Traurig, to Allison Bozniak, Greenberg Traurig (GTG-E000107697) (January 31, 2002).

[29]Federici, Griles and Norton's former counselor at Interior, Michael Rossetti, have testified that Norton had no relationship with CREA after Norton became Interior Secretary. Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005); Interview of J. Steven Griles, former deputy secretary, Department of the Interior, in Washington, D.C. (October 20, 2005); Interview of Michael Rossetti, former counselor to the Secretary, Department of the Interior, in Washington, D.C. (October 28, 2005).  In addition, Federici testified that she never had any conversations with Norton between 2001 and 2004 about any of Abramoff's Tribal clients.  Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

326

Interior on pending matters affecting his much-valued Tribal clients. It is also reflected in how much he had these same clients "donate" to CREA. It is further corroborated by a number of internal business communications between Abramoff and his team members that reflect his belief.

A notable example of such communications is an email, dated January 3, 2002, entitled "Italia Meeting," from Abramoff to members of his team. In this document, Todd Boulanger, a senior member of Abramoff's team asked, "Can [Italia] get shit in the President's budget to [C]ongress?"[30]

Abramoff responded, "I don't think she has juice beyond [I]nterior."[31] Another example is an email between Abramoff and Boulanger, dated February 12, 2002, entitled "Political Contribution Requests." In that email, the two discussed including CREA in a political contribution request list they were submitting to the Saginaw Chippewa.[32] Abramoff wrote Boulanger, "Todd, did we not request money for CREA from them? That's our access to Norton. We need $ for them more than many of these others."[33]

Still another example is an email from Abramoff to business associate and Signatures partner Rodney Lane, entitled "CREA—Freshman Reception." There, the two discussed "comping" a CREA function.[34] Ultimately, Abramoff replied, referring to Federici, "[u]nfortunately, she is critical to me."[35] This email is typical of others, such as an email dated June 27, 2002, that describes Abramoff's reluctantly "comping" CREA functions—at least some of which appear to have been attended by Members of Congress, senior Administration officials, or their senior staff.[36] The Committee finds that only one person could have induced Abramoff so convincingly into believing that Federici had stroke at Interior that he directed his Tribal clients to provide substantial contributions to what she herself described as a "mom and pop non-

---

[30]Email between Todd Boulanger, Greenberg Traurig, and Jack Abramoff, Greenberg Traurig (GTG-E000107575) (January 3, 2002).

[31]*Id.*

[32]Email between Jack Abramoff, Greenberg Traurig, and Todd Boulanger, Greenberg Traurig (GTG-E000025072) (February 12, 2002).

[33]*Id.*

[34]Email between Jack Abramoff, Greenberg Traurig, and Rodney Lane (GTG-E000105191) (March 4, 2003).

[35]*Id.*

[36]*See, e.g.*, Email from Jack Abramoff, Greenberg Traurig, to Rodney Lane (GTG-E000105140) (June 27, 2002).

profit"[37]—Italia Federici.  What she said or did to so induce him into this belief is one question, among others, that this Chapter attempts to answer.

## 2. Federici Promises to Help Abramoff in Exchange for, or Because of, CREA Contributions

When she testified before the Committee, Federici attempted to explain the Tribes' largesse to her organization by saying that Abramoff told her that his Tribal clients were concerned that over the decades, Democrats became dominant in electoral politics.[38]  So, according to Federici, Abramoff told her that those Tribes had become used to giving very "heavily to one political party and ... wanted to diversify."[39]  They wanted to make sure that they were giving "more evenhandedly."[40]

As an explanation for why Abramoff's clients gave so much to CREA within such a short period of time, this is unconvincing.[41]  There is no doubt that Abramoff directed his Tribal clients to contribute to CREA.  The question is why?  Why would Abramoff have had his much-valued Tribal clients (whom he relied on as a significant source of sizeable federal campaign contributions as well as millions in federal lobbying revenue to Greenberg Traurig, secret "gimme five" partnership income with Scanlon, contributions to run his Jewish boys' school in Maryland; and capital to float his restaurants) pay so much to this obscure organization?

---

[37]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[38]*Id.*

[39]*Id.*

[40]*Id.*

[41]In somewhat surprising testimony, it seems that Federici too found this rationale implausible.  While discussing Abramoff's explanation as to why his tribal clients were willing to make sizeable contributions to CREA without directly discussing with her CREA's mission or work, the following exchange occurred during Federici's deposition.  "FEDERICI:  Who writes $50,000 checks to people they don't know if it wasn't what Jack—Jack said these people have a lot of money, they want to give to Republicans, they're taking my advice, and they really just don't want to be bothered with executive directors [like me].  Fine, and then they sent their checks in.  And then what did these disappointed people think they were going to get, and you tell me who's committing fraud ... I mean it all fit ....  STAFF:  [Mr. Abramoff] told you that?  FEDERICI:  Yes ...."  *Id.*  Why, given her concerns, Federici continued to accept these contributions remains unclear.  The Committee defers to law enforcement authorities to determine (1) whether, in connection with their contributions to CREA, the Tribes were in fact defrauded and, (2) if they were defrauded, who did so or conspired to do so.

Documents in the Committee's possession suggest that Abramoff did so because of, or in exchange for, special favors that Federici had promised to do for him or his Tribal clients at Interior.

## B.    Abramoff and Federici Start Working Together

In her deposition with Committee staff, Federici recalled first reaching out to Abramoff, on the advice of friends, to try to persuade him to participate in a real estate investment deal.[42]  In the course of discussing that deal, they first discussed CREA.[43]  On January 30, 2001, it appears that Federici held herself out to Abramoff as having access to the political appointment process being undertaken by the incoming Administration:

> I very much appreciate your generous offers regarding CREA and I've been working on the document you requested regarding grassroots and strategy.  I look forward to sharing it with you when you return.  According to the folks I've talked with, Gale is expected to be confirmed with about 80 votes ....  Jeanne Adkins (my friend from [Colorado]) has been offered the CFO position.  She and I are talking later about other positions and she will continue to discuss resumes with appropriate contacts ....[44]

Abramoff got the hint.  After having offered to help raise money for CREA,[45] he responded, "Thanks so much Italia.  Please let me know what I can do to help Dennis Stevens, Mark Zachares (Office of Insular Affairs) and Tim Martin (Bureau of Indian Affairs) be placed.  Look forward to hearing form [sic] you regarding CREA."[46]  Apparently, these were individuals

---

[42]See id.

[43]See id.

[44]Email between Italia Federici, Council of Republicans for Environmental Advocacy, to Jack Abramoff, Greenberg Traurig (GTG-E000105164) (January 30, 2001) (emphasis added). Federici construed these "generous offers" from Abramoff to mean "[in] general, let's get you funded, let's get some support for you guys, this looks like a really good idea."  Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[45]See id.

[46]Email between Italia Federici, Council of Republicans for Environmental Advocacy, to Jack Abramoff, Greenberg Traurig (GTG-E000105164) (January 30, 2001).

who Abramoff, for his own reasons, wanted placed in the Administration.[47]

According to an email dated March 1, 2001—just seven days before the President nominated Griles for the second highest position at Interior, Abramoff met with Griles.[48] Apparently, Federici was present—later reporting to Abramoff that "[a]fter I retrieved my coat I ended up sharing a cab with Steve [Griles]. He really enjoyed meeting you and was grateful for the strategic advice on BIA and Insular Affairs. You definitely made another friend."[49]

---

[47]During Federici's deposition with Committee staff, staff specifically asked her, "Did you ever help Mr. Abramoff in getting any particular person into the U.S. Department of the Interior at transition in 2000 after the election?" Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005). She responded, "No. Like everyone else in Washington, Jack was forwarding me names of people he thought [then-Interior Secretary] Gale [Norton] would love .... [Abramoff would ask] Hey it would be great if she could interview this person or that person." Id. Documents in the Committee's possession suggest what Abramoff had in mind. For example, in a contemporaneous email from Abramoff to former Christian Coalition Executive Director Ralph Reed, Abramoff asked Reed for help placing him on the Interior transition team, noting, "this [sic] would be really key for future clients for both of us. Let's discuss." Email from Jack Abramoff, Preston Gates Ellis & Rouvelas Meeds, to Ralph Reed, Century Strategies, "Interior Dept [sic] transition team" (GTG-E000022954) (October 24, 2000). Reed responded, "ok." Id.

[48]See Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig, "Thanks from me and Steve and Invitation" (GTG-E000037865) (March 1, 2001).

[49]Id. While Griles vaguely recalls having met Abramoff "sometime before becoming Deputy Secretary," his specifically recalls first meeting him at the September 2001 private dinner for CREA. See Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, DC (October 20, 2005). Griles could not remember what he talked with Abramoff about—only that he "spoke and said hello to everyone who was there." Id. A few weeks after that dinner, Abramoff prepared a letter to Griles, thanking him for "calling me today" and expressing appreciation for "your help with the [Commonwealth of the Northern Marianas Islands ("CNMI")] governor's race and ensuring that the President does NOT endorse anyone in that race, in particular the liberal "Republican" Juan Babuata, who is running against the Speaker and former chairman of the Bush campaign there, Ben Fitial." Email from Jack Abramoff, Greenberg Traurig, to J. Steven Griles, U.S. Department of the Interior; to Laura Lippy, Greenberg Traurig, "FW: Letter" (GTG-E000105260) (October 18, 2001) (emphasis in original). At his deposition, Griles had no recollection of having had any conversations with Abramoff about the CNMI, Fitial or "anything like that with the White House." Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005). Furthermore, Griles insisted that "if [he] would have done something on that, [he] would think that [he] would recall it today." Id. In his draft letter to Griles, Abramoff went

330

Abramoff responded, in part: "Thank you so much for everything. I am so glad we are working together."[50]

According to records recently released by the Secret Service, Abramoff visited the White House on March 6, 2001—two days before Griles' nomination.[51] After Griles was nominated but before he was confirmed, documents suggest, Abramoff tried to approach Griles about tribal issues, in particular, about the BIA's tribal insurance policy.[52]

Also in this interim, Abramoff worked with Federici on some special projects. For example, according to an email dated April 10, 2001, entitled "Ben Fitial seeing Secretary Norton," Federici tried to help Abramoff get a photo opportunity for Ben Fitial with Secretary Norton.[53] Fitial had successfully run for governor of the Commonwealth of the Northern Marinas Islands ("CNMI") and reportedly pressured senior CNMI officials to hire Abramoff. In this email, Federici and Abramoff discussed that the Secretary was not doing "photo-ops" with anyone.[54] In that context, Federici promised Abramoff that she would "try to figure out what exactly is going on over there."[65] Interestingly, Federici also offered to cover Fitial's travel

---

further, writing, "I also appreciate anything you can do to prod things forward to get Mark Zachares into position at OIA." Email from Jack Abramoff, Greenberg Traurig, to J. Steven Griles, U.S. Department of the Interior; to Laura Lippy, Greenberg Traurig, "FW: Letter" (GTG-E000105260) (October 18, 2001). The Committee has seen no evidence that this letter was ever sent.

[50]Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig, "Thanks from me and Steve and Invitation" (GTG-E000037865) (March 1, 2001).

[51]Press Release, Judicial Watch, *U.S. Secret Service Releases to Judicial Watch White House Logs Detailing Abramoff Visits—Logs Appear to be Incomplete, Show 2 Documented Visits Available on Judicial Watch's Internet Site, www.judicialwatch.org,* http://www.judicialwatch.org/abramoff-docs.shtml May 10, 2006 (linking to "Abramoff Secret Service Logs").

[52]*See e.g.*, Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy, "Subject: urgent tribal issue" (SENCREA 00018) (March 20, 2001).

[53]Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig (GTG-E000105287) (April 10, 2001).

[54]*Id.*

[55]*Id.*

331

expenses to Washington, D.C. in the future and "schedule [a] meeting with Gale."[56]

Likewise, in an email dated May 7, 2001, entitled, "[former Louisiana Coushatta Chairman] Chief Poncho," Federici asked Abramoff, "[i]s there something that I can do to say thank you for [Chief Poncho's] support for CREA - besides the time with Sec. Norton [?]."[57]

On July 18, 2001, less than a week after Griles arrived in office,[58] Abramoff wrote former Louisiana Coushatta counsel Kathryn Van Hoof and an associate covering the Tribe:

> I have a call into our guy Steve Griles, the Deputy Secretary and his assistant has a memo on the situation .... Just so I am clear when he and I do hook up, what is our full wish list at this point other than to inform him of the situation on the ground and the need, possibly, to get some positive signals from Norton to the Governor?[59]

He concluded, "Just want to make sure I make all the asks we need."[60]

Afterwards, with Abramoff apparently having induced at least one of his Tribal clients into contributing to CREA in connection with the September 2001 private dinner, Federici wanted to help with Abramoff's book of business. In an email dated January 2, 2002, entitled "dates for another dinner [sic]," Federici proposed to Abramoff another CREA dinner at a private

---

[56]*Id.*

[57]Email from Italia Federici, Council of Republicans for Environmental Advocacy, to Jack Abramoff, Greenberg Traurig (GTG-E000105174) (May 7, 2001). This is similar to an email dated a few months later, January 26, 2002, entitled "Hi Italia." There, Abramoff asked Federici whether she had "any word on getting the Chief a meeting with Gale?" Email between Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000018) (January 26, 2002). In response, Federici offered, "I meet with folks tomorrow and I will call you tomorrow in the early evening." *Id.*

[58]The Senate confirmed Griles as Deputy Secretary of the U.S. Interior Department on July 12, 2001.

[59]Email from Jack Abramoff, Greenberg Traurig, to Kathryn Van Hoof, Coushatta Tribe of Louisiana, and Shawn Vasell, Greenberg Traurig, "Status" (COUSH-MiscKVH-0001529) (July 18, 2001).

[60]*Id.*

residence.[61]  According to this email, Federici offered to "target" intergovernmental relations officials from agencies that Abramoff "need[ed] to work with on CNMI and Indian issues."[62] Abramoff was amenable to the idea.[63]  In a similar email, Federici held out the possibility that she could get Abramoff together with Griles and former Assistant Secretary for Indian Affairs Neil McCaleb for a small lunch or dinner.[64]  Abramoff responded, "A small lunch with Steve would be huge for us, since we really need to get to know him."[65]  There can be no doubt that a "CREA dinner" that focused on Abramoff's lobbying needs and "target[ed]" agencies that Abramoff "need[s] to work with on CNMI and Indian issues"[66] had little to do with CREA's tax exempt purpose.

## C.    Contributions in Exchange for Access?

A number of records indicate that Federici promised to help Abramoff's clients in contemplation of continued contributions from Abramoff's clients to CREA.  Among those records is a January 9, 2003, email between Federici and Abramoff, entitled "help??!!," in which Federici asked Abramoff, "I hate to bother you with this right now, but I was hoping to ask about a possible contribution for CREA ... [we] have started out the new year with practically nada.  I thought I'd see if there was any way you could help us reach out to some of your folks who were so generous last year?"[67]

Abramoff responded, "Absolutely.  We'll get that moving asap. [REDACTED] are

---

[61]Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig (GTG-E000253568) (January 2, 2002).

[62]*Id.*

[63]*Id.*

[64]Email between Italia Federici, Council of Republicans for Environmental Advocacy, to Jack Abramoff, Greenberg Traurig (GTG-E000105067) (January 3, 2002).

[65]*Id.*  The Committee notes the apparent inconsistency between Abramoff's statement in this email and other older emails (some of which the Committee has cited to above) in which Abramoff professes to have a close relationship with Griles.

[66]Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig (GTG-E000253568) (January 2, 2002).

[67]Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig (GTG-E000105202) (January 9, 2003).

coming to DC [REDACTED] so I'll hit them immediately."[68]

But, he continued, "By the way[,] Gov Foster ... just sent Gale another letter pushing a new compact he signed for [J]ena. Can you make sure Steve [Griles] knows about this and puts the kibosh on it? Thanks."[69]

Federici promised, "I will tell him where they are now - and with whom. Thanks Jack!"[70]

Likewise, in an email from Abramoff to Federici, dated January 21, 2003, entitled "Intel from Dept of Int/BIA," Abramoff asked Federici if she could help him get inside information on BIA action on a pending matter affecting the Louisiana Coushatta, one of Abramoff's clients and a major contributor to CREA.[71] In the very next sentence, he told Federici that a contribution from one of his clients was on the way: "I'll have it in a week or so. I'm still working on the rest."[72]

In response, Federici wrote, "Thanks Jack! I will ask about the timing and content and call you."[73]

Similarly, in an April 3, 2003, email entitled, "urgent alert - DOI Proposes Policy Changes in Compact Review Process," Abramoff attached a memo on this issue to an email to Federici and wrote, "If this attached memo is correct, someone over at BIA is doing some really odd things. Any way to see if this is something coming from the top? All of our tribes are very agitated about this one."[74]

In response, Federici wrote, "I will definitely see what I can find out. I hate to bug you,

---

[68]*Id.*

[69]*Id.*

[70]Email from Italia Federici, Council of Republicans for Environmental Advocacy, to Jack Abramoff, Greenberg Traurig (SENCREA 10/04 000057) (January 9, 2003).

[71] Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000062) (January 21, 2003).

[72]Email between Jack Abramoff, Greenberg Traurig, and Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000062) (January 21, 2003).

[73]*Id.*

[74]Email between Jack Abramoff, Greenberg Traurig, and Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 [illegible]) (April 3, 2003).

but is there any news about a possible contribution from [REDACTED]?"[75]

Additionally, in an email from Abramoff to Federici, dated April 10, 2003, Federici discussed the costs associated with a CREA program. In response, Abramoff wrote, "I met last night with [a client]. They offered [REDACTED] but I felt badly asking them since they are not getting any cooperation yet. Perhaps once the court case clears in a few weeks Steve [Griles] might be able to grab control of this. [T]hey are great folks."[76]

Another example is contained in two emails from Abramoff to Federici, dated May 1, 2003. There, referring to a matter pending before Interior, Abramoff told Federici that the BIA is "about to screw the Coushattas, and the other tribes there as well" and asked "[c]an you bring this to [Steve Griles'] attention? We MUST get this stopped."[77] About an hour later, Abramoff reported to Federici that one of his clients was going to send over a contribution to CREA the following week.[78]

In an email dated August 2, 2003, and entitled "Saginaw Cost Share, " Federici responded to an email from Abramoff regarding an apparently unrelated tribal issue pending before Interior.[79] There, Federici invited Abramoff to call her "if there is an urgent matter" and said that she will "try to talk to someone about this first thing."[80]

Still another example can be seen in the email between Abramoff and Federici, dated January 26, 2002, entitled, "Hi Italia." There, Abramoff asked Federici for an update on getting the chief of one of his Tribal clients a meeting with then-Secretary Norton.[81] In the very next sentence, he gave Federici an update on a contribution to CREA from one of his clients.[82] In the

---

[75]*Id.*

[76]Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000094) (April 10, 2003).

[77]Email between Jack Abramoff, Greenberg Traurig, and Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000100) (May 1, 2003).

[78]*Id.*

[79]Email between Italia Federici, Council of Republicans for Environmental Advocacy, and Jack Abramoff, Greenberg Traurig (SENCREA 10/04 000110) (August 2, 2003).

[80]*Id.*

[81]Email between Jack Abramoff, Greenberg Traurig, and Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000018) (January 26-27, 2002).

[82]*Id.*

335

same email stream, he insisted that Federici needed to get information related to the Jena Band's efforts to get a compact, to Griles "immediately."[83]  A few weeks later, in an email, dated February 15, 2002, between Abramoff and Scanlon, entitled "shit," Abramoff described a phone call he received from Federici about information she obtained from Griles about the Jena deal.[84]

In testimony before the Committee, Federici attempted to explain away her solicitousness for Abramoff's practice as generosity or, in her words, "to be nice"—acts of kindness in the face of complaints by Abramoff, "consistent ... over the course of years," that the Bureau of Indian Affairs ("BIA") was "in the back pocket of people who didn't like him" and that his work-product and clients were not being treated fairly by Interior.[85]  Federici maintained that she was sympathetic to Abramoff's concerns about not being able to get a meeting on a timely basis or get answers to basic questions.[86]  And, she insisted, with her friend Griles serving as the chief operating officer at Interior, she was happy to help a friend.[87]

Federici's explanation is unconvincing.  The documents described above suggest that Federici promised to help Abramoff with Interior because of, or in exchange for, Abramoff's directing his clients to contribute to CREA.[88]  Indeed, contributions from Abramoff's Tribal clients were critical to CREA.  During a Committee hearing, Federici admitted that Abramoff and his clients contributed about $500,000 over the relevant period.  Also, during his deposition, Griles told Committee staff that one evening Federici called him very upset after money from Abramoff's clients stopped coming in.[89]  Griles recalled that Federici complained that because "Jack is not giving us funds anymore," she had to "go back and find more money in order to keep

---

[83]*Id.*

[84]Email from Jack Abramoff, Greenberg Traurig, to Michael Scanlon, Capitol Campaign Strategies (GTG-E000010914) (February 15, 2002).

[85]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).  According to Federici, Abramoff elaborated that "his work product and his clients were being mistreated and not treated equitably, not treated the way other lobbyists' clients were being treated." *Id.*

[86]*Id.*

[87]*See id.*

[88]It is notable that, during her deposition, Federici admitted that she never mentioned Abramoff's concerns about BIA being "in the back pocket" of others, to Griles. *Id.*

[89]Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005).

[CREA's] activities going."[90] Griles recalled simply telling Federici that she had to go back to contributors who helped her in the past.[91]

Federici's explanation that she was motivated strictly by friendship and generosity is also belied by at least one occasion when Federici apparently lied to Abramoff about a promise to communicate with Griles. In an email, dated September 24, 2002, Abramoff asked Federici for a favor: to ask Griles to mention him to a Tribe with which Griles was meeting.[92] To this request, Federici responded, "I will remind him about that and I'm sure he'd love to mention your help."[93] However, in her deposition, Federici dismissed the email, saying that she did not approach Griles about this because she actually thought Abramoff's request was "cheesy."[94] But, she never told Abramoff that she decided not to do as she had originally promised.[95] Why not? Likely to ensure that Abramoff would continue directing his clients to make significant contributions to CREA.

Vice Chairman Dorgan summarized Federici's testimony, and the Committee's skepticism of her testimony, at a recent hearing: "You are an environmental organization. You come into a lot of money from Indian tribes. My guess is that that money had nothing to do with generosity, or had very little to do with energy or the environment, but had a lot to do with Mr. Abramoff saying to his contacts in these tribes, 'I want you to stick money into Ms. Federici's organization,' and they did."[96]

At the same hearing, the Vice Chairman succinctly described the Committee's belief of why Abramoff's clients contributed so much to CREA, as follows:

I am just telling you that our records are full of these things. It is full

---

[90]*Id.*

[91]*Id.*

[92]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005). *See also* Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (GTG-E000105153) (September 24, 2002).

[93]*Id.*

[94]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[95]*Id.*

[96]"Tribal Lobbying Matters" *Hearings before the Committee on Indian Affairs*, 109th Cong. at 31 (November 17, 2005).

of references to the duties that you were performing [or promised to perform] for Mr. Abramoff. Those duties had to do with the term 'juice' that also exists in our set of records. You had 'juice.' You got paid for that 'juice' by having Mr. Abramoff direct funds to your organization, and you spent a lot of time in your correspondence back and forth with Mr. Abramoff about what you are doing; not about the environment; not about energy; [but about] all of these issues that have to do with Mr. Abramoff. It looks to me like you were working for Mr. Abramoff and you were getting money from Indian tribes to do it. That's what it looks like to me."[97]

He also observed, "The way you describe it in this testimony is the Indian tribes are generous; Jack is generous; everybody is generous. That is unbelievable to me."[98] It is unbelievable to the Committee.

## D.    What did Federici Do for Abramoff at Interior?

In her deposition with Committee staff, Federici said that she could only remember talking to Abramoff about three issues—a "school cost-share" issue, relating to the Saginaw Chippewa; the Gun Lake Tribe's land-into-trust application; and the Jena Band's attempts at getting land-into-trust and a compact in Louisiana.[99]

For the Saginaw Chippewa, Abramoff asked Federici to help him with former Interior Deputy Secretary Griles on a "school cost share program."[100] This was one context that, according to Federici, Abramoff told her that the BIA was in the back-pocket of people who did not like him and that his clients were not being treated fairly. Consequently, Federici testified, she felt bad for Abramoff and thought she could help with Griles.[101] But, when Abramoff sometimes asked her to get Griles to "kill" this or "put the kibosh" on that, she never told him

---

[97]*Id.* at 32.

[98]*Id.* at 33.

[99]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[100]Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000110) (August 21, 2003).

[101]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

338

that she would not do any of it or ever correct him, she said.[102]  She wasn't "going to correct a 50-year old, male, conservative activist leader, [and] you know, donor."[103]

About the "school cost share" program, Federici denied having had a substantive conversation with Griles.[104]  According to Federici, she merely mentioned to Griles, "Is anybody paying attention to what's going on with the school cost share [?]"[105]  Otherwise, she recalled only having repeated Abramoff's "line" that excluding the Saginaw was "unfair"; that his "[clients] [weren't] being treated adequately"; and that "[M]embers of Congress are worked into a frenzy."[106]  Regarding her interaction with Griles on these and similar issues, Federici insisted, "[T]hese were not conversations.  These were mentions and sort of heads-up ...."[107]

The Gun Lake Tribe's application for land-into-trust also had the potential to negatively affect the Saginaw Chippewa.  Federici could only recall that Abramoff told her that Interior was "directly going against what Steve wanted."[108]  However, Federici has no recollection of having talked with Griles about that issue.[109]

Finally, regarding the Jena Band's efforts to get a compact and land-into-trust, which would have harmed the Louisiana Coushatta, Federici testified that Abramoff told her that key conservatives, including James Dobson and Ralph Reed, were writing in opposition.[110]  As a result, Federici recalls, she just made sure that Griles knew that "conservatives were upset" and were calling into Interior in droves.[111]  According to Federici, the foregoing reflects her memory about her discussions with Abramoff about matters affecting his clients and her communications

---

[102]*Id.*

[103]*Id.*

[104]*Id.*

[105]*Id.*

[106]*Id.*

[107]*Id.*

[108]*Id.*

[109]*Id.*

[110]*Id.*

[111]*Id.*

with Griles about those issues.[112]

However, documents indicate that Federici at least promised Abramoff that she would liaise with Griles more extensively than she has admitted to the Committee. For example, according to a September 24, 2002, email, Abramoff asked Federici to talk to Griles about a "Tigua water issue."[113] Federici responded, "I am calling right now."[114] Similarly, in an email dated December 4, 2002, entitled "[G]un [L]ake [I]ndian [T]ribe [C]asino," Abramoff complained to Federici about developments relating to this Tribe and conveyed to Federici a strategy, regarding that Tribe's environmental impact report, to shut down its land-into-trust application.[115] Federici responded, "I will call [Steve Griles] asap."[116] Also, in another email dated December 6, 2002, entitled "Gun Lake: New Hope For Gun Lake Casino," Abramoff urged Federici, "[T]his is what we have to stop."[117] Federici responded, "seeing him at 4pm today."[118]

In a related email dated March 6, 2003, and entitled "Saginaw Chippewa Tribe—School Cost Share," Abramoff asked Federici "if [she] can call Steve on this."[119] She responded, "got it."[120] Additionally, in an email from Abramoff to Federici, dated December 2, 2002, entitled "Jena Band: Panel, Logansport asked to speak on proposed casino - Shreveport Times," Abramoff wrote, "It seems that the Jena are on the march again. [I]f you can, can you make sure Steve squelches this again?"[121] Federici responded, "Thanks for the update. I'll bring it up

---

[112]*Id.*

[113]Email between Jack Abramoff, Greenberg Traurig, and Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 035) (September 24, 2002).

[114]*Id.*

[115] Email between Jack Abramoff, Greenberg Traurig, and Italia Federici, Council of Republicans for Environmental Advocacy (GTG-E000024441) (December 4, 2002).

[116]*Id.*

[117] Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000041) (December 6, 2002).

[118]*Id.*

[119] Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (GTG-E000027919) (March 6, 2003).

[120]*Id.*

[121] Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000039) (December 2, 2002).

340

asap!"[122]

Likewise, in an email from Abramoff to Scanlon, dated February 15, 2002, entitled "shit," Abramoff wrote that he "just got a call from [Federici]."[123] According to that email, Federici apparently provided Abramoff with then-nonpublic information she indicated that she had gotten from Griles that "as of now, Norton is going to sign the Jena deal."[124] Similarly, in an email dated January 21, 2003, entitled "Intel from dept of Int/BIA," Abramoff asked Federici if there is "any way to find out" when and how the BIA will respond to a letter from Governor Foster about a new Jena casino.[125] Federici responded, "Thanks, Jack! I will ask about the timing and content and call you ...."[126] Abramoff also reached out to Federici about the Jena Band's casino proposal in another email, dated March 9, 2003, entitled "Jena Choctaw Update."[127] Then, Federici responded, "I will call you on Monday with whatever I can find out."[128] These emails stand for a modest, but important, proposition: that Abramoff repeatedly asked Federici to contact Griles on issues important to his clients—the same clients that contributed to CREA—and that Federici promised to help.

In attempting to explain away those emails, Federici suggested that she did not necessarily follow-through on Abramoff's requests.[129] She explained that after she received such "hair-on-fire" emails from Abramoff requesting that she talk to Griles, she would say "I'll call" or "something like that."[130] But, Federici testified, "[a]nd if I said yes, I'll try to call Steve, and I couldn't reach Steve, it's not like anybody was, you know, necessarily—it could just completely drop off his plate until the next hair-on-fire email, you know. I just figured Jack was throwing

---

[122]*Id.*

[123] Email from Jack Abramoff, Greenberg Traurig, to Michael Scanlon, Capitol Campaign Strategies (GTG-E000010914) (February 15, 2002).

[124]*Id.*

[125] Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000062) (January 21, 2003).

[126]*Id.*

[127] Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy (SENCREA 10/04 000075) (March 9, 2003).

[128]*Id.*

[129]Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005).

[130]*Id.*

stuff against the wall.  Maybe somebody else sorted it out."[131]  Federici elaborated as follows:

> I would say, I'll call.  But the gist of the email.  If he would
> say—Jack, I think some of them are almost comical.  It's like his hair
> is on fire: Oh my God, this is happening and that's happening.  By the
> way, great to see you tonight.  It's like, you know, you go back and
> you read some of these.  So, if he said, you know, I'm having a
> problem, this problem with the Saginaw thing, again with the school
> cost share, this Saginaw thing, this Saginaw thing, can you—or the
> Jena, you know ....  I mean, I would just take that information and
> digest it down into what it, the components that it actually was, which
> is Jack's worried about Jena.  And ... if I said I would call Steve I
> would try to reach him.  But if he was traveling or giving a speech or
> something and a few days passed, I wouldn't try to take it back up
> again.  I mean, again it's something I was just doing to be polite to
> Jack.  It's not my job, and I was actually doing CREA work.[132]

Federici underscored that while she originally helped Abramoff with his Tribal clients *vis-a-vis* Griles "to be nice, ... after the Saginaw thing it was just, it was way too stressful and, frankly, not my job."[133]  But, having repeatedly promised Abramoff that she would speak with Griles on matters at Interior affecting his Tribal clients, she was all too willing to continue accepting significant tribal "contributions" from Abramoff.

## E.    What, If Anything, Griles Did for Abramoff's Clients Is Unclear

Griles repeatedly testified that Abramoff had no special access to him.[134]  In his

---

[131]*Id.*

[132]*Id.*

[133]*Id.*  Federici elaborated, "The whole cost share, just the whole like—you know, to the best of my recollection it was like oh my God, Senator this and Senator that, the Senate's leaving in a half an hour and this is going to expire, and why are they doing this, that, and the other thing. And it was just like, you know—I think my initial response to that was, I don't care.  And then, you know:  But you have to care; it's about money for school for poor kids and it's $3 million, this is terrible.  I mean, it was just way over the top.  It was too much pressure on me." *Id.*

[134]"Tribal Lobbying Matters," *Hearings before the Committee on Indian Affairs*, 109th Cong. at 89 (November 2, 2005).  *See, e.g.*, "Tribal Lobbying Matters," *Hearings before the Committee on Indian Affairs*, 109th Cong. at 89 (November 2, 2005) (testimony of J. Steven Griles, former deputy secretary, Department of the Interior); Letter from Barry M. Hartman, Esq.,

deposition, Griles agreed that "[Abramoff] was another lobbyist with whom he did business.  Just as [he] did business with many others in town."[135]

However, some evidence suggesting that Griles may have assisted Abramoff gives rise to concern.  Former Louisiana Coushatta Tribal councilman William Worfel testified that Abramoff told him that he would approach Griles about stopping the Jena Band of Choctaw Indians' attempt to get a compact in Louisiana.[136]  Worfel recalls that Abramoff ultimately told him that Griles helped kill, or helped convince the Secretary to reject, the Jena compact.[137]

During his interview, Worfel also told staff that Abramoff's lobbying associate Stephanie Leger Short told him that Griles was also supposed to help the Tribe with economic development grants.[138]  In her interview, Short, who formerly managed the Louisiana Coushatta account for Abramoff, testified that Abramoff described Griles as "[his] guy" and was always "going to call Griles" and "get on Griles."[139]  Based on Abramoff's comments, Short understood that Abramoff and Griles were "close": "When things got hairy with Coushatta, it was always [that Abramoff] was going to call Griles and see what he could do."[140]  Regarding the Louisiana Coushatta, Griles' name came up mostly during the Jena Band's efforts in Logansport and Vinton, Louisiana.[141]  It also came up, according to Short, on an Agua Caliente tax issue and an issue

---

counsel to J. Steven Griles, Kirkpatrick & Lockhart Nicholson Graham, to Pablo E. Carrillo, Esq, Chief Investigative Counsel, U.S. Senate Committee on Indian Affairs, January 3, 2006; Letter from Barry M. Hartman, Esq., counsel to J. Steven Griles, Kirkpatrick & Lockhart Nicholson Graham, to the Honorable John McCain, U.S. Senate Committee on Indian Affairs, April 6, 2006.

[135]Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005) ("That was my vision, and there was nothing unique about it.).

[136]Interview of William Worfel, former Vice-Chairman, Coushatta Tribe of Louisiana, in Washington, D.C. (September 13, 2005).

[137]*Id.*

[138]*Id.*

[139]Interview of Stephanie Leger Short, former associate, Greenberg Traurig, in Washington, D.C. (August 18, 2005).

[140]*Id.*

[141]*Id.*

regarding the Choctaw.[142]  According to Worfel, Abramoff said that Griles was willing to help the Tribe because of its "contribution" to CREA, which made the Tribe "a friend of Interior."[143]

Worfel also stated that Abramoff told him that he interviewed Griles for his position at Interior and, in fact, helped him get his job there.[144]  He also recalled that Abramoff mentioned Griles' name many times and said that they were "close."[145]  From his conversations with Abramoff, Worfel thought of Griles as Abramoff's "point man" or "inside man" at Interior: "[t]hat was his person. Boom, he could pick up the phone and Griles—it was like Griles worked for him."[146]  At his interview, Worfel told Committee investigators, "The only thing I can tell you is I've said Steve Griles' name about 20 times since we started this [interview].  [In the context of getting help for the Tribe,] Jack Abramoff said Steve Griles' name maybe 200 times."[147]  Worfel's recollection about what Abramoff told him about how Griles could help his Tribe is consistent with the accounts of other Tribal representatives.

Notwithstanding the testimony and documents described above, Griles could recall only one or two conversations with Federici concerning Abramoff's Tribal clients.[148]  In that conversation, Griles remembered Federici saying only something to the effect of "I was talking [to] Jack Abramoff, he really would like for you to give him a call."[149]  Griles said he believed that this communication may have been related to "an Indian insurrection question."[150]  Nor does Griles recall Federici's asking him to help Abramoff's clients.[151]

Griles denied talking with Federici about matters that, according to documents, Abramoff

---

[142]*Id.*

[143]Interview of William Worfel, former Vice-Chairman, Coushatta Tribe of Louisiana, in Washington, D.C. (September 13, 2005).

[144]*Id.*

[145]*Id.*

[146]*Id.*

[147]*Id.*

[148]Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005).

[149]*Id.*

[150]*Id.*

[151]*Id.*

asked her to discuss with him. In his interview, Griles stated, "I don't recall Ms. Federici ever mentioning Gun Lake to me."[152] Similarly, Griles held that he did not "recall ever having a discussion on a Tigua tribe or a water issue with anyone."[153] Griles also stated that he did not "recall receiving any information from Ms. Federici on Bay Hills [sic]."[154] Likewise, when asked about Abramoff or Federici asking him to pull [BIA personnel] from the Choctaw elections, Griles asserted "I don't recall ever hearing of the issue."[155] Griles' recollection failed him again when he stated "I don't recall any discussion with [Abramoff] about Mashpee. I didn't do tribal recognitions."[156] Correspondingly, Griles did not "recall a conversation with [Federici] either" regarding the Mashpee recognition.[157] Griles later declared, "I don't recall today having any discussions with [Federici] about [the Jena Band compact]."[158]

Committee staff tried to explore the precise nature of Griles' relationship with Abramoff and whether Griles did anything to further the interests of Abramoff's clients on matters pending at Interior. To that end, a discussion about a binder ensued. During his interview, Griles stated that one day he returned to his office to find a mysterious binder with no name on his desk.[159] After inquiring where the binder came from, his secretary told him that it had been delivered to the front desk, and he decided to "just [flip] through it."[160] Skimming the documents he discovered that the notebook was actually a packet of information about the Jena Band and "looked like it had letters – congressional letters, it had studies or something in it."[161] Accordingly, Griles remembered asking Sue Ellen Wooldridge, Counselor to the Interior Secretary, what to do with the notebook and was informed that it was now a federal record and that he had "no option except to give it to Interior lawyer Michael Rossetti."[162] Griles maintained

---

[152]*Id.*

[153]*Id.*

[154]*Id.*

[155]*Id.*

[156]*Id.*

[157]*Id.*

[158]*Id.*

[159]*Id.*

[160]*Id.*

[161]*Id.*

[162]*Id.*

that he gave the notebook to Rossetti and "didn't endorse its contents."[163]

Rossetti, however, has a different recollection of those events. Rossetti recalled that only after "some time" and "a series of questions that took much longer to get to that answer than I would have thought was necessary," Griles actually told him where the binder came from: from a member of Congress by way of a chief of staff by way of a lobbyist "who turned out to be Mr. Abramoff."[164]

Griles strenuously disagreed: "I did not say it came from Mr. Abramoff. I did not say it came from Congress. I speculated that it could have come from any of those sources. I did not know and I do not know today where it came from."[165] Griles testified that the conversation concluded with his advising Rossetti "to please make sure the Secretary knew that there were all sides of this issue, and please brief her on that."[166]

With regard to the charge that Griles tried to insinuate himself in matters pending at Interior affecting Abramoff's tribal clients, Rossetti's account is again fundamentally different from Griles'. Rossetti recalls that Griles became involved with the Jena's land-into-trust application issue the second time it was brought up at Interior.[167] Rossetti testified that Griles had several discussions with him during which Griles requested to be involved in his meetings with career employees and the Secretary about a possible decision on the Tribe's application.[168] Rossetti said that those discussions took place twice in a hallway and in Rossetti's office and that

---

[163]*Id.*

[164]"Tribal Lobbying Matters," *Hearings before the Committee on Indian Affairs*, 109th Cong. at 91 (November 2, 2005) (Griles' testimony).

[165]*Id.* at 92 (Rossetti's testimony). In an interview with Committee staff, former Abramoff associate Stephanie Leger Short indicated that she prepared the binder. Interview of Stephanie Leger Short, former associate, Greenberg Traurig, by telephone (June 16, 2006). She explained that in the binder, which was actually one of about 15 or so, she inserted letters opposing the Jena Band's land-into-trust application, applicable sections of the Indian Gaming Regulatory Act ("IGRA"), and other related documents. *Id.* She also noted that, while some copies went to members of the Louisiana delegation, she was "99 percent sure" that Abramoff was supposed to get a copy to the U.S. Department of the Interior. *Id.* But, she had no recollection of Abramoff's mentioning Griles at the time. *Id.*

[166]"Tribal Lobbying Matters," *Hearings before the Committee on Indian Affairs*, 109th Cong. at 92 (November 2, 2005).

[167]*Id.* at 99.

[168]*Id.*

346

he thought that it was unusual that Griles was so concerned about those meetings.[169]  He speculated that Griles was worried that some secret discussion might be taking place.[170]  Rossetti stated that he assured Griles that Griles would be there at the meeting.[171]

Rossetti testified that Griles' attendance at a meeting regarding Abramoff's clients came up again.[172]  At that time, Rossetti asked Griles, "[w]hy is this issue so important to you?"[173]  According to Rossetti, Griles simply replied, "I just want to be at the meeting."[174]  On a third occasion, Rossetti asked Griles, "[w]hat's your deal? What do I need to know? Are there any outside voices that I need to know about?"[175] At that point, according to Rossetti, Griles "turned purple" and immediately left.[176]  Ultimately, Rossetti said, Griles told him that he did not have to be at that meeting and did not attend.[177]

Relevant to understanding the full extent of Griles' relationship with Abramoff are any communications that Griles may have had with Abramoff about possibly working at Greenberg Traurig.  According to a July 17, 2003, email from Abramoff to Federici, whatever direct line of communication Abramoff had with Griles was disrupted:

> Hi there.  Are you around for a chat?  I am in a most difficult situation regarding Interior and need your advice.  Steve [Griles] is nothing but a gentleman and great guy to me, but he can't (or at least won't) discuss any of my clients with me.  the [sic] problem is that, since he won't do so, and since you are not able to chat with him now, I am left in a real dilemma.  I can't deliver anything from Interior for my clients.  It is as if the Clinton guys are back in power. I don't know what to do.  I have a few clients that need answers, basic

---

[169]*Id.*

[170]*Id.*

[171]Interview of Michael Rossetti, former counselor to the Secretary, U.S. Department of the Interior, in Washington, D.C. (October 28, 2005).

[172]*Id.*

[173]*Id.*

[174]*Id.*

[175]*Id.*

[176]*Id.*

[177]*Id.*

answers, from Interior, and I have no one to chat with. What should I do?[178]

But, subsequently, on September 9, 2003, Abramoff wrote to some of his associates: "This cannot be shared with anyone not on the distribution list. I met with [Griles] tonight. He is ready to leave Interior and will most likely be coming to join us ... I expect that he will be with us in 90-120 days."[179]

Apparently, on or about January 12, 2004, Griles and Abramoff met with Greenberg Traurig lobbying practice head Fred Baggett.[180] In testifying before the Committee, Griles stated that "[a]t the end of [the meeting], they said, we would like for you to join our firm."[181] Griles insisted that he merely "politely listened" and replied, "I'm not leaving the Federal Government."[182] Griles testified that he had made the determination that he was going to serve

---

[178]Email from Jack Abramoff, Greenberg Traurig, to Italia Federici, Council of Republicans for Environmental Advocacy, "FW: Griles" (SENCREA 10/04 000108) (July 17, 2003). While Federici's answer to this email is unknown, she recalled this email during her deposition. Deposition of Italia Federici, president, Council of Republicans for Environmental Advocacy, in Washington, D.C. (October 7, 2005). She testified that she never asked Abramoff or Griles about why Griles was not "discussing [Abramoff's] clients with [him]": "I didn't ask Jack because I didn't want to pry and I didn't raise it with Steve [Griles] because I knew better." *Id.* She elaborated, "I [knew] that if Steve's not going to talk with somebody he's not going to talk with them ...." *Id.*

[179]Email from Jack Abramoff, Greenberg Traurig, to Kevin Ring; Todd Boulanger; Michael Williams; and Duane Gibson, Greenberg Traurig; "Griles" (Bates number 56340) (September 9, 2003). Exactly when and where this conversation occurred, much less what was discussed, remains unclear.

[180]*See* Event Reminder from Jack Abramoff, Greenberg Traurig, to self, "Steve Griles and Fred Baggett—Sigs" (Bates number 100878) (undated) (indicating that meeting was to occur on "Mon 1/12/2004 [from 5:00 p.m.- 6:00 p.m.]"). Griles best recollection is that this meeting might have occurred sometime in 2003. *See* Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005).

[181]"Tribal Lobbying Matters" *Hearings before the Committee on Indian Affairs*, 109th Cong. at 104 (November 2, 2005). *But see* Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005) (attributing statement to "[e]ither [Abramoff or Baggett] or both").

[182]*Id. See also* "Tribal Lobbying Matters" *Hearings before the Committee on Indian Affairs*, 109th Cong. at 104 (November 2, 2005).

through "the 4 years of the President before [he] left."[183]  According to Griles, he then returned to Interior and spoke with the agency ethics officer and the deputy ethics officer at Interior about the discussion.[184]  Griles remembered that these ethics officials told him that this meeting triggered no waiver or recusal obligations—he did not have to do anything.[185]

In contrast to Griles' recollection that "they," that is, Abramoff and Baggett, told him that "we would like for you to join our firm," in his interview with Committee staff, Baggett described the meeting as merely "introductory" and maintained that he never talked to Griles about coming to work at Greenberg Traurig.[186]  Baggett also indicated that he had no knowledge about Abramoff (or anyone else at Greenberg Traurig) having had employment discussions with Griles.[187]

Days after the meeting at Signatures, on February 3, 2004, Abramoff followed-up with his associates about the prospect of Griles' joining Greenberg Traurig, writing simply, "Has decided he cannot leave the administration before the election."[188]  Griles categorically denied having had any other conversations with Abramoff about possibly working at Greenberg Traurig, other than this meeting.[189]

Based on the information in its possession, the Committee cannot definitively conclude what, if anything, Griles did to assist Abramoff's clients on matters then pending at Interior.  In its totality, the information described above supports relatively modest propositions, namely, that Abramoff _believed_ that he had influence over Griles, either directly or through Federici; that Abramoff told others that he had a robust relationship with Griles or had some influence over

---

[183]_Id._

[184]Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005); "Tribal Lobbying Matters" _Hearings before the Committee on Indian Affairs_, 109th Cong. at 104 (November 2, 2005).

[185]Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005); "Tribal Lobbying Matters" _Hearings before the Committee on Indian Affairs_, 109th Cong. at 104 (November 2, 2005).

[186]Interview of Fred Baggett, director, Greenberg Traurig, in Washington, D.C. (September 29, 2005).

[187]_Id._

[188]Email from Jack Abramoff, Greenberg Traurig, to DCCasino, Greenberg Traurig, "Griles" (Tracking Number 3707795) (February 3, 2004).

[189]_See_ Interview of J. Steven Griles, former Deputy Secretary, U.S. Department of the Interior, in Washington, D.C. (October 20, 2005).

349

decision-making at Interior; and that it was likely on that basis that he may have directed his Tribal clients to "contribute" to CREA. However, it must be carefully said that, without more evidence, it is plausible that, in fact relying on his relationship with Federici, Abramoff may have simply exaggerated his access to Griles to his clients.

In any event, given the paucity of evidence in the Committee's possession, the Committee is unable to arrive at any definitive conclusions as to the veracity of Griles' testimony on his relationship, and interaction, with Abramoff during all times relevant. And, without a good faith basis for concern that Griles may have been untruthful with the Committee, further exploration is beyond the scope of the investigation. However, it should be noted that the Committee is troubled by the marked inconsistency between the Griles' and Rossetti's testimonies on the narrow issue of whether Griles tried to insinuate himself in decision-making processes affecting any of Abramoff's Tribal clients. It is also concerned about the implications of some of the fragmentary evidence discussed above.

## F.    Conclusion

Over the last two years, the Committee's investigation has sought to determine, among other things, whether monies paid by the Tribes at Abramoff or Scanlon's direction to or through various entities were ultimately used for purposes intended by those Tribes. In the case of CREA, by Federici's own admission, Abramoff and or his clients contributed about $500,000 to the organization between 2001 and 2003.

From the evidence discussed above, it appears that some of the Tribes were induced into paying CREA because Abramoff told them, among other things, that those payments would get them favorable treatment at Interior. The evidence also suggests that Federici may have led Abramoff into believing that she had pull at Interior and that she would use it in exchange for, or because of, contributions by Abramoff's Tribal clients to CREA. Unfortunately, the extent to which Federici actually sought to influence Interior on pending matters affecting Abramoff's clients remains unclear. Also unclear is what, if anything, Griles (who Abramoff believed was Federici's contact at Interior) might have done on behalf of Abramoff's clients at Interior and (if Griles did anything) what his motives for doing so might have been.

Against that backdrop, the Committee is concerned about the veracity of Federici's testimony on several important areas, discussed above.[190] Additional inquiry into those areas by

_____

[190]A part of Federici's testimony that concerns the Committee relates to the nature of CREA. When Federici appeared before the Committee on November 17, 2005, a Member asked her whether any of monies paid to CREA as contributions were ultimately used for purely personal purposes. "Tribal Lobbying Matters," *Hearings before the Committee on Indian Affairs*, 109th Cong. at 49 (November 17, 2005). In response, Federici said, "No; not to the best of my recollection." *Id.* at 38-40. Elsewhere in the hearing, Federici responded to a similar

350

# PART IV

## Recommendations

### A.    Introduction

Over the past two years, the Committee on Indian Affairs (the "Committee") has developed a robust legislative record on the facts and circumstances surrounding Jack Abramoff and Michael Scanlon's relationship with and representation of the Mississippi Band of Choctaw Indians ("Choctaw"), the Coushatta Tribe of Louisiana ("Louisiana Coushatta"), the Saginaw Chippewa Indian Tribe ("Saginaw Chippewa"), the Agua Caliente Band of Cahuilla Indians ("Agua Caliente"), the Ysleta del Sur Pueblo of Texas ("Tigua"), and the Pueblo of Sandia (collectively, "Tribes") .  After careful consideration of that record, the Committee makes the following observations and recommendations.

### B.    Contracting for Legal, Lobbying and Other Professional Services

#### 1.    No New or Revised Federal Legislation Needed

The Committee has exhaustively examined Abramoff and Scanlon's "gimme five" scheme, by which the two bilked the Tribes out of tens of millions of dollars.  Without doubt, the depth and breadth of their misconduct was astonishing.  Nevertheless, with respect solely to the kickbacks from Scanlon to Abramoff, the Committee concludes that existing federal criminal statutes are sufficient to deter and punish such misconduct.

Indeed, there is no better support for the Committee's conclusion than Abramoff's and Scanlon's guilty pleas.  On November 17, 2005, Scanlon pled guilty to, among other things, conspiracy (1) to defraud some of the Tribes under 18 U.S.C. §§ 1341 and 1343; and, (2) to defraud and deprive some of the Tribes of Abramoff's honest services under 18 U.S.C. §§ 1341, 1343, and 1346.  On January 3, 2006, Abramoff pled guilty to, among other things, (1) conspiracy to commit mail and wire fraud under 18 U.S.C. §§ 1341 and 1343; (2) conspiracy to commit honest services wire and mail fraud, under 18 U.S.C. §§ 1341, 1343, and 1346; (3) honest services mail fraud under 18 U.S.C. §§ 1341 and 1346.

That Abramoff and Scanlon perpetrated their kickback scheme against Indian tribes does not change the applicability or effectiveness of those statutes as tools to deter and punish such misconduct.  The Committee sees no basis for treating Indian tribes differently than other similarly aggrieved parties in this respect.  The Committee thus finds no reason or basis to carve out or create a special category for fraud against Indian tribes under federal law.

**EXHIBIT 9**

**Response to Request for Information Pertaining to
the Coushatta Tribe of Louisiana**

The following is a response to Senator John McCain's request for information regarding lobbyists and other representatives of the Coushatta Tribe of Louisiana. I am unable to respond to several of the particular requests, as they cover issues with which I had no involvement.

1.    *A chronology of the communications and events leading to the Coushatta Tribe of Louisiana retroceding its P.L. 638 contract law enforcement functions. The chronology should identify every single communication between the Bureau of Indian Affairs (BIA) and the Tribe or its representatives on this issue, the dates of those communications, the nature of the communication (e.g. meeting, telephone calls, etc.), the people involved in those communications, and the subject/content of those communications. Please attach to the chronology copies of all written corresponding, including e-mail, between BIA and the Tribe and/or its representatives reflecting, referring to, or relating to the retrocession issue.*

       N/A

2.    *A list of all contacts from February 1, 2004 to the present between BIA and Jack Abramoff, Michael Scanlon, or anyone on their behalf. The list should include the dates of the contacts, the nature of the contacts, all persons involved in those contacts, and all matters discussed. Please also include copies of all written correspondence, including e-mail reflecting, referring to, or relating to such communications.*

During the period of February 9, 2004 to March 9, 2004, I received phone calls and e-mail from two Greenberg Traurig attorneys/lobbyists on behalf of the Coushatta Tribe of Louisiana. The first contact was a February 9, 2004 e-mail from Kevin Ring (attached) bringing to my attention a leadership dispute that took place during a Tribal meeting. Subsequently, Mr. Ring sent additional e-mail (attached) providing additional information regarding the dispute, encouraging BIA's involvement in resolving the dispute, and requesting general updates on what, if any, action we planned to take. I have also included my responses to his e-mail as well as an e-mail exchange between Principal Deputy Assistant Secretary Aurene Martin and me regarding Mr. Ring's request that we respond to the Tribe's Chairman asking that the Department recognize the elected council as the Tribe's leadership.

Following Mr. Ring's request that we respond to the Chairman's letter, I called Mr. Ring on or about February 12, 2004 and asked that he send me a copy of the letter. He subsequently e-mailed a copy (attached). I recall that Mr. Ring also contacted me by telephone during the period of February 9, 2004 to approximately February 13, 2004 on one or two occasions. I do not recall the specific dates of those phone calls. As I recall, our discussions were brief and consisted of his requesting an update and my explaining that we were evaluating the situation and potential options. Finally, on or about March 9, 2004, Todd Boulanger contacted me by telephone and asked that I fax him a copy of a letter from BIA Eastern Region to the Coushatta Tribe of Louisiana. The letter addressed the Tribe's leadership dispute. I forgot about his request and neglected to fax him the letter.

3. *A copy of the annual external audit of the Coushatta Tribe of Louisiana's expenditure of any federal money it received from or through BIA from January 1, 2001 to the present. For any period(s) for which no audit has been received, please provide copies of the monthly expenditure reports submitted to the tribe.*

    **N/A**

4. *Please advise the investigating Committees in writing who has custody of the computers of former Coushatta Tribal CEO Aubrey Temple and his assistant.*

    **N/A**

5. *Please confer with your regional and local personnel and advise the investigating Committees in writing whether Chairman Lovelin Poncho, or another representative of the Coushatta Tribe of Louisiana, represented to BIA that Kevin Sickey voluntarily resigned as Tribal police chief. Please identify all communications by date, nature, participant, and speaker in which such a representation was made. Please produce all documents reflecting, referring to, or relating to such communications.*

    **N/A**

6. *Please identify in writing for the investigating Committees which lawyers, lobbyists, and other consultants have represented or are representing the Coushatta Tribe of Louisiana in its negotiations with the BIA on the Memorandum of Understanding for the transition and conduct of its law enforcement functions.*

    **N/A**

| Feb. 13, 2004 | Aurene Martin | Unknown | Martin phone call to Abramoff, who was not available. Spoke with unknown associate of Abramoff | Eastern Region sent letter to Tribe | B-10 Phone message from Abramoff |
|---|---|---|---|---|---|
| Feb. 13, 2004 | Michael Olsen | Kevin Ring | Email | Letter re Coushatta | B-11 |
| Mar. 9, 2004 | Michael Olsen | Todd Boulanger | Boulanger phone call to Olsen | Requesting copy of BIA letter to Coushatta | None |

We have had the following contacts with Jack Abramoff, Michael Scanlon, or anyone on their behalf, between February 1, 2004, and the present.

| Date of contact | Indian Affairs Staff | Name of lawyer/lobbyist | Nature of contact | Matters discussed | Tab Number |
|---|---|---|---|---|---|
| Feb. 9 – Mar. 9, 2004 | Michael Olsen | | Olsen summary of his contacts with Abramoff, Scanlon or their associates | | B-1 |
| Feb. 9, 2004 | Michael Olsen | Kevin Ring | Email | Coushatta leadership dispute | B-2 |
| Feb. 9 – 13, 2004 | Michael Olsen | Kevin Ring | Ring phone calls to Olsen | Updates on Coushatta matter | None |
| Feb. 11, 2004 | Michael Olsen | Kevin Ring | Email | Coushatta issues | B-3 |
| Feb. 11, 2004 | Michael Olsen | Kevin Ring | Email | Coushatta issues – draft letter | B-4 |
| Feb. 11, 2004 | Michael Olsen | Kevin Ring | Email | Coushatta issues | B-5 |
| Feb. 11, 2004 | Aurene Martin | Jack Abramoff | Martin phone call to Abramoff | Would DOI recognize Chairman Poncho and send letter to Tribe? | B-6 Phone message from Abramoff |
| Feb. 12, 2004 | Michael Olsen | Kevin Ring | Olsen phone call to Ring | Requesting copy of Coushatta letter to Secretary Norton | None |
| Feb. 12, 2004 | Michael Olsen | Kevin Ring | Email and attached letters | Coushatta letter to Norton | B-7 |
| Feb. 12, 2004 | Michael Olsen | Kevin Ring | Email | Meeting plans | B-8 |
| Feb. 12, 2004 | Michael Olsen | Kevin Ring | Email | Coushatta issues | B-9 |